# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - -

MICHAEL JORDAN,

    Plaintiff,

vs.       Court File No. 10-CV-00340

JEWEL FOOD STORES, INC.,
and SUPERVALU, INC.,

    Defendant and
    Third-Party Plaintiffs,

vs.

TIME, INC., and VERTIS, INC.,

    Third-Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - -

THE VIDEOTAPE DEPOSITION OF

THOMAS B. HEDRICK

NOVEMBER 19, 2010

Rule 30(B)(6)

**CONDENSED**

PRO-SYSTEMS COURT REPORTING
4305 BRYANT AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55409
(612) 823-2100

Page 14

1  recorded by the videographer who is right in
2  front of you and that person will be
3  recording your face and also be recording
4  all of your conversation.
5           Because it's important that
6  we be able to read the transcript that will
7  be produced as a result of this deposition,
8  and because the transcript will be produced
9  by the court reporter who's sitting to your
10 left, it's important that we be clear in our
11 diction and so that we can understand what
12 the transcript says later on and it's
13 important that we do not talk over one
14 another. Our reporter here today is an
15 excellent court reporter but he cannot take
16 down the words of both of us if we speak at
17 the same time.
18          And so during your
19 testimony, please, I'm not being rude, if I
20 ask you to wait until I finish my question,
21 because sometimes witnesses will do that,
22 it's normal in a normal conversation, and so
23 forgive me if I ask you to do that.
24          In addition if I don't
25 allow you to finish your answer, please make

Page 15

1  sure you let me know that and then I will
2  allow you to do that.
3           Also in normal
4  communication, when we're not being deposed
5  and when we're not being recorded by a court
6  reporter, we shake our heads, we do
7  nonverbal communication to indicate our
8  responses to one another. Unfortunately
9  because we do have a court reporter today
10 and he cannot take those nonverbal cues
11 down, we do need to get verbal answers and
12 so sometimes I will be asking you for a
13 verbal response, and what I mean by that is
14 you have just shaken your head or done
15 something that will not be suitable for the
16 transcript. Do you understand that?
17     A.   I do.
18     Q.   Okay. And, finally, I'm going to
19 be asking you a series of questions today,
20 as will the other attorneys attending this
21 deposition. Sometimes we're not able to
22 articulate as clearly as we'd like and you
23 are not able to understand the question. If
24 you do not understand the question, all you
25 need to do is let me know that and I will

Page 16

1  try to rephrase it so you do understand it.
2  If you do not let me know that then I will
3  assume that you did understand the question
4  and that your answer will stand. Do you
5  understand that?
6      A.   I do.
7      Q.   All right. Let's get started
8  then. I'm going to ask you a series of
9  things about yourself because I don't know
10 anything, I don't have your CV and so please
11 bear with me if I ask you some things you
12 think you already know because none of the
13 others here at the table do and we need to
14 go through that information.
15          So first of all can you
16 please state your full name for the record?
17     A.   My name is Thomas, T-H-O-M-A-S,
18 Bradford Hedrick, H-E-D-R-I-C-K.
19     Q.   Are you currently employed?
20          MS. McNAMARA: Excuse me all,
21 could we move the mike a little closer to
22 the witness. Thank you so much.
23          MR. TILLACK: What I'll do is
24 I'll try to speak up, Liz, and we'll see if
25 the witness can speak up a little bit too so

Page 17

1  you make sure you can hear him.
2           MS. McNAMARA: This is much
3  better. Thank you.
4      Q.   (BY MR. TILLACK) Okay. Are you
5  currently employed, sir?
6      A.   Yes, I am.
7      Q.   And by whom are you employed?
8      A.   I am employed by SuperValu,
9  Incorporated.
10     Q.   And where do you work, sir?
11     A.   I work at our office, our
12 corporate headquarters in Eden Prairie,
13 Minnesota.
14     Q.   If you were no longer employed at
15 a later date, where is the best place to
16 reach you?
17     A.   At my home.
18     Q.   And can we have your home
19 address, please?
20     A.   My home address is 5511 Richmond
21 Curve, C-U-R-V-E, Minneapolis, Minnesota.
22     Q.   May I have your date of birth,
23 please?
24     A.   March 20th, 1964.
25     Q.   And what's your current title at

