# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MICHAEL JORDAN,                               )
    Plaintiff,                                )
        vs.                                    )  No. 10-cv-00340
JEWEL FOOD STORES, INC., and                  )
SUPERVALU INC.,                               )
    Defendants/Third-Party Plaintiffs,        )
        vs.                                    )
TIME, INC. and VERTIS,                        )
    Third-Party Defendants.                   )

Videotaped Deposition of

MARJORIE KRAMER, taken before GREG S. WEILAND, CSR, RPR, pursuant to the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions, at Suite 6600, 233 South Wacker Drive, in the City of Chicago, Cook County, Illinois, commencing at 9:31 o'clock a.m., on the 6th day of October, 2010.

Page 54

1  really of identification so we all identify the same
2  ad.
3  　　　So I'd ask the court reporter to mark the
4  next exhibit as Exhibit 6, please.
5  　　　　　(Plaintiff Exhibit 6 was marked
6  　　　　　for identification.)
7  BY MR. TILLACK:
8  　Q.　Ms. Kramer, have you seen Exhibit 6
9  before?
10 　A.　Yes.
11 　Q.　What is Exhibit 6?
12 　A.　It is a Sports Illustrated Commemorative
13 Issue dedicated to Michael Jordan.
14 　Q.　And did the defendants place an ad in
15 Exhibit 6?
16 　　　MR. ZEULI:　Object to the form.
17 　　　THE WITNESS:　No.
18 BY MR. TILLACK:
19 　Q.　Did the defendants have anything to do
20 with any of the material appearing in Exhibit 6?
21 　A.　Yes.
22 　Q.　Okay. And what is that material, please?
23 　A.　It is a tribute page. It is a tribute
24 page to Michael Jordan.

Page 55

1  　Q.　Okay. Can you identify that for me?
2  　A.　Yes, the inside back cover.
3  　Q.　Okay. So am I correct that the inside
4  back cover that you're looking at now in Exhibit 6
5  is the original version of what we just looked at
6  and marked as Exhibit 5?
7  　A.　Yes.
8  　　　MS. McNAMARA:　Objection to form.
9  BY MR. TILLACK:
10 　Q.　Now, you can continue looking at Exhibit 6
11 that has the original page. Because I don't have it
12 in front of me, I'm going to be looking at the copy
13 that we marked as Exhibit 5.
14 　A.　Okay.
15 　Q.　But I'll be asking you about the same
16 exact document if you don't mind.
17 　　　You understand, don't you, that what you
18 refer to as a tribute and I refer to as an
19 advertisement, which is the document that's
20 Exhibit 5 and then that appears on the inside back
21 cover of Exhibit 6, appeared in the Sports
22 Illustrated Presents dated November 4, 2009?
23 　A.　Yes. I don't know if that's the date
24 because I didn't study that.

Page 56

1  　　Yes.
2  　Q.　Why did the defendants place what you call
3  a tribute and I refer to as an ad in the Sports
4  Illustrated Presents?
5  　A.　Very simple. We were offered a free page
6  in a commemorative edition.
7  　Q.　And who offered the defendants a free page
8  in the commemorative edition?
9  　A.　It was directly offered by the Time
10 Magazine group to our corporate headquarters.
11 　Q.　And when you say "directly offered," what
12 do you mean?
13 　A.　A representative from Time Magazine
14 contacted a representative, or the buyer in this
15 case, SUPERVALU buyer involved with magazines and
16 offered a free commemorative page.
17 　Q.　Do you know when the Time representative
18 contacted the SUPERVALU representative about the
19 free page?
20 　A.　Yes.
21 　Q.　When was that?
22 　A.　At the end of September, I believe
23 September 28th, 2009.
24 　Q.　Okay. Do you know who the Time

Page 57

1  representative was that made the offer?
2  　A.　I do not know the name.
3  　Q.　Do you know who received the offer on
4  behalf of SUPERVALU?
5  　A.　Yes.
6  　Q.　Who was that?
7  　A.　A lady named Amy Thie, I think it's
8  T-h-e-i or i-e.
9  　Q.　Okay. Do you know what Amy Thie's
10 position with SUPERVALU was when she received the
11 offer?
12 　A.　I believe she was an assistant sales
13 manager.
14 　Q.　Do you know what the offer was?
15 　A.　The offer was for a free commemorative
16 page in this magazine in this commemorative issue in
17 return for display space in our stores.
18 　Q.　And when you say display space in your
19 stores, what are you referring to?
20 　A.　The fact that the publication would be
21 available for sale.
22 　Q.　And the publication you're referring to is
23 Sports Illustrated, correct?
24 　A.　Michael Jordan Commemorative Edition.

Page 58

1  Q. And when you say display space, are you
2  referring to actual space to stock and show the
3  magazine for sale; is that right?
4  A. Yes.
5  Q. Okay. Forgive me, I'm not in your
6  business, and so when I hear display space, I just
7  want to be sure that you and I understand each
8  other.
9  What do you mean by display space?
10  A. I mean there's a magazine rack at every
11  checkout that has numerous magazines, and one of
12  those slots would be dedicated to this publication,
13  the Michael Jordan Commemorative Edition.
14  Q. I see. And then you also referred to the
15  display space in the stores.
16  Which stores did you --
17  A. The Jewel-Osco stores in Chicago.
18  Q. Okay. Were any other stores involved in
19  the offer?
20  A. I don't know.
21  Q. Now, you said that the offer was for a
22  free page, correct?
23  A. A free page, correct.
24  Q. Do you have any knowledge of why Time

