# EXHIBIT I

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MICHAEL JORDAN and JUMP 23, INC.,  )
        Plaintiffs,              )
    vs.                              )  No. 10-cv-00407
DOMINICK'S FINER FOODS, LLC, and  )
SAFEWAY INC.,                     )
        Defendants.             )

    Videotaped Deposition of KRISTIN ZIERAU, taken before GREG S. WEILAND, CSR, RPR, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions, at Suite 6600, 233 South Wacker Drive, in the City of Chicago, Cook County, Illinois, commencing at 9:41 o'clock a.m., on the 29th day of October, 2010.

Thompson Court Reporters, Inc.
312-421-3377

### Page 174

1 that there's a problem with the copying here, so
2 it's that the specs on this document, Number 7, is a
3 little clearer?
4    A. Possibly, yeah.
5    Q. You don't think that anybody has modified
6 the document, do you?
7    A. No.
8    Q. Okay. On the first page then on
9 Plaintiffs' Number 7, you'll see the second e-mail
10 of the three here on the page starts with an e-mail
11 from Sibyl Darter to Robert Nardini, Jeff Norkiewicz
12 and Monica McCombs.
13        Do you see that?
14    A. Yes.
15    Q. You've identified Robert Nardini,
16 Jeff Norkiewicz, but I can't recall if you've
17 identified Monica McCombs.
18        Could you tell me who she is?
19    A. She is the vice president of marketing
20 planning.
21    Q. Is that for Safeway?
22    A. Yes.
23    Q. And does she also work in Pleasanton?
24    A. Yes.

### Page 175

1    Q. Who is Olga Manirko?
2    A. Olga is the manager of advertising account
3 management.
4    Q. And also for Safeway?
5    A. Yes.
6    Q. And also in Pleasanton?
7    A. Yes.
8    Q. So what was the purpose of Sibyl sending
9 this e-mail to Robert Nardini, Jeff Norkiewicz and
10 Monica McCombs?
11    A. The purpose of the e-mail was that we have
12 an opportunity to have this full-page ad in lieu of
13 meeting the commitments that Damian talks about down
14 below. One of those commitments is making space for
15 floor displays in store, and that decision to do so
16 comes from Jeff and Robert.
17    MR. TILLACK: I need to have that answer
18 read back for me, if you wouldn't mind.
19        (Answer read.)
20 BY MR. TILLACK:
21    Q. I want to clarify.
22        Did you mean that Sibyl Darter was
23 conveying to Messrs. Nardini and Norkiewicz and
24 Ms. McCombs that the defendants could run a

### Page 176

1 full-page ad in Sports Illustrated instead of
2 providing the commitments or on the condition that
3 they provide those commitments that had been
4 requested?
5    A. On the condition.
6    Q. And that's what you meant when you said in
7 lieu of?
8    A. Yes.
9    Q. Do you know if Ms. Darter received a
10 response back from any of the people she wrote to?
11    A. Yes.
12    Q. And what was the response?
13    A. The response was that they would be
14 willing to do the display space. Therefore, we
15 could, yes, participate in the ad.
16    Q. All right. The top e-mail is from
17 Monica McCombs, and that's to Sibyl Darter and
18 Robert Nardini and Jeff Norkiewicz.
19        And am I correct that this is in response
20 to the e-mail below from Sibyl Darter?
21    A. Yes.
22    Q. Now, in this one, Ms. McCombs asks, "Could
23 we tie Promise into this somehow, three question
24 marks? Jeff, I am good with this if you are. We

### Page 177

1 can discuss on our call today," with a smiley face.
2        First of all, what is Promise?
3    A. Promise is our internal description of our
4 everyday low price campaign.
5    Q. What do you understand Ms. McCombs meant
6 when she asked whether we could tie Promise into
7 this somehow?
8    A. Ms. McCombs was giving her suggestion on
9 ad design in my opinion.
10    Q. And the suggestion was a possibility of
11 including the everyday low price campaign in this
12 ad?
13    A. Correct.
14    Q. Do you know if any -- if she received any
15 response to that suggestion?
16    A. I don't know if we -- I don't know.
17        Oh, I take that back. I do know because
18 it was discussed on the call.
19    Q. So are you testifying that in fact her
20 inquiry about including the everyday low price
21 campaign in the ad was actually discussed on the
22 call scheduled for September 15, 2009?
23    A. I can't testify that Promise was brought
24 into the call. Based on my previous testimony, the

