# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| MICHAEL JORDAN, ) | |
| Plaintiff, ) | |
| vs. ) | No. 10-cv-00340 |
| JEWEL FOOD STORES, INC., and ) | |
| SUPERVALU INC., ) | |
| Defendants/Third-Party Plaintiffs, ) | |
| vs. ) | |
| TIME, INC. and VERTIS, ) | |
| Third-Party Defendants. ) | |

Videotaped Deposition of ROBIN MARIE ZIMMERMAN, taken before GREG S. WEILAND, CSR, RPR, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions, at Suite 6900, 233 South Wacker Drive, in the City of Chicago, Cook County, Illinois, commencing at 9:41 o'clock a.m., on the 27th day of October, 2010.

Thompson Court Reporters, Inc.
312-421-3377

**Page 46**

1  (Question read.)
2  BY MR. TILLACK:
3  Q. You mentioned that you start -- when you
4  started with Jewel you were at Melrose Park, right?
5  A. Yes, I was.
6  Q. When did you make the move to Itasca?
7  A. August 16th, 2008.
8  Q. Was that with a company move from
9  Melrose Park to Itasca?
10  A. Our store support offices relocated to
11  Itasca on that day.
12  Q. And you were part of the store support?
13  A. Yes, uh-huh.
14  Q. Did there come a time in the fall of 2009
15  that you heard about an opportunity for the
16  defendants to place an advertisement in Sports
17  Illustrated Presents relating to Michael Jordan?
18  A. Can you repeat the question, please?
19  Q. Yes.
20  A. Okay.
21  Q. Since I think I got it out right, I'm
22  going to ask Greg to repeat it.
23  THE WITNESS: Okay.
24  (Question read.)

**Page 47**

1  THE WITNESS: Yes, we did.
2  BY MR. TILLACK:
3  Q. Okay. And when was that?
4  A. It was around September 30th of that
5  year.
6  Q. And how was it that you heard about that
7  opportunity?
8  A. I received an e-mail requesting that we
9  get to work on the ad. It was through a chain that
10  we received.
11  Q. Okay. And prior to that time, you had no
12  knowledge of the potential to place an ad in Sports
13  Illustrated; is that right?
14  A. No, I did not.
15  Q. Okay. So am I correct that the first time
16  you heard about this was through an e-mail that you
17  received on your computer at work, correct?
18  A. That is correct, yes.
19  Q. I'm going to be moving to Exhibit 10, Tony
20  and Patrick.
21  I'd like you to please take a look at what
22  was previously marked as Plaintiff's Exhibit 10.
23  A. Okay.
24  Q. Have you had a chance to look over

**Page 48**

1  Plaintiff's Exhibit 10?
2  A. Yes, I have.
3  Q. Is this the e-mail that you just referred
4  to in your testimony?
5  A. That is correct.
6  Q. Okay. Now, can you identify for me the
7  portion of this e-mail string that you received on
8  September 30th that you had just identified in
9  your recent answer?
10  A. Actually it wouldn't be September 30th.
11  It would have been October 1st, because it was
12  sent in the evening of September 30th.
13  So I would have received it on
14  October 1st when I got to work that morning.
15  Q. All right. And what -- can you actually
16  tell us referring to the page number -- these page
17  numbers, by the way, have little digits on the
18  bottom that are marked.
19  A. Okay.
20  Q. And this one, for example, on
21  Plaintiff's 10 goes from JFS 000369 to JFS 000371.
22  A. Okay.
23  Q. Can you point to us to a particular page?
24  A. That would be on JFS 000369.

