UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 10 C 340 |
| vs. | ) | |
| | ) | Judge Feinerman |
| JEWEL FOOD STORES, INC., and SUPERVALU INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| JEWEL FOOD STORES, INC., and SUPERVALU INC., | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TIME INC. and VERTIS, INC., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| _____ | ) | |
| | ) | |
| TIME INC., | ) | |
| | ) | |
| Third-Party Counter-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JEWEL FOOD STORES, INC., and SUPERVALU INC., | ) | |
| | ) | |
| Third-Party Counter-Defendants. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

In 2009, when Plaintiff Michael Jordan was inducted into the Naismith Memorial

Basketball Hall of Fame, Third-Party Defendant Time Inc. published a *Sports Illustrated*

*Presents* commemorative issue devoted to celebrating his career.  Doc. 77-1 at 2-3.  Time asked

-1-

numerous businesses, including Defendant/Third-Party Plaintiff Jewel Food Stores, Inc., to

design a page for the issue "with some play on words or design that is specific to Michael

Jordan." Doc. 102 at ¶ 29.  Jewel paid nothing for the opportunity, but did agree to stock and sell

the issue at special displays by the checkout counters of its grocery stores.  Doc. 101 at ¶ 15.

Jewel's internal copywriter created a message, and its marketing vendor, Third-Party Defendant

Vertis, Inc., designed the graphics.  Doc. 102 at ¶¶ 31, 32, 34.  Jewel's page and the issue's cover

are reproduced at the end of this opinion.

The page features a pair of basketball shoes spotlighted on the hardwood floor of a

basketball court.  The number Jordan wore for most of his tenure with the Chicago Bulls (23)

appears on the tongue of each shoe, with the following message positioned above:

> A Shoe In!  After six NBA championships, scores of rewritten record books
> and numerous buzzer beaters, Michael Jordan's elevation in the Basketball
> Hall of Fame was never in doubt!  Jewel-Osco salutes #23 on his many
> accomplishments as we honor a fellow Chicagoan who was "just around the
> corner" for so many years.

Beneath the text is Jewel's logo, which features its registered trade name "Jewel-Osco" in large,

underlined print.  Beneath the logo, in smaller font, is Jewel's slogan: "Good things are just

around the corner."  Jewel operates about 175 grocery stores in the greater Chicago area—hence

the reference to Jordan being Jewel's "fellow Chicagoan."  The page mentions no specific Jewel

product or service; Jewel does not sell basketball shoes.

Displeased with this unsolicited salute, Jordan sued Jewel in the Circuit Court of Cook

County, claiming that Jewel had improperly used his identity without authorization.  The

complaint alleges violations of the Illinois Right of Publicity Act, 765 ILCS 1075/1 *et seq*.; the

Lanham Act, 15 U.S.C. § 1125(a); the Illinois Consumer Fraud and Deceptive Trade Practices

Act, 815 ILCS 505/1 *et seq*.; and the common law tort of unfair competition. Jewel removed the case to federal court and filed a third-party complaint against Time and Vertis, seeking contribution and indemnification. Jewel's parent company, Supervalu Inc., was added as Jewel's co-defendant and as a third-party plaintiff. Except where the distinction is pertinent, Jewel and Supervalu will be referred to together as "Jewel." Time filed third-party counterclaims against Jewel and Supervalu for breach of contract and indemnification.

Before the court are Jewel's motion for summary judgment on all of Jordan's claims and Jordan's cross-motion for partial summary judgment, which asks the court to find that Jewel made commercial use of his identity. A significant and potentially dispositive issue to Jordan's claims is whether Jewel's page is "noncommercial speech," which receives full First Amendment protection, or "commercial speech," which receives lesser protection. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561-63 (1980). For the following reasons, Jewel's page is noncommercial speech. Because the parties did not adequately address the consequences to Jordan's various claims of such a holding, the court defers consideration of whether judgment in favor of Jewel and against Jordan should follow.