Page 90

1 congratulatory message from the Acme Markets
2 chain to the sports team described here on
3 their victory.
4     Q.    What is Acme?
5     A.    Acme is a SuperValu owned
6 retailer in the Philadelphia area and parts
7 of New Jersey and the surrounding region.
8     Q.    In your understanding of what an
9 advertisement is, as you already described
10 today, do you consider the document which is
11 the second page of Plaintiff's Exhibit 9 to
12 be an advertisement?
13     A.    No, I do not consider this an
14 advertisement.
15     Q.    Why don't you consider it to be
16 an advertisement?
17     A.    Because its purpose again similar
18 to the Shaw's piece is to congratulate the
19 team on their victory, that's the impulse
20 behind this.
21     Q.    When you say impulse, do you mean
22 the motivation?
23     A.    Correct.
24     Q.    Okay. Was there any motivation
25 on behalf of the Defendants part to enhance

Page 91

1 their reputation in the community by placing
2 this ad?
3     A.    No, absolutely not.
4     Q.    When you say absolutely not, how
5 do you know that?
6     A.    It's -- let me try to phrase it
7 this way, because I think this is a very
8 accurate statement. By virtue of the people
9 I've worked with both at the division or
10 banner level and people with me at
11 corporate, forgive me for being rather
12 informal here, this is essentially a useless
13 piece to us. As I stated on the earlier
14 piece, this is not going to enhance our
15 brand, it's not going to take away from it,
16 it is what it is. It's a congratulations,
17 way to go team, kind of piece. There is --
18 it's benign to our business, it costs us no
19 money, the considerations that we've
20 described previous are very insignificant,
21 this is not a brand building vehicle for us.
22     Q.    You say this is a useless piece.
23 Let me ask you in particular about part of
24 this useless piece. Do you see the top of
25 this useless piece on the second page of

Page 92

1 Plaintiff's 9, do you see that?
2     A.    I'm sorry?
3     Q.    The top of it, please?
4     A.    Right here, yes.
5     Q.    Yes. What does it say?
6     A.    "Everyday celebrations are just
7 around the corner."
8     Q.    What else does it say?
9     A.    Acme.
10     Q.    Okay. Do you consider the use of
11 the phrase "everyday celebrations are just
12 around the corner" to be useless?
13     A.    In context of a piece like this,
14 yes, absolutely.
15     Q.    Do you consider the use of the
16 trademark Acme to be useless?
17     A.    Yes. In this case this is not a
18 brand building or sale driving piece for us
19 and in that, in my definition, this is a
20 useless piece and others would share that
21 view.
22     Q.    Do you know how this ad was
23 created?
24     MR. ZEULI: Objection to the
25 form.

Page 93

1     A.    Presuming that you'd like to know
2 the general process similar to what we
3 described for Shaw's, it would follow very
4 similar process, where the request would
5 have come from Acme to the team in Phoenix
6 to produce a piece to spec as described and
7 would have gone through the similar round of
8 creating it, sending it to people at Acme to
9 look at, review it, approve it, and
10 ultimately send it on to Time.
11     Q.    (BY MR. TILLACK) You've
12 described the general process for me. Do
13 you have any information about the actual
14 process that was used to create this ad?
15     A.    The step-by-step specifics, no.
16 But to the best of my knowledge it was
17 produced in Phoenix by the production group
18 there. Our contact would have been Lynn
19 Smith-Palombit. Without aid of documents I
20 don't have the blow-by-blow of the proofing
21 iterations that went into this piece, I'd
22 have to see those.
23     Q.    Do you know why the decision was
24 made to use the trademark "everyday
25 celebrations are just around the corner" in

Page 94

1  this ad?
2  A.  Sure.
3  Q.  What was the reason for that?
4  A.  The reason is because around, and
5  forgive me for not reminding the exact month
6  or exact time of implementation, but as an
7  enterprise SuperValu came up with a new tag
8  which depends on what you would call an
9  expression half and a corner statement. The
10 general tagline used by our retail banners
11 is "Good things are just around the corner."
12 Neither one of these are used in isolation.
13 "The good things" would be the expression,
14 it can be substituted for other phrases like
15 "everyday celebrations". And so in context
16 of a message piece like this it's a
17 celebratory, hey, our team won, that seemed
18 a more suitable expression to tie in with
19 the regular tag expression.
20 Q.  What is the purpose of using the
21 part of this tagline as you refer to it
22 "just around the corner" in this ad?
23 A.  You know, the whole essence of
24 the "good things are just around the corner"
25 or in this case "everyday celebrations are