Page 59

1  offered the free page to the defendants?
2  A. No.
3  Q. Had Time before this instance ever offered
4  a free page of advertising space or tribute space to
5  the defendants?
6  A. Not that I'm aware of.
7  Q. Since this offer with regard to the
8  Michael Jordan Commemorative Issue in Sports
9  Illustrated, are you aware if Time has ever again
10  offered free space in the Sports Illustrated
11  magazine to the defendants?
12  A. I am not aware.
13  MR. ZEULI: Fred, can we take -- excuse
14  me, Clay, can we take a very short break?
15  MR. TILLACK: Sure.
16  MR. ZEULI: Just you can stay right there.
17  THE VIDEOGRAPHER: Going off the record at
18  10:35 a.m.
19  (Whereupon, an off-the-record
20  discussion was held.)
21  THE VIDEOGRAPHER: Going back on the
22  record at 10:36 a.m.
23  Please proceed.
24  MR. ZEULI: And, Ms. Kramer, would you

Page 60

1  like to have Mr. Tillack clarify for you the last
2  two questions that he asked?
3  THE WITNESS: Yes.
4  BY MR. TILLACK:
5  Q. Did you not understand my question?
6  A. Referring to -- and you'll have to
7  remember, for 42 years I am a Jewel-Osco employee,
8  so as you asked your questions, were you referring
9  to Jewel-Osco specifically or SUPERVALU, because
10  your two exhibits, one is Jewel and one is
11  SUPERVALU, so which were you referring to?
12  Q. Okay. At the time you answered, what did
13  you think I was referring to?
14  A. Jewel-Osco.
15  Q. Okay. You're talking about the last two
16  questions, right?
17  A. Yes, sir.
18  MR. TILLACK: Okay. Could the court
19  reporter please read back to me the first of the
20  last two questions.
21  (Question read.)
22  BY MR. TILLACK:
23  Q. Okay. And so you're telling me that your
24  answer, "not that I'm aware of," related to

Page 61

1  Jewel-Osco, correct?
2  A. Yes.
3  Q. Okay. I'm going to be asking you a number
4  of questions today, and because you're appearing on
5  behalf of both Jewel and SUPERVALU, I will ask the
6  questions as it relates to the defendants unless the
7  question doesn't call for that obviously.
8  If you believe that the answer is
9  different as to Jewel-Osco compared to SUPERVALU,
10  please let me know, but all my questions when I say
11  defendants in the plural refer to both Jewel-Osco
12  and to SUPERVALU.
13  Do you understand that?
14  A. Yes.
15  Q. Okay. Now, going back then to that first
16  question, as to SUPERVALU, since you answered only
17  for Jewel-Osco that time, had there ever been a
18  prior offer?
19  A. Yes.
20  Q. Okay. And what can you recall about that
21  prior offer or offers?
22  A. I believe it was made to Acme in
23  Philadelphia for the Phillies, and I believe there
24  was another one made to Shaw's in Boston for the

Page 62

1  Red Sox.
2  Q. Okay. I'll be asking you about those
3  prior offers later on in the deposition.
4      Besides those two that were made to your
5  understanding to SUPERVALU, can you recall any
6  others?
7  A. Yes and no. I believe, and I was not
8  involved because it was handled someplace else, I
9  believe the Bears ad that ran in 2006 was also
10 offered as a free page by Sports Illustrated to
11 Albertson's at the time.
12 Q. Okay. The testimony you gave a minute ago
13 with regard to the tribute as you call it in
14 Exhibit 5 and as it appears in Exhibit 6 and the ad
15 as I refer to it, you told me, and correct me if I'm
16 wrong, but you told me that that offer was made to
17 SUPERVALU.
18     Am I right about that?
19 A. Yes.
20 Q. Okay. And is that still your testimony?
21 A. Yes.
22 Q. Okay. Did you think that that offer was
23 also made to Jewel?
24 A. By whom? By the Time Magazine people?

Page 63

1  Q. Yes.
2  A. It -- yes.
3      MR. TILLACK: Okay. Now I'm going to ask
4  the court reporter to go back to that second
5  question and read that second question, please, if
6  you can find it.
7      (Question read.)
8  BY MR. TILLACK:
9  Q. Now, you've just told me that when you
10 answered that question you answered only as to
11 Jewel-Osco, correct?
12 A. Yes.
13 Q. Okay. Has the offer for free space in the
14 magazine been made to SUPERVALU since the offer
15 relating to the Michael Jordan Commemorative Issue
16 was made?
17 A. I am not aware.
18 Q. Okay. Now, going back to the offer that
19 Time made to SUPERVALU for a free page in the Sports
20 Illustrated Commemorative Edition for
21 Michael Jordan, do you know if the defendants
22 accepted that offer?
23 A. Yes.
24 Q. Who on behalf of the defendants accepted

Page 64

1  that offer?
2  A. Amy Thie for SUPERVALU.
3  Q. And did she accept it on behalf of Jewel
4  as well?
5  A. She accepted it after a conversation with
6  Bob Maag of Jewel, who accepted for Jewel.
7  Q. And can you spell Bob Maag's last name,
8  please?
9  A. Yes, M-a-a-g.
10 Q. Okay. And what position did Bob Maag hold
11 at the time?
12 A. Director of general merchandise for
13 Jewel-Osco.
14 Q. Is he still employed by Jewel-Osco?
15 A. No. He was let go as a part of the
16 marketing transformation or ad centralization.
17 Q. Do you know when approximately he was let
18 go?
19 A. I believe it was October 2009.
20 Q. So obviously sometime after he accepted
21 the ad on behalf of Jewel-Osco, right?
22 A. Yes.
23 Q. Do you know if either Amy Thie on behalf
24 of SUPERVALU or Bob Maag on behalf of Jewel

Page 65

1  consulted with anyone before deciding to accept the
2  offer?
3  A. Yes.
4  Q. Who did they consult with?
5  A. Bob Maag talked to Sue Herrick,
6  H-e-r-r-i-c-k, who was a sales manager who worked
7  for him but directly responsible for magazine sales
8  in our stores.
9  Q. Okay. Did Amy Thie consult with anyone?
10 A. Amy's initial e-mail went to both Bob and
11 Sue, so technically yes, she consulted with both of
12 them.
13 Q. Did she consult with anyone on the
14 SUPERVALU side?
15 A. Not that I'm aware of.
16 Q. Okay. And when you just now said that
17 Bob Maag consulted with Sue Herrick, are you
18 referring to an e-mail exchange?
19 A. Yes.
20 Q. Okay. Do you have any knowledge of any
21 other consultation between Amy Thie on the one hand
22 and any of her associates at SUPERVALU and Bob Maag
23 on the other hand and any of his associates at
24 Jewel-Osco?