Page 270

1  Q. All right. And I understood your answer
2  from before, but my question is different. My
3  question relates to the statement Mr. Keprta made in
4  that e-mail we just raised. And in that e-mail, he
5  commented that due to the fact that the SI issue was
6  an MJ commemorative edition, you'd think his people
7  would have looked at everything before it went to
8  print. So my question is a follow-up from that
9  comment Mr. Keprta made.
10     My question is, do you think it would have
11 been difficult for the defendants to have asked
12 Time/Warner if Mr. Jordan had in fact seen
13 everything before it went to print?
14  A. Would it have been difficult to ask that
15 question? No. But what he's stating here is that
16 what our belief always was was that you'd think that
17 his people, the people bringing us the offer, would
18 have looked at everything before it went to print.
19  Q. All right. Thank you. Now, the court
20 reporter has placed before you what's been marked as
21 Plaintiffs' Exhibit 29. It's a two-page document
22 numbered 000164 through 165.
23     Have you had a chance to look through
24 that?

Page 271

1  A. Yes.
2  Q. This is a document that was produced to us
3  in this litigation.
4     Can you describe to me what this is?
5  A. It looks as if it's a list of stores that
6  either carried or sold the UPC which matches the
7  commemorative issue.
8  Q. Okay. So is this a list of the stores
9  that carried or sold the Michael Jordan
10 Commemorative Issue that we've marked as Plaintiffs'
11 Exhibit 3?
12  A. I don't know what the list is other than I
13 recognize UPC and store and description of that it's
14 the ad. I don't know what it's -- I don't know that
15 it's telling me anything other than that.
16  Q. Do you know if this document was prepared
17 by the defendants?
18  A. It looks as if it was.
19  Q. The document includes a number of stores
20 in Illinois.
21     Would you agree with that?
22  A. Yes.
23  Q. Am I also correct that the document
24 indicates that stores in Washington, Idaho and

Page 272

1  Montana also stocked or sold the magazine?
2  A. Yes.
3  Q. Besides yourself, who else can help
4  explain this document?
5  A. Probably the category director. His name
6  escapes -- the general merchandise category
7  director, his name escapes me right now.
8  Q. And is that a person who works for Safeway
9  in Pleasanton, California?
10  A. Yes.
11  Q. Thank you.
12     (Plaintiff Exhibit 30 was marked
13     for identification.)
14 BY MR. TILLACK:
15  Q. The next exhibit is Plaintiffs'
16 Exhibit 30. Plaintiffs' Exhibit 30 is a two-page
17 document marked DOMINICK'S 000166 through 167.
18  A. I'm sorry, did you ask me a question?
19  Q. No.
20  A. Okay.
21  Q. I was just waiting for you to take a look
22 at it. No, I had not asked a question yet. Now I
23 will.
24     Do you know what Plaintiffs'

Page 273

1  Exhibit Number 30 is?
2  A. It looks to be a record of dollars and
3  units sold of I'm assuming the magazine that we're
4  talking about today.
5  Q. Now, I've given these documents to you in
6  the order that they were presented to us. Now I'm
7  going to ask you to take these two documents and put
8  them next to each other, put 29 next to 30.
9     And am I right that this Exhibit 30,
10 Pages 166 and 167, are actually the three remaining
11 columns to the document that was marked as
12 Plaintiffs' Exhibit 29?
13  A. That looks to be the case.
14  Q. So would I be correct that this document
15 tells us for each of the stores marked in
16 Plaintiffs' Exhibit 29 the gross amount that was
17 sold, the net amount that was received, and the
18 number of units that were sold?
19  A. Yes.
20  Q. Now, I noticed that the gross amount and
21 the net amount are the same.
22     Do you have an understanding of what the
23 difference is between gross and net?
24  A. Yes.