**Page 49**

1  Q. Okay. And what part of the e-mail string
2  on this page are you referring to as the message
3  that you received?
4  A. I'm referring to the e-mail from
5  Margie Kramer that had question, question, "Is this
6  in the works."
7  Q. Okay. And am I right that that's the
8  second part of the e-mail string on this first page
9  of Page 369?
10  A. You are correct, yes.
11  Q. And this is the e-mail that Margie Kramer
12  sent and that you said you received when you came to
13  work on October 1, right?
14  A. That is correct, yes.
15  Q. Now, when you received this, the -- what
16  did you do when you received the e-mail?
17  A. I reviewed it, and I went to American
18  Color or Vertis, it was Vertis, we still -- Vertis,
19  and I went, I spoke to Brian Tomasi and said we need
20  to get this in the works.
21  Q. Now, when you received the e-mail, was the
22  rest of the e-mail string that's included on
23  Plaintiff's Exhibit 10 attached to it?
24  A. Let me just look, okay --

### Page 54

1 Q. Prior to that had you known anything about
2 that?
3 A. No, I did not.
4 Q. Okay. Now, the third line says, "The ad
5 would need to be submitted by EOD Monday,
6 October 5th."
7 Do you see that?
8 A. Yes.
9 Q. Do you have an understanding of what EOD
10 means?
11 A. End of day Monday, October 5th.
12 Q. Okay. And then the fourth line says, "If
13 confirmed, here are the specs for the ad."
14 Do you see that?
15 A. Yes, I do.
16 Q. Okay. Now, when you read this, did you
17 have -- make a conclusion that this in fact was not
18 an advertisement that you were -- that the
19 defendants were being offered by Time?
20 MR. ZEULI: Objection, form.
21 THE WITNESS: I was looking at it more as
22 an image sort of tribute because it was
23 Michael Jordan and it was not going to be promoting
24 products.

### Page 55

1 BY MR. TILLACK:
2 Q. When you say it was Michael Jordan and not
3 going to be promoting products, how did you know
4 that?
5 A. Because it's a tribute. You're not -- you
6 don't promote products with a tribute.
7 Q. Why did you come to the conclusion that
8 the advertisement that was being solicited from the
9 defendants by Time was a tribute and not an
10 advertisement as you put it?
11 A. Because it said specific to
12 Michael Jordan, and you create it with a play on
13 words in the, what is it, the third bullet point.
14 Q. Yes, and that's where it says, "Retailer
15 designs the ad" --
16 A. Uh-huh.
17 Q. -- "and often creates it with some play on
18 words" --
19 A. Correct.
20 Q. -- "or design that is specific to
21 Michael Jordan"?
22 A. Correct.
23 Q. And from that you gathered that you would
24 not be selling products?

### Page 56

1 A. We were going to salute his induction into
2 the Hall of Fame and the fact that he was a Chicago
3 icon for so many years.
4 Q. But did anyone tell you that you were not
5 to sell products in the advertisement?
6 A. I'm sorry?
7 Q. Did anyone tell you that you were not to
8 sell products in the advertisement?
9 A. No, they did not.
10 Q. Did anyone tell you that you were not to
11 sell services in the advertisement?
12 A. No, they did not.
13 Q. So what was it about this particular
14 e-mail from Ann Anderson to Amy Thie that led you to
15 believe that neither products nor services were to
16 be offered with this advertisement that was being
17 solicited to the defendants?
18 A. Because this was a different sort of
19 assignment that we usually get. We usually get
20 things that, okay, you're going to promote, you
21 know, Pepsi, you're going to sell Pepsi along with
22 Michael Jordan.
23 This was Sports Illustrated. This was
24 like, okay, this is a chance to really just look

### Page 57

1 good, you know, have a nice ad for ourselves and to
2 promote Michael, you know, showcase Michael Jordan.
3 Q. The fourth bullet point on this particular
4 e-mail says, "Specs for the ad are located on this
5 site," and then it gives a website.
6 A. Uh-huh.
7 Q. And then it says, "Follow the Sports
8 Illustrated logos."
9 Do you see that?
10 A. Yes, I do.
11 Q. Now, did you go and look at what the specs
12 would be?
13 A. No, I did not.
14 Q. Okay. And do you know if anyone did?
15 A. Probably the Vertis production people.
16 Q. Okay. Why didn't you look to see what the
17 specs would be?
18 A. Because that was not my role.
19 Q. Okay. And what did you understand your
20 role would be with regard to this advertisement?
21 A. To create something with a play on words
22 to Michael Jordan.
23 Q. Okay. And just underneath that though it
24 says "specs for the ad are located."