### A.      Whether The Classification Of Jewel's Page As Commercial Or Noncommercial Speech Is An Issue of Law For The Court

Jordan and Jewel agree that the classification of speech as commercial or noncommercial presents an issue of law for the court. Doc. 146 at 1-3; Doc. 156 at 2-3. That assessment is correct. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983) ("Because the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech, we must first determine the proper

-3-

classification of the mailings at issue here."); *Connick v. Myers*, 461 U.S. 138, 148 n.7, 150 n.10 (1983); *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1016 (3d Cir. 2008) ("the categorization of speech is a question of law that [the court] must resolve through independent review" of the speech at issue); *Joe Dickerson & Assocs., LLC v. Dittmar*, 34 P.3d 995, 1003 (Colo. 2001) ("The question of whether a use of plaintiff's identity is primarily commercial or noncommercial is ordinarily decided as a question of law."); *Dryer v. NFL*, 689 F. Supp. 2d 1113, 1118-19 (D. Minn. 2010) ("[T]he Supreme Court has … insisted that the ultimate question of whether speech is commercial is not factual but is a question of law.") (citing *Connick*); *Raymen v. United Senior Ass'n*, 409 F. Supp. 2d 15, 23 (D.D.C. 2006) ("Whether a communication is commercial or noncommercial is a question of law."); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326-28 (S.D.N.Y. 2006), *aff'd*, 279 F. App'x 40 (2d Cir. 2008).

Jordan and Jewel likewise agree that various considerations bearing on the classification of speech as commercial or noncommercial—whether the speech is an advertisement, whether the speech refers to specific products or services, and whether the speech has an economic motivation, *see Youngs Drug*, 463 U.S. at 66-67—present issues for the court and not a jury. Doc. 146 at 6-7; Doc. 156 at 3-5. That assessment is correct as well. In *Youngs Drug*, the Supreme Court evaluated those considerations on the record before it, without any suggestion that jury participation was required or even appropriate. 463 U.S. at 66-68. The Seventh Circuit has employed the same approach when classifying speech as commercial or noncommercial. *See United States v. Benson*, 561 F.3d 718, 725-26 (7th Cir. 2009); *see also*, *e.g.*, *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185-86 (9th Cir. 2001).

All that said, Jordan maintains that "if material facts relevant to the court's determination of whether the speech is commercial speech are in dispute, the jury should be given the opportunity to resolve them through the use of special interrogatories." Doc. 156 at 6. Even assuming Jordan were right, no evidentiary hearing is required here. Jordan and Jewel primarily dispute not the material historical facts surrounding Jewel's page, but the legal conclusions to be drawn from those facts. Moreover, given the procedural posture, any genuine disputes of material fact presented by the record have been resolved in Jordan's favor. Accordingly, it is appropriate for the court to decide whether Jewel's page is commercial or noncommercial speech.

**B.      Whether Jewel's Page Is Commercial Or Noncommercial Speech**

In *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989), the Supreme Court held that "speech that *proposes* a commercial transaction … is what defines commercial speech." *Id*. at 482. Four years later, the Court reiterated that "the proposal of a commercial transaction [i]s '*the test* for identifying commercial speech.'" *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (quoting *Fox*, 492 U.S. at 473-74). And just last year, the Court referenced the "commonsense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2674 (2011) (emphasis deleted) (internal quotation marks omitted).

Although the Supreme Court occasionally articulates the definition in slightly different ways, the Seventh Circuit has adhered to what *Discovery Network* called "*the test* for identifying commercial speech," which turns on whether the speech proposes a commercial transaction. *See*

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 684-85 (7th Cir. 1998). Applying that test, the Seventh Circuit expressly held that speech is not commercial if it does not propose a commercial transaction. *Id.* at 686 ("The advertised publications … are not commercial speech because they do not propose a commercial transaction between [the speaker] and a specific customer.") (citing *Fox*, 492 U.S. at 473). The First and Ninth Circuits are in accord. *See Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 49 (1st Cir. 2005) ("The provision of advertising and licensing services is not speech that proposes a commercial transaction and therefore does not constitute commercial speech."); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002) ("If speech is not 'purely commercial'—that is, if it does more than propose a commercial transaction—then it is entitled to full First Amendment protection.").

It is difficult to see how Jewel's page could be viewed, even with the benefit of multiple layers of green eyeshades, as proposing a commercial transaction. The text recounts some of Jordan's accomplishments and congratulates him on his career and induction into the Hall of Fame. The shoes, the number 23, and the hardwood floor evoke Jordan and the sport and team for which he enjoyed his principal success. (Baseball cleats from Jordan's detour with the Birmingham Barons, or basketball shoes redolent of his coda with the Washington Wizards, would have been out of place and in some tension with the page's congratulatory spirit.) At the most basic level, the page does not propose any kind of commercial transaction, as readers would be at a loss to explain what they have been invited to buy.