Page 95

1  just around the corner" is multifaceted, but
2  part of that, and very critical to the
3  corporation, is that we're a local business
4  and so you try -- we try to acknowledge that
5  in this case the Philadelphia Phillies are
6  the local baseball team, they won the World
7  Series, congratulations from a local store
8  in effect. That's the intended, the
9  community involvement, we coexist with you
10 here in the market kind of expression.
11 Q.  Do you see at the bottom of this
12 advertisement it says "The store that knows
13 Philadelphia best SUPPORTS & CONGRATULATES
14 our hometown team!" Do you see that?
15 A.  Yes.
16 Q.  Who is that phrase "the store
17 that knows Philadelphia best" refers to?
18 A.  It's implied that that would be
19 Acme and it's a very broad statement to that
20 effect.
21 Q.  Do you see the use of the design
22 Acme up on the right-hand corner of this
23 advertisement?
24 A.  Yes.
25 Q.  Why was it decided to use the

Page 96

1  design mark Acme as opposed to the type face
2  Acme that we discussed earlier with regard
3  to the Red Sox ad?
4  A.  The same answer as in the Shaw's
5  piece, these are produced by visual people
6  and unless we were told to typeset the word
7  Acme, our natural impulse or inclination
8  would be to create a visual piece which
9  includes the pictogram which is the logo,
10 not typesetting it out.
11 Q.  So you described it as an
12 impulse, right?
13 A.  Impulse, habit, general
14 inclination of a graphic designer, sure.
15 Q.  Do you think there was any
16 thought given before the Defendants placed
17 the trademark Acme in this advertisement?
18 A.  No, I don't think so. You know,
19 again typically in customer or public facing
20 pieces you tend to go the more visual route
21 with a pictogram rather than typesetting it.
22 Q.  Do you think that it was
23 incorrect to use the trademark Acme in this
24 advertisement?
25 A.  No, I do not.

Page 97

1  Q.  Do you think it was incorrect to
2  use the trademark "everyday celebrations are
3  just around the corner" in this
4  advertisement?
5  A.  No, I do not.
6  Q.  Please take a look at what has
7  already been marked in the 30(b)(6)
8  deposition as Plaintiff's Exhibit 19. Can
9  you tell me what Plaintiff's Exhibit No. 19
10 is, please?
11 A.  This appears to be a memo or an
12 E-mail from a merchandising manager for
13 general merchandise, that's what GM stands
14 for in this case, to store directors at the
15 Acme chain to alert them to the presence or
16 arrival and merchandising display
17 requirements of this Commemorative Sports
18 Illustrated issue.
19 Q.  Am I right that the merchandising
20 manager you just referred to is Rochelle
21 Beard?
22 A.  Yes.
23 Q.  And she works for Acme; is that
24 right?
25 A.  Presumably, yes, I don't know

Page 110

1  place an ad in the 2009 edition of the
2  Sports Illustrated Presents if in fact the
3  Philadelphia Phillies win the World Series?
4     A.  Yes.
5     Q.  Now you see the second E-mail on
6  that string on the first page of Plaintiff's
7  22 from Lisa Grubbs to Ann Anderson?
8     A.  Yes.
9     Q.  And it's also sent to Amy Thie
10 and Rochelle Beard. Do you see that?
11    A.  Yes.
12    Q.  And Lisa Grubbs says "Rochelle,
13 please respond to Ann on your decision to
14 take the ad." Do you see that?
15    A.  Yes.
16    Q.  And then in the very top of the
17 first page on Plaintiff's 22 there's an
18 E-mail from Rochelle Beard to Ann Anderson
19 and a carbon to John Fransiscus at Time
20 Warner and also Lisa Grubbs and Amy Thie.
21 Do you see that?
22    A.  I do.
23    Q.  Do you see where Rochelle Beard
24 says, Ann Anderson at Time, Inc., "Yes, Ann,
25 we accept the offer"?

Page 111

1     A.  Yes.
2     Q.  That's an acceptance of the Time
3  offer to run an ad in the Sports Illustrated
4  Presents if the Philadelphia Phillies win
5  the World Series in 2009, isn't it?
6     A.  So it appears.
7     Q.  Yes. And then second underneath
8  that sentence that I just read, do you see
9  where Rochelle Beard says "Also, given last
10 year's performance as recognized by Source,
11 I am asking that the Acme ad receive a
12 preferred location compared to our grocery
13 competitors. Thanks for your
14 consideration." Do you see that?
15    A.  Yes.
16    Q.  What does that indicate to you?
17    A.  This -- this in my view is a
18 merchandising consideration rather than a
19 marketing one. The only inference I can
20 make here, and it is an inference, is that
21 they were wanting to increase presence in
22 the store for the sale, the incremental sale
23 of magazines as a unit.
24    Q.  And she thought that this ad
25 might help do that, didn't she?