Page 66

1  A. I don't.
2  Q. So all you know with regard to getting
3  approval to accept the offer of this free space is
4  based on e-mails you have read, am I right?
5      MR. ZEULI: Object to the form.
6      Go ahead. Go ahead.
7      THE WITNESS: That is correct. I actually
8  was out sick from September 28th through
9  October 2nd of 2009. I was not in the office at
10 all.
11 BY MR. TILLACK:
12 Q. Okay. With regard to the acceptance of
13 the offer, am I right that you had no personal
14 involvement in that; is that correct?
15 A. With the acceptance, I had no involvement.
16 Q. Now, a minute ago I asked you a question
17 about were you aware or are you aware of any
18 subsequent offer by Time for free space in the
19 Sports Illustrated magazine after the Michael Jordan
20 space was made, and you said not that I'm aware of.
21     Do you remember that?
22 A. Yes.
23 Q. Who would be aware of whether or not free
24 space has been offered again by Time?

Page 67

1  A. It would be whoever the current SUPERVALU
2  buyer is. I believe Amy Thie has left our company
3  as well. I don't know who the buyer would be.
4  Q. When did Amy Thie leave the company?
5  A. I don't know.
6  Q. Do you know why she left the company?
7  A. I don't know.
8  Q. Once the offer to have an ad placed in
9  Sports Illustrated was accepted, what happened next
10 in terms of the creation of the actual tribute as
11 you call it and the ad as I refer to it?
12 A. On the e-mail, Sue Herrick referred Amy
13 and the representative from Time to work with
14 Margie Kramer, quote-unquote, for the material.
15    Now, remember, I was out sick. Somewhere
16 middle of that week, I saw -- I felt good enough to
17 use my Blackberry and look at e-mail, saw the e-mail
18 with my name in it and forwarded it to
19 Robin Zimmerman, who is our copy writer, because she
20 had also been listed on one of the e-mails, and
21 said, hey, is this in the works, and she responded
22 back yes, it is.
23 Q. And again, am I correct that your
24 testimony is based on your reading of e-mails; is

Page 68

1  that correct?
2  A. Yes.
3  Q. Okay. Have you conducted any other
4  investigation aside from reading e-mails with regard
5  to the acceptance, creation and the placement of
6  this tribute as you call it and ad as I refer to it?
7  A. I don't understand what you're asking me.
8  Q. You've told me that you've read e-mails,
9  correct?
10 A. Yes.
11 Q. Okay. Have you conducted any interviews
12 either by person or by phone or any other manner
13 with anyone who has knowledge of the creation and
14 placement of this ad or tribute as you call it?
15 A. In what time period? When it happened,
16 since we received notice of the legal action?
17 Q. At any time.
18 A. Yes.
19 Q. Okay. And who have you talked to with
20 regard to this tribute as you refer to it and ad as
21 I refer to it?
22 A. Robin Zimmerman.
23 Q. Okay. And who else besides
24 Robin Zimmerman?

Page 69

1  A. My attorneys.
2  Q. Okay. And aside from your attorneys, is
3  Robin Zimmerman the only person that you've ever
4  spoken with about the offer of the ad, the creation
5  of the ad and the placement of the ad?
6  A. I'm going to clarify. I've never spoken
7  to anybody about the offer of the ad because that is
8  not in my area of responsibility. The only other
9  people I have spoken with since the legal action, my
10 boss Terri Geraghty, her boss Steve Irland.
11 Q. You said that the creation -- sorry -- the
12 acceptance of the ad is not within your area of
13 responsibility.
14     What did you mean by that?
15 A. That was offered by someone on the general
16 merchandise side of our business to someone --
17 corporately to someone in the Jewel local office of
18 our business. So if somebody is offering, it's not
19 my vendor who -- whoops, it's not my vendor who
20 offered the ad. It was offered by a magazine vendor
21 to a magazine buyer, who then clarified it with a
22 local magazine buyer.
23 Q. So am I correct that you've had no
24 conversations with anyone about that offer or the

Page 94

1 referring to the wording at the top half of the page
2 of Exhibit 5, right?
3    A. Yes.
4    Q. Okay. And am I correct that
5 Robin Zimmerman wrote all those words?
6    A. Yes.
7    Q. Do you know if what was actually --
8 actually appeared in Exhibit 5 in terms of the copy,
9 is that what her initial draft was, or were there
10 multiple drafts?
11    A. I don't know.
12    Q. If there were multiple drafts, where would
13 we find them?
14    A. I don't know that.
15    Q. How does Robin create her copy?
16    A. On her computer in a Word document.
17    Q. In a Word document, all right.
18       And is it her habit to create multiple
19 versions of Word documents so that she can tell what
20 the changes have been from time to time in a
21 document she's preparing?
22    MR. ZEULI: Objection, foundation and
23 form.
24    THE WITNESS: I can't speak to that. You

Page 95

1 know, you yourself know if you work on a Word
2 document, it's very easy to back space and type
3 over. I don't think that Robin keeps a file of
4 round one, round two, round three.
5       In this case she was shown two pieces of
6 artwork that she needed to write a paragraph for
7 each one. And again, remember, they had 24 hours
8 basically. I don't think there was time for a
9 progression, but I'm guessing.
10 BY MR. TILLACK:
11    Q. Okay. And if I wanted to know that, I'd
12 need to talk to Robin, right?
13    A. Yes.
14    Q. Okay. Am I correct that Robin actually
15 created copy for the other piece of artwork which
16 was the progression of the basketball player you
17 described?
18    A. Yes.
19    Q. And have you seen the copy that she wrote
20 for that?
21    A. That advertising piece, yes.
22    MR. TILLACK: Let me just -- Tony, do you
23 know if that was produced to us?
24    MR. ZEULI: Why don't we go off the