## Page 70

1 intention.
2    Q. Regardless of whether it was the
3 intention, do you believe that it has that effect?
4       MR. ZEULI: Objection, asked and answered.
5       THE WITNESS: I do not.
6 BY MR. TILLACK:
7    Q. What was the purpose of you including the
8 words "Jewel-Osco" on your ad then?
9    A. It was a signature.
10    Q. When you say signature, what do you mean?
11       MR. ZEULI: I'm going to object to that
12 earlier question as to foundation.
13 BY MR. TILLACK:
14    Q. Okay. When you say signature, what does
15 that mean?
16    A. It was a signature because it was like
17 kind of a salute to him, and we had -- you know, we
18 needed to have a signature at the end. It's like,
19 okay, Michael Jordan, you did a great job, from your
20 friends at Jewel-Osco.
21    Q. You mentioned that you were a big
22 basketball fan, right?
23    A. Yes.
24    Q. And that you knew that Michael Jordan was

## Page 71

1 being inducted into the Hall of Fame, right?
2    A. Yes, I did.
3    Q. Did you think when you helped create this
4 ad that there was going to be any benefit by
5 associating Jewel-Osco with Michael Jordan?
6       MR. ZEULI: Object to the form of the
7 question.
8       THE WITNESS: No, I did not.
9 BY MR. TILLACK:
10    Q. Now, you said that when you received this
11 e-mail from Margie Kramer that the first thing you
12 did was go talk to Brian Tomasi, right?
13    A. That is correct, yes.
14    Q. And at that time when you received it, do
15 you remember what -- was it a Thursday? Was
16 October 1 a Thursday?
17    A. Yes, it was.
18    Q. Okay. Now, you wrote an e-mail back to
19 Margie Kramer, didn't you?
20    A. Yes, I did.
21    Q. And is that e-mail that one that appears
22 at the very top of the first page of Plaintiff's
23 Exhibit 10?
24    A. Yes, that is it.

## Page 72

1    Q. Okay. And you said, "Thanks, it's in the
2 works now."
3      Do you see that?
4    A. I do.
5    Q. Well, how did you know it was in the works
6 if you had never heard about it before?
7    A. Because once we received the e-mail, I
8 spoke to Brian and we knew we had to get rolling on
9 it, so it was in the works.
10    Q. Okay. But prior to that time, did you
11 have knowledge that it was actually in the works?
12    A. No, I did not.
13    Q. Did you -- let me start over.
14      Was Margie Kramer in the office when you
15 came in on October 1?
16    A. No, she was out ill.
17    Q. Okay. Was she out ill all that week?
18    A. Yes, she was.
19    Q. Okay. Do you know what she was suffering
20 from?
21    A. I do not, no. Sorry.
22    Q. Did you call her to talk to her about this
23 ad?
24    A. I think she was -- I believe she was

## Page 73

1 pretty sick, so I didn't want to call her about it.
2    Q. So let's go back to the e-mail that we
3 were just referring to, which is your e-mail to
4 Margie Kramer, and I think it's also to
5 Brian Tomasi, right?
6    A. Uh-huh.
7    Q. And that's October 1, correct?
8    A. Yes, you're correct.
9    Q. And you said, "Thanks, it's in the works
10 now," and then you asked a question. You said, "Do
11 we have to go with the 'Everyday Celebrations Are
12 Just Around the Corner' business that Acme did?"
13      Do you see that?
14    A. Yes, I do.
15    Q. What do you mean by that?
16    A. Because I thought that it was too selly
17 and it really didn't pay tribute to the Phillies,
18 and we wanted to pay tribute to Michael Jordan.
19    Q. I'm just -- I'm just trying to understand.
20       MR. ZEULI: I don't know how you do that.
21       MR. TILLACK: I'm just trying to
22 understand what your last answer was.
23      Can I rehear that last answer, please.
24       (Answer read.)