Jordan contends that Jewel's use of its trade name, Jewel-Osco, and its advertising slogan, "Good things are just around the corner," effectively propose a commercial transaction by

inviting the reader to visit Jewel stores. Doc. 136 at 3-5. As Jordan notes, Supervalu's nationwide advertising campaign directs Jewel and Supervalu's other regional grocery chains to use the slogan to promote their stores. Supervalu apparently believes that the slogan, by conveying that its stores are "just around the corner," excites consumers with the thought that the "good things" those stores offer are readily available and easy to get. Based on these facts, Jordan concludes that the page's statement that he "was 'just around the corner' for so many years" explicitly links him to Jewel's advertising campaign and thereby invites readers to enter into a commercial transaction.

Jordan's factual description of the role played by the "just around the corner" slogan in Supervalu's national advertising campaign has record support, and thus is credited at this juncture. But the conclusion Jordan draws from those facts—that the slogan's placement under Jewel's logo, and its deployment in the congratulatory text, means that the page proposes a commercial transaction—utterly fails to account for context. *See Adventure Commc'ns, Inc. v. Ky. Registry of Elec. Fin.*, 191 F.3d 429, 441 (4th Cir. 1999) ("Consideration of the full context of the speech is … critical."). This issue of *Sports Illustrated Presents* was not ordinary *Sports Illustrated* fare. It was a special commemorative issue expressly designed as a paean to Jordan, a fact confirmed by its title, "Jordan[:] Celebrating a Hall of Fame Career." Jewel's page embraces the issue's theme, focusing not on Jewel or its particular products and services, but on Jordan.

The page does use Jewel's logo, "Jewel-Osco." But the logo was the most effective way to identify Jewel as the speaker. Readers, particularly in Chicago, would have had trouble identifying the speaker if the page had been attributed to "Supervalu Inc." The same holds, though certainly to a lesser extent, if the formal corporate name "Jewel Food Stores, Inc." had

been used.  Because it is the name that appears on Jewel stores, "Jewel-Osco" more readily calls the company to mind than does "Jewel Food Stores, Inc."  Use of a formally correct though less familiar name could cause a moment's hesitation or confusion—hesitation and confusion that does not arise when a speaker is identified by his, her, or its more common name.

The use of Jewel's slogan—describing Jordan as being "just around the corner"—was simply a play on words, a cheeky way to ensure that the congratulatory message *sounded* like it was coming from Jewel and not any from other person or entity.  Imagine if Arnold Schwarzenegger, the movie star turned Governor of California, placed a page in the *Los Angeles Times* with this message after the Los Angeles Lakers won the 2009 NBA championship:

> Congratulations to our Lakers for 'terminating' the Orlando Magic and bringing home yet another NBA title, and to Kobe Bryant for winning the Finals MVP.  Let me join all Angelenos in saying that Kobe and the team surely will 'be back' in the 2010!

The reference to the "Terminator" movie franchise and Schwarzenegger's memorable catch-phrase ("I'll be back") from his lead role in the first installment personalize the congratulatory message.  Who other than Schwarzenegger would congratulate the Lakers and Bryant in precisely that way?  The "Terminator" references thus are deployed to make the congratulatory message more effective, not to tie the Lakers and Bryant to the "Terminator" franchise in an effort to encourage readers to buy Terminator DVDs and video games and thereby enhance Schwarzenegger's royalty checks.

That the same holds true for Jewel's page becomes clear upon viewing the "just around the corner" language in the context of the full sentence in which it appears: "Jewel-Osco salutes #23 on his many accomplishments as we honor a fellow Chicagoan who was 'just around the

corner' for so many years." In this context, "just around the corner" is deployed to serve the congratulatory theme—it personalizes the message and reinforces the notion that Jordan is Jewel's "fellow Chicagoan" and therefore a source of pride for Jewel and all other Chicagoans. It is highly unlikely that the slogan's presence would lead a reasonable reader to conclude that Jewel was linking itself to Jordan in order to propose a commercial transaction. And even if the slogan's presence somehow could be viewed as introducing some minimal element of commercialism, that element is intertwined with and overwhelmed by the message's noncommercial aspects, rendering the page noncommercial as a whole. *See Hoffman*, 255 F.3d at 1185 ("Any commercial aspects are inextricably entwined with expressive elements, and so they cannot be separated out from the fully protected whole.") (internal quotation marks omitted); *Adventure Commc'ns*, 191 F.3d at 441 ("When [commercial and noncommercial] elements are intertwined, the commercial or noncommercial character of the speech is determined by 'the nature of the speech taken as a whole.'") (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988)).