Page 112

1        MR. ZEULI: Objection,
2  foundation.
3     A.  In the ad literally has nothing
4  to do with the merchandising component of a
5  magazine. We are talking about the sale of
6  a unit of magazines, not about a
7  congratulatory piece that appeared in the
8  magazine, they are two distinctly different
9  things in my view.
10    Q.  (BY MR. TILLACK) You'll agree
11 that she asked Time Warner for, to be sure,
12 that the Acme ad would receive a preferred
13 location compared to our grocery
14 competitors. Do you see that?
15    A.  She wrote that.
16    Q.  And that's a preferred location
17 within the Sports Illustrated Presents
18 magazine, right?
19    A.  Thank you for rephrasing it. And
20 that is a reasonable inference and I
21 misunderstood the question earlier.
22    Q.  Thank you.
23        MR. TILLACK: What are we on
24 now?
25        THE REPORTER: 32.

Page 113

1        MR. TILLACK: Would you mark
2  this as Plaintiff's 32. Liz, and for the
3  record, I'm asking the court reporter to
4  mark as Plaintiff's Exhibit 32 the document
5  that's a multipage document, it starts JFS
6  001378, it continues on to JFS 1425, it is
7  called styleguide.
8        (Plaintiff's Exhibit No. 32
9        marked for identification.)
10    Q.  (BY MR. TILLACK) The court
11 reporter has placed in front of you what's
12 been marked Plaintiff's Exhibit 32. Can you
13 identify this exhibit for us, please, sir?
14    A.  I can. This is the overall
15 SuperValu brand styleguide that was
16 published by the enterprise.
17    Q.  When you say the enterprise, who
18 is the enterprise?
19    A.  The enterprise is SuperValu, Inc.
20    Q.  I see a date on the upper
21 right-hand corner on the first page, do you
22 see that, where it says 10/24/2008?
23    A.  Correct.
24    Q.  What does the date represent?
25    A.  That would have been the date of

Page 114

1  publication of this particular edition of
2  the document.
3    Q.  Is the document still in effect?
4    A.  Yes.
5    Q.  Has the document been in effect
6  ever since October 24, 2008?
7    A.  Yes, it is presently still, you
8  know, perhaps some revisions,
9  notwithstanding incremental revisions to the
10 document, this is a living document that's
11 still in effect.
12   Q.  Do you know of any revisions that
13 have been made to this particular document?
14 I see by the way just if you look with me,
15 it says version 1.1. Do you see that?
16   A.  I do.
17   Q.  Do you know of any other
18 subsequent versions besides 1.1?
19   A.  Not off the top of my head, but I
20 don't believe there's any significant
21 updates or changes to it.
22   Q.  What is the purpose of this
23 document?
24   A.  The purpose of this document,
25 like any styleguide that any company might

Page 115

1  have, is to establish parameters of use
2  around the general brand of marks and
3  identifications of the company. And so it
4  gets fairly granular, you know, the kinds
5  of words used, how colors are used, the kind
6  of spatial requirements in context, there's
7  other art elements and so forth.
8    Q.  In this case am I correct that
9  this styleguide is related to the use of the
10 trademark "good things are just around the
11 corner, SuperValu"?
12   A.  That's correct.
13   Q.  Thank you.
14      MR. TILLACK:  Would you mark
15 the next one as 33.
16      (Plaintiff's Exhibit No. 33
17       marked for identification.)
18      MR. TILLACK:  Liz, and for the
19 record, the court reporter is marking as
20 Plaintiff's 33 the document labeled JFS 1426
21 continuing on through JFS 1438.
22      MS. McNAMARA:  Thank you.
23   A.  Okay.
24   Q.  (BY MR. TILLACK)  Can you
25 identify, sir, what is Plaintiff's

Page 116

1  Exhibit 33?
2    A.  Yes. This is a -- we call them
3  banners, but our individual retail chain,
4  this is a banner specific styleguide around
5  the use of Jewel-Osco brand marks.
6    Q.  And who was Plaintiff's
7  Exhibit 33 prepared by?
8    A.  This would have been prepared by,
9  and I'm not sure of the exact individual,
10 but by the brand marketing group at
11 SuperValu in Eden Prairie.
12   Q.  Are employees of the Defendants
13 expected to refer to this document when
14 using the trademark Jewel-Osco Pharmacy?
15   A.  Yes.
16   Q.  Thank you.
17      Do you know, by the way,
18 this is marked September 15th, 2008, do you
19 see that?
20   A.  Uh-huh.
21   Q.  Yes?
22   A.  Yes.
23   Q.  Is this the current version of
24 this document?
25   A.  Yes. I don't think it's been