Page 96

1 record.
2    MR. TILLACK: Okay.
3    THE VIDEOGRAPHER: Going off the record at
4 11:26 a.m.
5       (Whereupon, an off-the-record
6       discussion was held.)
7    THE VIDEOGRAPHER: Going back on the
8 record at 11:27 a.m.
9       Please proceed.
10 BY MR. TILLACK:
11    Q. In your testimony you referred to two
12 graphics that were shown to Robin Zimmerman. One
13 was the graphic of the shoes, and one was a graphic
14 of a progression of a basketball player with a ball.
15       We've just had an off-the-record
16 conversation, and based on that conversation, let me
17 ask you again, are you sure that the second graphic
18 was a graphic of a progression of a basketball
19 player with a basketball?
20    A. No. It was a single basketball player
21 with a basketball.
22    Q. Okay. So again, for clarification for the
23 record, it's your testimony that Robin Zimmerman was
24 shown two graphics, one which was a graphic of shoes

Page 97

1 that is similar to or identical to the graphic we
2 see in Exhibit 5, and the other was a graphic of a
3 basketball player that is a single basketball player
4 with a ball, right?
5    A. Yes.
6    Q. Okay. And it's also your testimony now
7 that Robin Zimmerman created text not only for the
8 graphic of the shoes but also a graphic of the
9 basketball player?
10    A. Yes.
11    Q. Okay.
12    A. That is correct.
13    Q. Once Robin Zimmerman created the text for
14 the two different graphics she was presented, what
15 did she do with the graphic and text that were
16 created?
17    A. She gave the text to Balta to place with
18 the appropriate graphic. I can't speak to the
19 timing.
20    Q. Okay. When you -- and when you refer
21 several times in your testimony to Balta, is that
22 just a nickname?
23    A. Baltazar, Baltazar, the name Baltazar was
24 a mouthful. Around the office for the years we

Page 118

1  at the specs for the ad?
2      A. He would have had to in order to give --
3  in order to produce the page that you see or the
4  piece that you see in the format that is needed by
5  the magazine.
6      Q. Do you know if Robin Zimmerman looked at
7  the specs of the ad?
8      A. I would almost definitely say she did not.
9  That's not her function.
10     Q. But you don't know for sure, right?
11     A. I will say for sure she did not. That's
12 not her function, and I can't say specifically on
13 this page, but knowing how we operated then, how we
14 operate today, Robin would never go and look at
15 specs.
16     Q. Okay. Now, the first dot on this string
17 of dots we've been looking at says, "Ad would be a
18 full page, full color."
19         Do you see that?
20     A. Yes.
21     Q. Okay. And then the second one says, "Ad
22 is free of charge, however, in return we seek the
23 above commitments."
24         Did you have an understanding of what the

Page 119

1  above commitments were?
2      A. I did not.
3      Q. Okay. Do you know if anyone at either
4  SUPERVALU or Jewel understood what the above
5  commitments were?
6      A. I believe that it would have been Amy Thie
7  because she was in contact when they talk about the
8  phone conversation. I believe that she would have
9  known.
10     Q. Do you -- do you believe that the above
11 commitments are included in this particular e-mail?
12     A. I don't see them here.
13     Q. Okay. In the first paragraph of this
14 e-mail, second sentence, it says:
15         "This is similar to our offering Acme
16     commemorative ad space for the Phillies World
17     Series Championship, see attached. Please
18     confirm as soon as possible."
19         Do you see that?
20     A. Yes.
21     Q. Is the Acme commemorative ad that's
22 referred to here the same ad that you referred to
23 today early in your testimony when you talked about
24 a tribute or an ad with regard to the Phillies?

Page 120

1      A. Yes.
2      Q. Okay. That's all I have on that.
3      A. Okay.
4         MR. TILLACK: I think we're up to 8.
5             (Plaintiff Exhibit 8 was marked
6             for identification.)
7         MR. ZEULI: Can we plan to take a lunch
8  break after this exhibit?
9         MR. TILLACK: Sure. Actually, you know,
10 to make sense, I have one that goes with this, so
11 I'd like to do an 8 and a 9 if you don't mind.
12 BY MR. TILLACK:
13     Q. Okay. The court reporter has placed in
14 front of you what's been marked as Exhibit 8. It is
15 a document with three pages that are numbered
16 JFS 000365 through 000367.
17         Have you seen what's been marked as
18 Plaintiff's Exhibit 8 before?
19     A. Yes.
20     Q. And what is Plaintiff's Exhibit 8?
21     A. It is an e-mail. If I start on the very
22 back, it is an e-mail that begins with the e-mail
23 from Ann at Time to Amy Thie making the offer of the
24 free space, free page. Amy Thie in turn forwards

Page 121

1  that e-mail to Bob Maag and Sue Herrick saying we've
2  been offered a free ad in the Sports Illustrated
3  Michael Jordan Commemorative Issue, we would like to
4  authorize a small floor display. Sue in turn sends
5  a note back that sends the attachment and sends it
6  to me, and you can see above that I think there's a
7  page missing or some words missing where I forwarded
8  this note on September 30th to Brian Zimmerman,
9  Robin -- Robin Zimmerman, Brian Tomasi,
10 Bunny Galloway, who was the Vertis site manager at
11 the time, and my comment to them, I don't know where
12 it is, but my comment was, "Is this in the works."
13     Q. Okay. So am I correct that you forwarded
14 Sue Herrick's e-mail on to the people that are
15 listed in the very top of this first page of the
16 e-mail of the exhibit; is that right?
17     A. Yes, yes.
18     Q. Do you need some water?
19     A. No, I'm good.
20     Q. Thank you. Do you know what Sue Herrick
21 was referring to as "the attachment"?
22     A. I think that in Ann's note to Amy she
23 referred to:
24         "This is similar to our offering Acme