Page 74

1  BY MR. TILLACK:
2     Q. When you say too selly, what do you mean
3  by that?
4     A. It was -- it just -- let me think about
5  this.
6        It just seemed it was just hitting too
7  over the head. It didn't have any specific, it
8  didn't have -- it was just like a generic ad that
9  you could run, and we did not want to do that. We
10 wanted to do something that paid tribute to
11 Michael Jordan.
12    Q. Right. And so you were talking though in
13 this phrase, you were talking about the phrase when
14 you said "Do we have to go with the 'Everyday
15 Celebrations Are Just Around the Corner' business,"
16 you were talking about the phrase "Everyday
17 Celebrations Are Just Around the Corner," right?
18    A. Uh-huh.
19    Q. And you thought that was too selly?
20    A. And also it was not an everyday
21 celebration. It was a once-in-a-lifetime moment,
22 so ...
23    Q. But you thought that "Everyday
24 Celebrations Are Just Around the Corner" was too

Page 75

1  selly, right?
2     A. Yes, I did.
3     Q. Now, you're referring to the "Everyday
4  Celebrations Are Just Around the Corner" business
5  that Acme did.
6        What business are you referring to there?
7     A. That was just a phrase. It was just
8  e-mail speak.
9     Q. I understand that's a phrase, but what
10 actually are you referring to when you talk about
11 Acme in conjunction with that phrase?
12    A. That was the Acme ad that had been
13 attached to another e-mail that ran in Sports
14 Illustrated.
15    Q. I see, okay. So this was an attachment
16 that came with or that was supposed to have come
17 with one of these e-mails; is that right?
18    A. Yes.
19    Q. On Plaintiff's Exhibit 10, is there a
20 reference to that attachment?
21    A. It would be on -- see attached. It would
22 be on the e-mail on 000370 --
23    Q. Right.
24    A. -- from Ann Anderson to Amy Thie, and it

Page 76

1  said see attached.
2     Q. And that's in the very top paragraph where
3  it says, "This is similar to our offering Acme
4  commemorative ad space for the Phillies World Series
5  Championship"?
6     A. That is correct, yes.
7     Q. Okay. Let me ask you if you'd look one
8  e-mail up there on that same page, which is 370.
9        Do you see that, where it's from Amy Thie
10 to Bob Maag and Sue Herrick? Do you see that?
11    A. Yes, I do.
12    Q. And that's where Amy Thie says to Bob and
13 Sue, "Good morning, Bob/Sue. We have been offered
14 the opportunity for a free ad in the Sports
15 Illustrated Michael Jordan Commemorative Issue for
16 when he is inducted into the Hall of Fame. The
17 issue is on sale October 29th. We would like to
18 authorize that a small floor display is put up, two
19 pockets, at this time as well. Attached is an
20 example of what was done with Acme last year for the
21 Phillies winning the World Series."
22       Now, is it possible that your
23 understanding of what was done with regard to Acme
24 was because the prior ad was attached to the

Page 77

1  Amy Thie e-mail to Bob Maag and Sue Herrick?
2     A. It was not attached to the ad I received
3  originally though, the e-mail request I received.
4     Q. But now I'm just asking you for the
5  reference in the e-mail. You had earlier identified
6  it as being attached to the Ann Anderson.
7        Do you know that for a fact?
8     A. I just know because I see see attached.
9     Q. So you know that there was a prior ad
10 showing the Acme ad for the Phillies, right?
11    A. I do know that.
12    Q. Right.
13    A. Yes, yes.
14    Q. And you remember receiving that, correct?
15    A. Yes.
16    Q. Okay. Let me ask you to look at what was
17 previously marked as Plaintiff's Exhibit 8.
18       Now, do you see -- have you had a chance
19 to look at Plaintiff's Exhibit 8?
20    A. 000365?
21    Q. Right.
22    A. Yes.
23    Q. Okay. Now, that is a copy of an e-mail
24 string, correct?