A fruitful comparison is provided by *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996), which concerned a 1993 General Motors television advertisement. The spot opened by calling Lew Alcindor a "champ" and noting that he was named the NCAA basketball tournament's outstanding player in 1967, 1968, and 1969. *Id.* at 409. The spot proceeded to ask: "Has any car made the 'Consumer Digest's Best Buy' list more than once?" and responded: "The Oldsmobile Eighty-Eight has. In fact, it's made that list three years in a row. And now you can get this Eighty-Eight special edition for just $18,995." *Ibid*. The spot closed by calling the Oldsmobile Eighty-Eight "A Definite First Round Pick." *Ibid*. All this led the court of appeals

to conclude that the spot conveyed the message that the Eighty-Eight, just like Alcindor, "won an 'award' three years in a row … and … is a 'champ' and a 'first round pick.'" *Id*. at 413. GM touted Alcindor's accomplishments as a means to propose commercial transactions—sales of a particular Oldsmobile model—not as a means to congratulate him on honors he earned a quarter century before the spot aired. The opposite is true of Jewel's page.

The discussion thus far has been limited to a general inquiry into whether Jewel's page "proposes a commercial transaction," the test set forth in *Discovery Network* and *Commodity Trend Service*. The result of that inquiry—a finding that no commercial transaction was proposed—is confirmed by examining three subsidiary considerations that the Supreme Court and the Seventh Circuit consult when determining whether speech is commercial or noncommercial. Those considerations are "whether: (1) the speech is an advertisement; (2) the speech refers to a specific product [or service]; and (3) the speaker has an economic motivation for the speech." *Benson*, 561 F.3d at 725 (citing *Youngs Drug*, 463 U.S. at 66-67). No single consideration is sufficient, standing alone, to find speech to be commercial. *See Youngs Drug*, 463 U.S. at 66-67 ("The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech. Similarly, the reference to a specific product does not by itself render the pamphlets commercial speech. Finally, the fact that [the speaker] has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech.") (citations and footnote omitted). Nor is any single consideration a necessary condition of finding speech to be commercial. *See id*. at 67 n.14 ("Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial.").

The first consideration is whether Jewel's page "is an advertisement." *Benson*, 561 F.3d at 725. Jordan points to Jewel's use of its logo and "Good things are just around the corner" slogan as evidence that the page is an advertisement. That submission is unpersuasive for the reasons set forth above; the slogan, by means of a pun, was put to work in service of honoring and congratulating Jordan. Jordan also notes that Jewel personnel referred to the page as an "ad," as did Time personnel when offering the page to Jewel. Doc. 101 at ¶¶ 28-29; Doc. 104. But the word "ad" clearly was used as convenient shorthand; there is no equivalently precise and pithy term for the kind of page that Jewel and others placed. The point is confirmed by correspondence regarding a page placed by Charleen and Peter Onanian, family friends of Jordan, in the enshrinement magazine published by the Basketball Hall of Fame. Doc. 102 at ¶ 38; Doc. 77-6 at 2-3. In attempting to distinguish the Onanian page from the Jewel page, Jordan argues that "[u]nlike Jewel, the Onanians made no commercial use of Jordan's name." Doc. 136 at 12. Yet in email correspondence that Jordan himself cites to support his submission that the "Onanian tribute was authorized by Jordan's representatives," Doc. 101 at ¶ 43, the correspondents refer to the Onanian page as an "ad," Doc. 110. The Onanian page was not an advertisement, despite its being referred to as an "ad." The same holds for Jewel's page.

Other aspects of Jewel's page affirmatively distinguish it from an advertisement. Jewel paid no money for the page; it agreed only to stock copies of the commemorative issue in its stores. *See Hoffman*, 255 F.3d at 1185 (noting that the defendant magazine publisher did not receive consideration for publishing the speech in question); *cf. U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 934 (3d Cir. 1990) ("there is no question that [the statements] are advertisements; they were disseminated as part of an expensive, professionally

-11-

run promotional campaign"). Nor does Jewel's page focus on or praise any product or service; rather, the praise is directed towards Jordan. *See Hoffman*, 255 F.3d at 1185 (noting that the defendant magazine publisher "did not use [Dustin] Hoffman's image in a traditional advertisement printed merely for the purpose of selling a particular product"); *cf. Facenda*, 542 F.3d at 1017 (concluding that the speech at issue was an "advertisement" because, "[l]ike an informercial, the program focuses on one product, explaining both how it works and the source of its innovations, all in a positive tone"). The page was timed to coincide with Jordan's induction into the Hall of Fame, not to any Jewel promotion. *Cf. ibid*. ("the program was only broadcast eight times in a three-day span immediately before the release of the video game to retail stores—much like an advertisement for an upcoming film").