Page 117

1  substantially changed since then.
2    Q.  Has this document been in effect
3  since September 15th, 2008?
4    A.  Yes.
5    Q.  Thank you.
6      (Plaintiff's Exhibit No. 34
7       marked for identification.)
8      MR. TILLACK:  Liz, and for the
9  record, the court reporter is marking the
10 next document Plaintiff's Exhibit 34 which
11 is marked JFS 1439 all the way through to
12 JFS 1452.
13     THE WITNESS:  Thank you.
14   Q.  (BY MR. TILLACK)  The court
15 reporter has placed Plaintiff's Exhibit 34
16 for you, Mr. Hedrick, can you identify this
17 document for us, please?
18   A.  I can but I'd like to correct
19 myself in one aspect. The previous
20 Exhibit 33 gave me was the brand styleguide
21 for Jewel-Osco Pharmacy in particular as an
22 entity, as a pharmacy entity. This is the
23 companion piece which is the brand identity
24 guidelines for the Jewel-Osco Grocery Store
25 operation, combined grocery and drugstore,

Page 118

1  non-pharmacy operation.
2     Q.   Is Plaintiff's Exhibit 34 created
3  by SuperValu?
4     A.   Yes, by the same brand and
5  management group that would have written the
6  prior exhibit.
7     Q.   What is the purpose of
8  Plaintiff's Exhibit 34?
9     A.   The same purpose really, to
10 establish general use guidelines for use of
11 brand marks and taglines and contextually
12 within printed and other visual matter.
13    Q.   I see on the first page this is
14 dated September 15th, 2008. Do you see
15 that?
16    A.   Yes.
17    Q.   Is this the current version of
18 this document?
19    A.   To the best of my knowledge, yes.
20    Q.   Has this been in effect ever
21 since it was introduced on September 15th,
22 2008?
23    A.   To the best of my knowledge, yes.
24    Q.   Now are people who use the marks
25 identified in Exhibits 32, 33 and 34

Page 119

1  expected to refer to these guidelines when
2  using those marks?
3     A.   Yes.
4     Q.   Okay. Thank you.
5          MR. TILLACK: Did you send this
6  to Liz?
7          MR. ZEULI: I did.
8          MR. TILLACK: Liz, and for the
9  record, I'm marking as Plaintiff's
10 Exhibit 35 the document with the number JFS
11 1564.
12         (Plaintiff's Exhibit No. 35
13         marked for identification.)
14    Q.   (BY MR. TILLACK) The court
15 reporter has placed in front you, Mr.
16 Hedrick, Plaintiff's Exhibit 35. Can you
17 identify what Plaintiff's Exhibit 35 is,
18 please?
19    A.   Yes, this is a summary of
20 magazine sales at Jewel Stores.
21    Q.   Okay. On the -- is this a
22 summary of any magazine sales at Jewel
23 Stores?
24    A.   It's divided into two halves, in
25 the columns that are headed by the green

Page 120

1  highlight that shows total magazine sales in
2  dollars and in the units sold and then the
3  other half is for a particular magazine
4  item.
5     Q.   And what is the particular
6  magazine item depicted in this document,
7  Plaintiff's Exhibit 35?
8     A.   Based on our preparation it is
9  the Commemorative Sports Illustrated issue
10 for the Michael Jordan Hall of Fame
11 induction.
12    Q.   Do you know who prepared this
13 document, Plaintiff's 35?
14    A.   Yes, this was prepared by a
15 gentleman named Paul Thalacker, and I'll
16 attempt to spell that, I believe it's
17 T-H-A-L-A-C-K-E-R, and Mr. Thalacker, since
18 I know you'll ask, is an analyst, I believe
19 an analyst in our marketing analytics
20 department.
21    Q.   Is that in SuperValu's marketing
22 analytics department?
23    A.   SuperValu in Eden Prairie, yes.
24    Q.   Why did he prepare this document?
25    A.   I requested it.