Page 122

1   commemorative ad space for the Phillies World
2   Series Championship, see attached."
3       I'm not sure why Sue sent it to me saying
4   "the attachment" unless she was forwarding it, truly
5   don't, truly don't know.
6       Q. Okay. And then as you've testified, then
7   you got this from Sue and then forwarded it on to
8   the people you've identified, correct?
9       A. Right. That is correct.
10      Q. Now, does seeing this e-mail refresh your
11  recollection at all on any of the events up until
12  this point that we've already discussed with regard
13  to creation of this piece?
14      A. It doesn't change anything I've said.
15      Q. All right. Thank you.
16          (Plaintiff Exhibit 9 was marked
17          for identification.)
18  BY MR. TILLACK:
19      Q. Okay. The court reporter has placed in
20  front of you the exhibit that's been marked as
21  Plaintiff Exhibit 9. It's two pages. It's marked
22  with the stamp TIME 00306 through TIME 00307.
23      Have you had a chance --
24      A. Oh, I'm sorry.

Page 123

1       Q. No, no, I was just waiting for -- have you
2   had a chance to look at this exhibit?
3       A. Yes.
4       Q. Have you seen what's marked as Exhibit 9
5   before?
6       A. Yes.
7       Q. Okay. And what is that?
8       A. It is the cover of the commemorative
9   edition when the Phillies were -- won the World
10  Series as well as the commemorative piece that Acme
11  placed in that publication.
12      Q. Okay. And when you refer to "the
13  commemorative piece that Acme placed in the
14  publication," are you referring to the page which is
15  the second page of this document labeled as
16  TIME 00307?
17      A. Yes.
18      Q. Is this the piece that is referred to in
19  the preceding two exhibits, being Exhibits 7 and 8,
20  when it refers to the piece that was given to Acme?
21      MR. ZEULI: And just to clarify, are you
22  referring to 307 or 306 or both?
23      MR. TILLACK: 307.
24      THE WITNESS: Yes, I believe it is.

Page 124

1   BY MR. TILLACK:
2       Q. Now, with regard to the -- you called this
3   a commemorative page, right?
4       A. Yeah, a tribute, a commemorative, a
5   salutation.
6       Q. Okay. In your mind is this also a
7   tribute?
8       A. Yeah, except this borders on an ad because
9   there's a product that we sell, meaning the cake.
10      Q. And you're referring to the photograph on
11  the upper right-hand side?
12      A. Upper right-hand side as well as the lower
13  left, the piece of cake in the little boy's hand.
14      Q. I see. And that cake is something that is
15  sold at Acme stores, right?
16      A. That is correct.
17      Q. This piece which is depicted on
18  TIME 00307, do you know how this particular piece
19  was created?
20      A. I do not.
21      Q. Do you know who would have been
22  responsible for creating this piece?
23      A. I would assume comparable people in the
24  Acme division, because again, at the time that these

Page 125

1   ran, every, every SUPERVALU or Albertson's banner
2   had their own advertising department.
3       Q. So it's your assumption that just as you
4   and your team at the Jewel-Osco headquarters in
5   Itasca helped create the piece for Michael Jordan,
6   there would be a similar team who would help create
7   the piece for Acme's ad with regard to the Phillies?
8       A. Yes.
9       Q. And do you have any knowledge of who at
10  Acme or its corporate parent reviewed the proposed
11  ad before it was run in Sports Illustrated on behalf
12  of the Acme store for Phillies?
13      A. I do not.
14      MR. TILLACK: All right. At this point
15  this is probably a good stopping point for lunch, so
16  why don't we do that.
17      MS. McNAMARA: How much time are we
18  taking?
19      MR. TILLACK: It's really up to the
20  witness what she's comfortable with.
21      THE VIDEOGRAPHER: Going off the record at
22  12:00 p.m.
23          (Whereupon, a lunch recess was
24          taken.)

Page 158

1  Q. Okay. And it says just above SUPERVALU
2  and Mike Kimrey's name:
3      "I approve floor displays for Sports
4      Illustrated 2007 World Series Championship
5      Issue to be placed in appropriate stores by a
6      representative of TDS or your servicing
7      wholesaler."
8      Do you see that?
9  A. Yes.
10 Q. And that's similar, if not the same, to
11 the same commitment that we saw in
12 Exhibit something?
13 A. 14.
14 Q. 14, thank you.
15     MR. ZEULI: Objection.
16 BY MR. TILLACK:
17 Q. Exhibit 14?
18     MR. ZEULI: Objection, form.
19 BY MR. TILLACK:
20 Q. Is that correct?
21 A. It's similar, not exact.
22 Q. Thank you.
23     (Plaintiff Exhibit 18 was marked
24     for identification.)

Page 159

1 BY MR. TILLACK:
2 Q. The court reporter has marked Exhibit 18,
3 which is TIME 00027 through TIME 00028, and has
4 placed it in front of the witness.
5     Ms. Kramer, have you had an opportunity to
6 review Exhibit 18?
7 A. Yes.
8 Q. Do you know what Exhibit 18 is?
9 A. It appears to be a letter from Time to
10 someone else within Time saying that Acme has the
11 offer of a free page in a salute issue to the
12 Phillies if they win the World Series.
13 Q. Is the free ad in the Sports Illustrated
14 offer that's referred to in Exhibit 18 the offer
15 that you have already testified about today earlier
16 with regard to the Shaw's -- sorry, with regard to
17 the Acme ad for the Philadelphia Phillies?
18 A. Yes.
19 Q. And do you know how the -- strike that.
20     Going back to the prior ad for Shaw's,
21 Exhibit 16, I may have asked you, and if I did,
22 forgive me for repeating myself, do you know how
23 that particular ad was created?
24     MR. ZEULI: Objection, form.