### Page 82

1  was put together?
2  A. No, I did not.
3  Q. Okay. Did you know anybody who actually
4  put the Acme ad together?
5  A. No, I did not.
6  Q. Okay. So you were just looking at the ad
7  and asking the question based on what you saw that
8  day on October 1, right?
9  A. Yes, you're right.
10 Q. Okay. Thank you. Now, the phrase
11 "Everyday Celebrations Are Just Around the Corner,"
12 did you understand that to be a trademark of the
13 defendants?
14 A. It was part of the logo, yes.
15 Q. Were you using the phrase "Everyday
16 Celebrations Are Just Around the Corner" in the ad
17 work that you were doing for Jewel?
18 A. We generally used "Good things are just
19 around the corner."
20 Q. And you had used that prior to
21 October 2009; is that right?
22 A. You are right, yes.
23 Q. And when you say you used it, how did you
24 use that phrase?

### Page 83

1  MR. ZEULI: Objection, form.
2  THE WITNESS: We generally used it with
3  the logo.
4  BY MR. TILLACK:
5  Q. Okay. And you are now pointing to the ad
6  as it appears in Plaintiff's Exhibit 5?
7  A. Yes, uh-huh.
8  Q. And you say we used it with the logo.
9  What do you mean by that?
10 A. Because it was Jewel-Osco and then the
11 official tagline, which was "Good things are just
12 around the corner."
13 Q. So it's your testimony that when you used
14 the phrase "Good things are just around the corner"
15 you usually paired it with the Jewel-Osco logo,
16 right?
17 A. That is correct, yes.
18 Q. Do you understand that the Jewel-Osco logo
19 is a trademark of the defendants?
20 A. Yes, I do.
21 Q. And what kind of advertising did you use
22 the Jewel-Osco logo paired with "Good things are
23 just around the corner"?
24 A. As a logo it appeared with our circulars

### Page 84

1  and everything else.
2  Q. Okay. And when you say everything else,
3  what other things did you use besides circulars?
4  A. Circulars, ads, in store signage, direct
5  mailers, basically every -- you know, television,
6  the television spots.
7  Q. Okay. And did you understand that that
8  was identifying the source of the advertisement,
9  which was Jewel-Osco?
10 MR. ZEULI: Objection, form, and calls for
11 a legal conclusion.
12 Go ahead.
13 THE WITNESS: Yes, I did.
14 BY MR. TILLACK:
15 Q. Thank you. Did you ever receive any
16 instructions or guidance on how to use the phrase
17 "Good things are just around the corner"?
18 A. Through word of mouth, it was like, okay,
19 we're supposed to -- you know, nothing specific, but
20 it was like we're supposed to use it here and there.
21 Q. When you say you heard from word of mouth,
22 you mean you just talked to folks in the department,
23 is that it?
24 A. Yes, yes.

### Page 85

1  Q. Okay. And when you say we're supposed to
2  use it, who are you referring to as being the party
3  or the institution that was asking you to use it?
4  A. SUPERVALU corporate said that is the
5  phrase, the tagline that we would be using going
6  forward.
7  Q. And did you understand the tagline was to
8  be used on all your advertising?
9  A. Yes, I did.
10 Q. Okay. Now, in the -- let's go back to
11 Plaintiff's 10, if I could ask you to look at that.
12 A. Okay, Plaintiff's 10, let me find it here.
13 Okay.
14 Q. And in Plaintiff's Exhibit 10, the next
15 line in that same paragraph we were reading says, "I
16 was thinking that we could do something a little
17 more like the Pepsi ad."
18 Do you see that?
19 A. Yes.
20 Q. Okay. What Pepsi ad are you referring to
21 there?
22 A. We did -- we worked in conjunction with
23 Pepsi and we did an ad that kind of had some nice
24 copy saluting Michael Jordan. I believe it was