One other fact weighs against finding the Jewel page to be an advertisement. Pending in another courtroom in this District is a lawsuit brought by Jordan against Dominick's Finer Foods LLC regarding a page that it placed in the same commemorative issue. *Jordan v. Dominick's Finer Foods LLC*, No. 10 C 407 (N.D. Ill. filed Jan. 20, 2010) (Shadur, J.). The Dominick's page, which is reproduced at the end of this opinion, says "Congratulations Michael Jordan[:] You Are a Cut Above"; beneath that message is a picture of a Rancher's Reserve steak and a coupon for said steak. *Jordan*, 10 C 407, Doc. 37 at 2. The fact that Jewel and Dominick's, fierce competitors in the Chicago grocery market, both placed pages in the commemorative issue is significant because anybody inclined to be swayed by Jordan's appearance in an advertisement knows that he does not play on two or more sides of the same fence, commercially speaking. Jordan is Hanes, not Jockey or Fruit of the Loom; Nike, not Adidas or Reebok; Chevrolet, not Ford or Chrysler; McDonald's, not Burger King or Wendy's. A reader who purchased the

commemorative issue and saw the Jewel and Dominick's pages would know, instinctively, that the Jewel page was not an advertisement.  This is particularly so because the Dominick's page pictures a steak and offers a coupon; if somebody were to view one of the pages as an advertisement, it would be the Dominick's page.  (Dominick's has not sought judgment on the ground that it engaged in noncommercial speech.)  The reader would see the Jewel page for precisely what it is—a tribute by an established Chicago business to Chicago's most accomplished athlete.

The second consideration asks whether the page "refers to a specific product."  *Benson*, 561 F.3d at 725.  Jordan contends that Jewel's slogan and logo effectively refer to all of Jewel's products and services.  The contention is unpersuasive.  The name and slogan of any business will evoke that business's products or services *in general*—McDonald's, fast food; IKEA, affordable furniture; Mercedes, luxury transportation; Apple, stylish technology.  But the Jewel page does not refer to a *specific* product or service, which is the relevant inquiry.  *See ibid*.; *Facenda*, 542 F.3d at 1017 (asking whether "the speech refer[s] to a specific product or service").  This is not to say that the failure to refer to a specific product or service *automatically* renders speech noncommercial.  *See id*. at 67 n.14 ("we express no opinion as to whether reference to any particular product or service is a necessary element of commercial speech").  If Jewel's page pictured a fully set Thanksgiving table, but no food or other products sold at Jewel stores, the page still might have been commercial.  *See* Tom Bennigson, Nike *Revisited: Can Commercial Corporations Engage in Non-Commercial Speech?*, 39 Conn. L. Rev. 379, 389 (2006) ("A Nike ad showing nothing but the Nike logo and the slogan 'Just do it,' perhaps accompanied by footage of beautiful people running, is commercial speech if anything is, though it does not refer

-13-

to any specific products."). But there is nothing in Jewel's page even remotely as evocative of its products and services.

The third consideration asks whether Jewel had "an economic motivation" for placing the page. *Benson*, 561 F.3d at 725. Jordan presents evidence, which again at this juncture is credited, that Jewel congratulated Jordan in the commemorative issue to promote itself to customers, to enhance its goodwill, and to convey that it is a good Chicago citizen. Doc. 101 at ¶ 29; Doc. 178. *Of course* that is why Jewel placed the page. To say that a for-profit corporation like Jewel has an "economic motivation" for taking any particular action is to state a truism. *See* American Law Institute, 1 Principles of Corporate Governance § 2.01(f) ("a corporation … should have as its objective the conduct of business activities with a view to enhancing corporate profit and shareholder gain"). As Jordan's able counsel correctly observed at argument on the cross-motions: "I think everything a corporation does and should seek to do should be to promote its business. Now, part of that is to promote its reputation and the way it's viewed in the community by customers and potential customers." 11/2/2011 Tr. at 12.