Page 121

1     Q.   Why did you request he do this?
2     A.   In preparation for this, it was
3  presumed that parties interested would want
4  this information.
5     Q.   Okay. When you say it was
6  presumed, did the attorneys for SuperValu
7  ask you to prepare this?
8     A.   Yes, I was requested to see if I
9  could secure this information.
10    Q.   All right. And on this piece of
11 paper is there any reference to the number
12 of magazines sold by stores that are not
13 Jewel Stores?
14    A.   No, this is specific to the Jewel
15 chain.
16    Q.   Do you know if the magazine was
17 sold by stores that were not in fact Jewel
18 Stores?
19         MR. ZEULI: Can I just get a
20 clarification. Are you asking about stores,
21 non-Jewel Stores that are under the
22 SuperValu family or just in any?
23         MR. TILLACK: I'm asking any
24 store in the world right now.
25         MR. ZEULI: Okay.

Page 178

1   A.  Okay.
2       MR. ZEULI: If you could hand
3   Mr. Hedrick Exhibit No. 6, the Jordan
4   commemorative piece, please.
5   Q.  (BY MR. ZEULI) And, Mr. Hedrick
6   turning to Plaintiff's Exhibit No. 6, could
7   you turn it over and I direct your attention
8   to the State Farm piece on the back. Take a
9   moment and read it. And then my question is
10  this. In the text where it says "excellence
11  you make so effortless". Can you tell me
12  who you believe the "you" refers to?
13  A.  **I believe that that is a**
14  **reference to Mr. Jordan.**
15  Q.  And by Mr. Jordan you mean
16  Michael Jordan?
17  A.  **Yes, Michael Jordan.**
18  Q.  And do you also see in this
19  particular piece any trademarks of which you
20  were aware?
21  A.  Yes, I do.
22  Q.  What do you see?
23  A.  **State Farm has used their long**
24  **held brand mark adjacent to the typeset**
25  **words State Farm.**

Page 179

1   Q.  And what is that brand?
2   A.  **The brand mark is the icon you**
3   **see with the red and white with the auto,**
4   **life, home ovals.**
5   Q.  And what's the trademark that's
6   used?
7   A.  **Well, State Farm Insurance with**
8   **the registered trademark sign, that's --**
9   Q.  Do you see a second trademark
10  that you are aware of?
11  A.  Yes, I do.
12  Q.  What is that?
13  A.  **Statefarm.com also with a**
14  **registered trademark symbol.**
15  Q.  Is there a third?
16  A.  **Yes, TM marking trademark for the**
17  **text set State Farm.**
18  Q.  Do you see a fourth?
19  A.  **Yes, there's a tagline "like a**
20  **good neighbor State Farm is there," again**
21  **with a registered trademark symbol.**
22  Q.  Thank you.
23      You had talked about
24  sometimes SuperValu running television
25  commercials. Was there ever a situation

Page 180

1   where prior to running the television
2   commercial the television company sent an
3   E-mail suggesting that you use a play of
4   words or images specific to a particular
5   individual?
6   A.  **You know, I really don't know.**
7   Q.  You can't think of any as you sit
8   here today?
9   A.  I can't.
10  Q.  Okay. If you would take a look
11  at Plaintiff's Exhibit 9, that's the Acme
12  piece, and Plaintiff's Exhibit 18. With
13  respect to Plaintiff's Exhibit 9, please
14  turn to the second page.
15  A.  Okay.
16  Q.  And do you recall that Miss
17  McNamara was asking you some questions about
18  whether SuperValu and Acme in this case had
19  made the determination to use the likeness
20  of the boy?
21  A.  Right.
22  Q.  And, okay, if you would turn to
23  Plaintiff's Exhibit 18. Do you recognize
24  that document?
25  A.  Yes, I do.

Page 181

1   Q.  What is that document?
2   A.  **This is an offer from Time Warner**
3   **retail to Ann Anderson indicating at Time,**
4   **Inc. that they would like to offer Acme a**
5   **congratulatory ad for the Philadelphia**
6   **Phillies.**
7   Q.  And is it your understanding that
8   this particular offer in Plaintiff's
9   Exhibit 18 ultimately resulted in the piece
10  that we see as Plaintiff's Exhibit 9?
11  A.  Yes, that's correct.
12  Q.  And when you look at the specs
13  for the ad, does it require or suggest that
14  a boy's image is used?
15  A.  It does not.
16  Q.  What does it suggest, what does
17  Time suggest that is used in this particular
18  piece?
19  A.  **It suggests that while we would**
20  **design the ad, that it creates it with some**
21  **plan words or design that's specific to the**
22  **Philadelphia Phillies who in advance of the**
23  **outcome was described as the hopeful winner.**
24  Q.  And was that followed in this
25  case, is there in the piece a reference to

(Pages 178 to 181)