Page 160

1     THE WITNESS: I do not know.
2 BY MR. TILLACK:
3 Q. Do you know how the ad that was ultimately
4 created for Acme with regard to the Philadelphia
5 Phillies was created?
6 A. I do not. Acme's, I believe I said, was
7 borderline, you know. I thought it was more of an
8 ad because it had a cake in it.
9     This one is similar to our Michael Jordan
10 piece. The Shaw's ad, which was Exhibit Number 16,
11 was similar to the Michael Jordan tribute in that it
12 wasn't selling anything.
13 Q. So it's your testimony that the ad that
14 ran in Sports Illustrated by Shaw's, which is in
15 Exhibit 16 at Page TIME 309, the second page of the
16 exhibit, is in fact a tribute?
17 A. Yes, it is.
18 Q. And you do not believe it's an ad, right?
19 A. I do not.
20 Q. Okay. And it's your testimony that Shaw's
21 was not selling anything in this ad; is that right?
22 A. I believe they were not selling anything
23 in this ad, correct.
24 Q. Do you think it's possible that Shaw's was

Page 161

1 selling Shaw's services?
2 A. I don't think so because nothing is
3 listed.
4 Q. When you use the Jewel-Osco trademark, do
5 you think that Jewel-Osco services are being sold?
6     MR. ZEULI: Objection, asked and answered.
7 BY MR. TILLACK:
8 Q. You can answer.
9 A. No. We put our logo on lots of things.
10 Q. Okay. I'm done with that. Thanks.
11     (Plaintiff Exhibit 19 was marked
12     for identification.)
13 BY MR. TILLACK:
14 Q. The court reporter has marked Exhibit 19,
15 which has been placed in front of the witness.
16 Exhibit 19 is JFS 000348.
17 A. Yes.
18 Q. Okay. Have you had an opportunity to
19 review Exhibit 19, Ms. Kramer?
20 A. Yes.
21 Q. Okay. What is Exhibit 19?
22 A. It appears to be a store communication
23 from the general merchandise sales manager
24 merchandising manager to the stores giving them

Page 162

1 direction on how to display the Sports Illustrated
2 issue that is commemorating the Phillies winning the
3 World Series.
4    Q. And is Rochelle Beard the general manager
5 of sales merchandising?
6    A. I don't know.
7    Q. Do you believe that she's someone
8 affiliated with Shaw's -- sorry, with Acme?
9    A. Yes.
10    Q. Let me get that out right.
11      Do you know if Rochelle Beard is someone
12 affiliated with Acme?
13    A. Not for a fact, but I would assume that
14 she is.
15    Q. Do you see where in the first sentence she
16 says:
17      "As you know, Sports Illustrated and Acme
18    have partnered to merchandise the upcoming
19    Sports Illustrated World Series Commemorative
20    Issue."
21    Do you see that?
22    A. Yes.
23    Q. Isn't that what Jewel-Osco and SUPERVALU
24 did with Sports Illustrated when they got together

Page 163

1 to partner to merchandise the Sports Illustrated
2 Presents issue for Michael Jordan?
3    MR. ZEULI: Objection, form.
4    THE WITNESS: I can't answer that. I
5 wasn't involved in that part of the decision.
6 BY MR. TILLACK:
7    Q. Now, in your view, I think you told me
8 that you believe that this is more of an ad, right?
9    A. Yes.
10    Q. And that's because it includes a piece of
11 cake in the ad, right?
12    A. And an actual cake in the upper right-hand
13 corner.
14    Q. And that's what for you makes it an ad,
15 that they're depicting a piece of cake, right?
16    A. They're showing something we sell in our
17 stores or that Acme sells in their store.
18    Q. Otherwise, in your mind it would be a
19 tribute, right?
20    A. Not really. It doesn't say anything. You
21 know, there's a line, and I can't see it here. I
22 know we had the actual copies here. I got it.
23      There's a line at the very bottom that
24 says, "The store that knows Philadelphia best

Page 164

1 supports and congratulates our hometown team."
2    Q. And you're looking at Exhibit 9 now,
3 right?
4    A. I am looking at Exhibit 9, yes, that is
5 correct.
6    Q. And what does that line mean to you?
7    A. That would be the only tribute on the
8 whole page. The top 90 percent of this ad is
9 selling Acme, "Everyday celebrations are just around
10 the corner, Acme." Here's a cake Acme sells; here's
11 a little boy enjoying that piece of cake.
12    Q. So you think that the use of the phrase
13 "Everyday celebrations are just around the corner,
14 Acme" is actually selling Acme, right?
15    MR. ZEULI: Objection, mischaracterizes
16 her testimony.
17 BY MR. TILLACK:
18    Q. Isn't that right?
19    A. The words "Celebrations" and showing a
20 cake, yeah, that's selling Acme.
21    Q. Okay. And the phrase "Everyday
22 celebrations are just around the corner," that's a
23 phrase used by Acme, right?
24    A. I can't comment. I can't definitely say

Page 165

1 what Acme did. They certainly used it here.
2    Q. Well, that was the phrase you testified
3 was the corporate phrase to be used by everyone
4 including Acme and Jewel, right?
5    A. As one phrase, "Good things are just
6 around the corner," "Everyday celebrations," Holiday
7 celebrations are just around the corner," yes, those
8 were given to us by corporate.
9    Q. And that's designed to sell the services
10 and products offered by a particular store, right?
11    A. On this page.
12    Q. And this page it happens to be Acme,
13 right?
14    A. It happens to be Acme; it happens to be a
15 cake.
16      (Plaintiff Exhibit 20 was marked
17      for identification.)
18 BY MR. TILLACK:
19    Q. All right. The court reporter has marked
20 as Exhibit 20 the document with numbers TIME 00034
21 through TIME 00037.
22      Have you had a chance to review
23 Exhibit 20?
24    A. Yes.