Some have invoked that truism to argue that a corporation's speech, by definition, must be classified as commercial. *See* Bennigson, 39 Conn. L. Rev. at 395 ("[A]ll corporate expenditures—including expenditures for corporate speech—are supposed to further the interests of the corporation, and the interests of the corporation are purely economic. Thus any speech financed by a for-profit corporation, if it is not a misappropriation of corporate funds, is commercial, in that the only legitimate criterion for deciding to fund the speech is whether it serves the commercial interests of the company."). That argument was definitively rejected in *Youngs Drug*, where the Supreme Court ruled that "the fact that [the speaker] has an economic

-14-

motivation for mailing the pamphlets would *clearly* be insufficient by itself to turn the materials into commercial speech." 463 U.S. at 67 (emphasis added); *see also* Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 Va. L. Rev. 627, 640 (1990) ("[t]he commercial speech distinction cannot turn on the profit motive of the speaker; the labeling of speech as commercial has to be the result of an examination of the speech itself"). The notion that a speaker's economic motivation renders speech commercial, and thus less deserving of First Amendment protection, has not gained any traction—at least not among those whose decisions a lower court must follow—in the nearly three decades since *Youngs Drug* was decided.

In sum, Jewel's economic motivation for producing and placing its page in the commemorative issue does not render the page commercial speech. *See Adventure Commc'ns*, 191 F.3d at 441 ("In and of itself, profit motive on the speaker's part does not transform noncommercial speech into commercial speech."). The governing precedents require that there be something more, and that something is missing from this case. Accordingly, Jewel's page is noncommercial speech entitled to full First Amendment protection.

The court recognizes that this conclusion rests in part on judgments regarding how reasonable readers would view the page. Those judgments are necessary in First Amendment cases asking whether challenged speech is commercial or noncommercial; as noted above, that decision is committed to the court as an issue of law. Because "judges are not perceptual psychologists or marketing experts," *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 509 F.3d 380, 383 (7th Cir. 2007), it is possible that consumer surveys might bear upon a court's judgment by indicating whether people actually consider the challenged speech to have proposed a commercial transaction. *See generally Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626-28 (1995)

-15-

(considering survey evidence in applying the second prong of the *Central Hudson* test for determining the validity of restrictions on commercial speech). The matter need not be considered here, however, because no party submitted evidence of any such survey. *See Top Tobacco*, 509 F.3d at 383 (noting that the trademark plaintiff did not conduct a consumer survey to support its view regarding consumer confusion). Based on the evidence of record, including relevant pages from the commemorative issue and historical facts concerning the development and placement of Jewel's page, the far better view is that Jewel's speech is noncommercial.

### C.   Whether Further Briefing Is Necessary On Whether Jordan's Claims Can Proceed Given That Jewel's Page Is Noncommercial Speech

As for the implications of this holding for Jordan's claims, the parties offer little guidance. Jewel contends that the First Amendment's "protections include a complete defense to all of Jordan's claims in his amended complaint," Doc. 74 at 15, but its discussion is perfunctory. Jordan contends in a footnote that "[e]ven if Defendants' use of Jordan's identity were non-commercial, the First Amendment would not provide them with a complete defense," Doc. 100 at 13 n.5, but its submission is equally perfunctory. The court respectfully requests that Jordan and Jewel—and Time and Vertis if they would like—submit simultaneous briefs on whether the noncommercial status of Jewel's page conclusively defeats Jordan's claims. Those briefs should separately address the Lanham Act, Illinois Right of Publicity Act, Illinois Consumer Fraud and Deceptive Trade Practices Act, and common law unfair competition claims, and should be filed by February 27, 2012. Simultaneous response briefs may be filed by March 19, 2012.

*      *      *

For the foregoing reasons, Jewel's page in the *Sports Illustrated Presents* commemorative issue is noncommercial speech within the meaning of the First Amendment. Jewel's summary judgment motion is granted insofar as it seeks resolution of that question; the motion is denied without prejudice insofar as it seeks judgment on Jordan's claims. Jordan's motion for partial summary judgment is denied. Because the supplemental briefing requested above may result in entry of judgment for Jewel on Jordan's claims, Time's and Vertis's summary judgment motions—which seek judgment on Jewel's third-party claims against them—are denied without prejudice. If any of Jordan's claims survive, Time and Vertis may reinstate their motions.

February 15, 2012

_____
United States District Judge