Page 182

1  A. Yes.
2  Q. And it also shows that that rate is being
3  credited back, correct?
4  A. That is correct.
5  Q. So it shows that Jewel-Osco didn't have to
6  pay any money for the page but that if it had been
7  charged it would be $16,000, right?
8  A. That is correct.
9  Q. Thank you. Now, one more time if I could
10 ask you to take another look at that piece that was
11 in the exhibit.
12 A. Number 5?
13 Q. Number 5. Thank you.
14     I'd like to ask you to focus on a few
15 things in this piece that I want to ask you about,
16 and the first thing is, in the language of the ad
17 itself, it says:
18     "Jewel-Osco salutes Number 23 on his many
19     accomplishments as we honor a fellow Chicagoan
20     who was just around the corner for so many
21     years."
22     Do you see that?
23 A. I do.
24 Q. What did the defendants mean when they

Page 183

1  said that "we honor a fellow Chicagoan who was just
2  around the corner for so many years"?
3  A. What I believe Robin meant, number one, he
4  did live in Chicago during his playing days and
5  since. Also just around the corner, when you think
6  about the fact that he was not only at the United
7  Center but if you went to any friend's house, you
8  saw kids on the street, his image, his number, his
9  framed jersey is everywhere. The man owns a
10 restaurant or owned a restaurant.
11     In the case of Jewel-Osco, we for many
12 years were involved with a charity auction since the
13 early 1980s where the primary beneficiary was -- it
14 used to be the Henry Horner Boys & Girls Club. It
15 is -- after Mr. Jordan's father died, it became the
16 James Jordan Boys & Girls Club. We once a year held
17 a live and silent auction with all of the proceeds
18 going to that Boys & Girl Club. Our senior vice
19 president, Nancy Chagares, is on the board of that
20 Boys & Girls Club. Michael Jordan's mother and in
21 one year his sister appeared at that auction to
22 thank our company for raising money for the Jordan
23 Boys & Girls Club.
24     So if I am paraphrasing for Robin, my

Page 184

1  understanding is when she said just around the
2  corner, she was thinking, my God, you can't go
3  anywhere without seeing something referencing
4  Michael Jordan.
5  Q. You recognize your logo, the Jewel-Osco
6  logo there, don't you?
7  A. I do.
8  Q. And then below it, it has the phrase and
9  the stylization "Good things are just around the
10 corner" with an arrow pointing to Jewel-Osco.
11     Do you see that?
12 A. I do.
13 Q. Why did the defendants use the phrase
14 "Good things are just around the corner" just
15 underneath the words "Jewel-Osco"?
16 A. That was the corporate tagline that went
17 with each division's logo.
18 Q. Didn't the defendants intend to link
19 Jewel-Osco with Michael Jordan by using the phrase
20 "Just around the corner" both times?
21 A. No, because our tagline is "Good things
22 are just around the corner." We didn't say good
23 things -- who was good things just around the
24 corner. What was said was fellow Chicagoan who was

Page 185

1  just around the corner.
2  Q. Won't you agree with me that in the
3  Jewel-Osco trademark it includes the phrase "Just
4  around the corner" and that in the copy that
5  Robin Zimmerman wrote and that is in this piece it
6  includes the phrase "Just around the corner" to
7  describe Michael Jordan as you just testified to?
8      MR. ZEULI: Objection to the form of the
9  question.
10 BY MR. TILLACK:
11 Q. You may answer.
12 A. Those words, "Just around the corner," are
13 in both places.
14 Q. And won't you agree with me that the use
15 of "Just around the corner" in the ad copy that
16 Robin Zimmerman wrote about Michael Jordan was used
17 to link Michael Jordan to the Jewel-Osco trademark
18 phrase "Good things are just around the corner"?
19 A. No. I believe what Robin was doing, and
20 Robin would be the one to speak to this, but I
21 believe that what Robin was doing was following the
22 direction in the e-mail from Time that said, you
23 know, we suggest you create the ad using a play on
24 words and other references. I don't know if it said

**Page 186**

1  the word specific or not, but it did say other
2  references to Michael Jordan, and I believe her
3  using the words "Just around the corner" as I
4  described was her attempt at a play on words.
5     Q. Is it your testimony that it was a
6  coincidence that the phrase "Just around the corner"
7  was used in connection with Mr. Jordan and a
8  coincidence that the phrase was also used in the
9  tagline for Jewel-Osco "Good things are just around
10 the corner"?
11    A. No. What I said was "Good things are just
12 around the corner" are part of our logo. It isn't a
13 coincidence. It's a play on words.
14    Q. A play on words meaning that
15 Robin Zimmerman knew that she had to use the logo
16 "Jewel-Osco, "Good things are just around the
17 corner," right?
18    MR. ZEULI: Objection, foundation. Excuse
19 me, foundation and form.
20 BY MR. TILLACK:
21    Q. You may answer.
22    A. Yes.
23    Q. She did know that, correct?
24    A. Of course she did.

**Page 187**

1     Q. And in writing the copy, she wanted to
2  create a play on words to identify Michael Jordan
3  being "Just around the corner" just as Jewel-Osco is
4  "Just around the corner", correct?
5     A. I can't -- I can't say that. I don't know
6  what's in her mind.
7     Q. And --
8     A. I mean truly, I could speculate, but I
9  can't do that.
10    Q. And you never asked her why she happened
11 to use "Just around the corner" in her description
12 of Michael Jordan, right?
13    A. Good grief, no.
14    Q. And when you say "Good grief, no," what do
15 you mean?
16    A. I could give you stacks of copy that Robin
17 has written. It is her trademark to do plays on
18 words, cutesy phrases.
19    We ran a series of ads about four years
20 ago that linked a fresh produce item with a
21 beautiful graphic, and the headline on every one of
22 those was some form of a play on words. Now, that
23 was an advertisement because at the bottom of it
24 whatever we pictured, sweet corn, tomatoes,

**Page 188**

1  watermelon, whatever, we actually advertised product
2  at the bottom.
3     But the reason the ads were successful
4  were because of the way Robin twisted words to kind
5  of make it appealing to the customer.
6     Q. I need to go back and ask you about what
7  you mean by play on words.
8     Why is it a play on words to say that
9  Michael Jordan is "Just around the corner"? How is
10 that a play on words?
11    A. Because we all know we he wasn't just
12 around the corner but he's everyplace you go in
13 Chicago, or at least he had been during his playing
14 days, not Michael physically but a Michael jersey, a
15 Michael sign, a Michael street banner, a Michael
16 restaurant, a Michael basketball, you know. When
17 Michael Jordan was playing basketball, he was
18 everywhere, and "he" being he or his products.
19    Q. And is it your testimony that as a
20 representative for Jewel-Osco and SUPERVALU that
21 there was no intention to link Michael Jordan with
22 the phrase "Just around the corner" to Jewel-Osco
23 with its phrase "Good things are just around the
24 corner"?

**Page 189**

1     MR. ZEULI: I just want to object. I
2  believe there's a double-negative in there, so just
3  make sure you know what exactly his question is.
4  BY MR. TILLACK:
5     Q. You may answer.
6     A. Okay. I need you to ask me the question
7  again.
8     Q. Is it your testimony as the representative
9  for Jewel-Osco and SUPERVALU that there was no
10 intention in this piece when using the phrase "Just
11 around the corner" with regard to Mr. Jordan to link
12 Mr. Jordan to Jewel-Osco and its phrase "Good things
13 are just around the corner"?
14    A. I can't answer that. Robin Zimmerman can
15 answer that question. I can't -- I can only
16 speculate what was in her mind.
17    If I were guessing, which I really should
18 not be doing, if I were guessing, I would say no,
19 she's not trying to link Michael Jordan to
20 Jewel-Osco. We were trying to commend the man in a
21 commemorative piece as directed by the e-mail we
22 received from Time Magazine.
23    Q. In the copy up above there above the
24 Jewel-Osco, it says:

Page 286

1  A. That is correct.
2  Q. And you're free to look at it.
3  A. No, that is correct. I was paraphrasing
4  because I didn't have it in front of me.
5  Q. Okay. And so the record is clear, no one
6  went to Time Inc. and asked whether they had
7  permissions from Michael Jordan; is that right?
8  A. That is correct.
9  Q. And no one went to Time Inc. and asked
10 whether they had any licenses to make any use of
11 trademarks in any tribute to him; is that right?
12 A. That is correct.
13     MS. McNAMARA: I think that I'm fine for
14 now. I'm done for now.
15     MR. ZEULI: So why don't we take two
16 minutes. We can clear this up.
17     MR. TILLACK: Okay.
18     MR. ZEULI: And then I know Patrick and I
19 think Liz have to switch.
20     THE VIDEOGRAPHER: Going off the record at
21 4:48 p.m.
22         (Whereupon, an off-the-record
23          discussion was held.)
24     THE VIDEOGRAPHER: Going back on the

Page 287

1  record at 4:52 p.m.
2      Please proceed.
3          (Plaintiff Exhibit 28 was marked
4           for identification.)
5      MR. TILLACK: Okay. Tony, we've been
6  discussing off the record about a separate
7  stipulation with regard to authentication for a
8  group of documents that the defendants produced in
9  this case.
10     We've created a document called Documents
11 for Authentication. It's two pages. We've marked
12 it as Plaintiff's 28. My understanding is you've
13 reviewed the documents listed on here and are
14 willing to stipulate on behalf of the defendants
15 that all the documents on Plaintiff's 28 are
16 authentic and do accurately reflect the terms and
17 conditions of the agreements therein.
18     MR. ZEULI: That's correct.
19     MR. TILLACK: Thank you.
20
21         EXAMINATION
22 BY MR. KUEHL:
23 Q. Ms. Kramer, my name is Patrick Kuehl.
24 We've met earlier.

Page 288

1  A. Yes.
2  Q. I represent Third-Party Defendant Vertis
3  Inc.
4  A. Okay.
5  Q. You're familiar with Vertis?
6  A. I am.
7  Q. Tell me, you explained early on in the
8  deposition that your business is going through some
9  changes right now; is that right?
10 A. That is correct.
11 Q. And your business has gone through some
12 changes for about the past year; isn't that right?
13 A. Yes.
14 Q. When did SUPERVALU acquire Jewel-Osco?
15 A. I'm -- boy, I want to say it's toward the
16 end of 2005, the beginning of 2006, somewhere in
17 that time frame. I don't know the exact date.
18 Q. So when the tribute at issue in this case,
19 which I believe is depicted in Plaintiff's
20 Exhibit 5 --
21 A. Yes.
22 Q. -- was created --
23 A. Yes.
24 Q. -- SUPERVALU had already acquired and was

Page 289

1  operating Jewel-Osco?
2  A. That is correct.
3  Q. And so your employer in September and
4  October of 2009 was Jewel-Osco, correct?
5  A. Yes.
6  Q. But you also reported to SUPERVALU?
7  A. We were owned by SUPERVALU, and we were
8  transitioning our business model to SUPERVALU.
9  Q. Tell me how Jewel-Osco utilized Vertis in
10 September and October -- well, let me back up. Let
11 me start over. I want to make that question a
12 little more broad.
13     Tell me how Jewel-Osco utilized Vertis'
14 services before Vertis closed its operations in
15 Itasca.
16 A. Jewel-Osco -- Vertis was our on-site
17 advertising production vendor as well as our
18 photographer, our food stylist, our creative concept
19 partner. They did everything for us that did not
20 involve -- they did everything for us involved with
21 putting together our weekly ad and any other
22 advertising or photography needs.
23 Q. And what -- who filled those needs once
24 Vertis closed its operations?