**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL JORDAN, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 10-340 |
| JEWEL FOOD STORES, INC., et al. | ) | Judge Gary Feinerman |
| Defendant. | ) ) | |
| v. | ) ) | |
| TIME INC. and VERTIS, INC. | ) ) | |
| Third Party Defendants. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THIRD PARTY DEFENDANT
TIME INC.'S MOTION FOR SUMMARY JUDGMENT**

**I.  PRELIMINARY STATEMENT**

The Seventh Circuit found Jewel Food Stores Inc.'s tribute ad celebrating the induction of Michael Jordan ("Jordan") into the Hall of Fame (the "ad") to be commercial speech largely because the ad "serves an economic purpose: to burnish the Jewel-Osco brand name" by "prominently featur[ing] the 'Jewel-Osco' logo and marketing slogan". *Jordan v Jewel Food Stores, Inc.,* 743 F.3d 509, 512, 519-20 (7th Cir. 2014).  As the Seventh Circuit repeatedly recognized, the commercial benefit of the ad ran to Defendants Supervalu, Inc. and Jewel Food Stores, Inc. (together "Jewel").  Indeed, in keeping with that finding, the undisputed facts establish that Time Inc. ("Time"), publisher of *Sports Illustrated* ("SI"), did not create the challenged tribute.  Time did not design the ad; write any copy for the ad; choose to feature basketball shoes, or the number "23;" nor did it review or approve the ad prior to its submission.  Most telling, as Jewel admits, Time had nothing to do with Jewel's decision to feature its logo and marketing slogan "Good Things are Just Around the Corner" in the ad, the very features

highlighted by the Seventh Circuit in reaching its commercial speech conclusion. All Time did was offer free advertising space in a *Sports Illustrated* Presents Commemorative magazine and thereby provided the forum for Jewel's tribute. None of these facts are in dispute.

Nonetheless, via third party claims for contribution and indemnity, Jewel attempts to shift the blame to Time. However, Jewel's contribution claims fail, first, because contribution cannot be obtained for intentional torts such as Jordan's right of publicity claims and, next, because Jordan has not – and could not – state a claim against Time arising out of the ad, the necessary predicate for contribution. In an unbroken line of cases across the country, it is consistently found that publishers like Time are not responsible for claims arising out of the content of ads placed in magazines, in no small part because the publisher obtains no commercial benefit from the *content* of the ad. Nor is there any possible basis for a theory that Time indemnified Jewel for the ad. Time had an arm's length vendor/vendee relationship with Jewel, which is not the sort of pre-tort relationship required for the law to imply an indemnity. Further, under any analysis of the facts, there is no basis for the required finding for indemnity that Jewel was "blameless" and that Time was the truly culpable entity. For these several independent reasons, Jewel's third party claims of contribution and indemnity against Time should be dismissed.

## II. SUMMARY OF FACTS

In 2009, Michael Jordan was inducted into the Basketball Hall of Fame. Facts ¶ 1. To celebrate his career, Time published a *Sports Illustrated Presents* commemorative magazine (the "Issue"); and was solely responsible for the Issue's editorial content. Time also solicited tributes and other advertising to be included in the Issue. Thus, on September 22, 2009, a representative of Time sent an email to Supervalu (and its brand Jewel) offering a page of advertising in the Issue. Facts ¶¶ 20-21, Ex. K. The ad was offered gratis, in exchange for certain commitments involving the placement and merchandising of the Issue in Jewel-Osco stores. Facts ¶ 21, Ex. K.

2

The relevant email referred Jewel to Time's online advertising "portal," where technical specs for the ad could be found, and noted that "retailer designs the ad" and "often creates it with some play on words or design that is specific to Michael Jordan." Facts ¶¶ 21-23, Ex. K. The email does not state or imply that Time would indemnify Supervalu and Jewel for the ad they were to design. Facts ¶ 24, Ex. K.

Jewel agreed to submit an ad and provide the merchandising commitments. Facts ¶¶ 31-32, Ex. K. As found by the Seventh Circuit, the fact that Jewel gave Time "valuable consideration" of floor space in its grocery stores, "suggest[ed] that it [Jewel] expects valuable brand-enhancement benefit from [the ad]. *Jordan*, 743 F.3d at 520. On or about October 5, 2009 Jewel submitted its ad via Time's advertising portal and Time published the ad. Facts ¶¶ 61-63. Time played no role in the creation or design of the tribute; no one involved with its creation communicated with anyone from Time or *SI* regarding the tribute (or for any other purpose), and neither the drafts nor the final product were presented to Time for comment or approval. *Id.* ¶¶ 36-64, 73-74. More specifically, every Jewel witness agreed that they could have designed an ad to include a "play on words or design" specific to Jordan without using his identity *and* that it was Jewel's decision alone to use its slogan "Good Things are Just Around the Corner" in the ad. *Id.* ¶¶ 29, 58, 74, 75.

Jordan sued Jewel in state court on December 21, 2009 asserting claims under the Lanham Act and state law claims of (1) violation of Illinois' Right of Publicity Act, (2) violation of Illinois' Consumer Fraud and Deceptive Trade Practices Act, and (3) common law unfair competition. Ex. S. On March 9, 2010, Jewel asserted third party claims against Time for Statutory Contribution, Common Law Contribution, and Indemnification. Prior to this Court's entry of summary judgment in Jewel's favor, Time filed a motion for summary judgment on

3

Jewel's third party claims. (Doc. 119). This Court denied Time's motion without prejudice to it being reinstated should any of Jordan's claims survive appeal. Following the Seventh Circuit's decision, Time now renews its motion for Jewel's claims against it to be dismissed.

### III. ARGUMENT

**A. Federal Law Prohibits Contribution and Indemnity Claims Under The Lanham Act**

There is no contribution or indemnity for Lanham Act claims. *See Wagner v. Circle W. Mastiffs*, 2010 WL 1009904, at *9-10 (S.D. Ohio Mar. 12, 2010) ("[c]ourts have consistently concluded that there is no right to indemnification or contribution under the Lanham Act," and collecting cases). For this reason, Jewel cannot obtain contribution or indemnity against Time with respect to Jordan's Lanham Act claims.

**B. Contribution Under The Joint Tortfeasor Act Or Common Law Is Unavailable For Any Violation Of Illinois' Right Of Publicity Act, Which Is An Intentional Tort**

It is long established that contribution is not available under the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2 *et seq.*, for damages awarded for intentional torts. *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 542 (Ill. 1989); *Hollinger Int'l, Inc. v. Hollinger Inc.*, 2006 WL 1444916, at *2 (N.D. Ill. Jan. 25, 2006) ("Courts have also interpreted the Act as prohibiting contribution claims based upon intentional torts."). This court has found that contribution under the common law is likewise barred for intentional torts. *Sorrano v. N.Y. Life Ins. Co.*, 2005 U.S. Dist. LEXIS 30962 at *11-12 (N.D. Ill. Jan. 29, 2005).

There can be no dispute that Illinois' Right of Publicity Act is an intentional tort. The Act requires proof of the same three elements as the common law privacy claim it supplanted: "an appropriation of one's name or likeness, without one's consent, for another's commercial benefit." *Blair v. Nevada Landing P'ship*, 859 N.E.2d 1188, 1191-92 (Ill. App. 2d Dist. 2006). A right of publicity claim can only be stated when the defendant "seeks to obtain for himself the

4

values or benefits of the plaintiff's name or identity" and thereby necessarily requires an element of intentionality. Restatement (Second) Torts § 652 & cmts (1977). *See, e.g.*, 1-6 Illinois Tort Law § 6.01 ("It is generally agreed that at the very least each of [the four branches of the invasion of privacy tree] is an intentional tort so that an allegation of merely negligent invasion of privacy will be dismissed.").[1] Courts nationwide agree. *See*, *e.g.*, *Merritt, Flebotte, Wilson, Webb & Caruso v. Hemmings*, 676 S.E.2d 79, 89 (N.C. App. 2009) (affirming dismissal of right of publicity counterclaim where evidence, at best, showed negligence, because "[d]efendants did not allege that [p]laintiffs were negligent, but instead brought a claim for the intentional tort of invasion of privacy"); *Chang v. Virgin Mobile USA, LLC*, 2009 WL 111570, at *5 n.17 (N.D. Tex. Jan. 16, 2009) (noting that invasion of privacy claims are "intentional torts"); *Jimenez v. Conley Magazine, L.L.C.*, 2006 WL 3716649, at *2 (W.D. Tex. Dec. 14, 2006) (same). Thus, as with Jordan's Lanham Act claims, Jewel may not obtain any contribution from Time arising out of Jordan's claim under the Right of Publicity Act.[2]

**C. Defendants' Statutory And Common-Law Contribution Claims Fail Because Time Is Not Subject to Liability to Jordan Under Any Remaining State Law Claims**

Under the Illinois Joint Tortfeasor Contribution Act and common law contribution, there is a "right of contribution" among two or more persons *only* if they are both "subject to liability

---

[1] It is evident that right of publicity claims are intentional torts for the additional reason that they are subject to the one-year statute of limitations applicable for intentional torts. *See Blair*, 369 Ill.App.3d at 323, 859 N.E.2d at 1192 (applying 735 ILCS 5/13-201 to statutory right of publicity claims).

[2] Jewel will no doubt again attempt to confuse "intention" with "willfulness" and argue that whether they proceeded willfully is a question of fact. Relying on *Doe v. Templeton*, Jewel has argued that one could state a claim under the Act for mere negligence. However, *Doe* did not hold or even address whether a right of publicity claim is an intentional tort, but rather found only that right of publicity violations are not necessarily *willful* for an award of punitive damages. 2004 U.S. Dist. LEXIS 15409, at *14-16 (N.D. Ill. Aug. 5, 2004). But, it is a "faulty assumption that willful is synonymous with intentional." *Sorrano*, 2005 U.S. Dist. LEXIS 30962 at *10-11. An intentional tort is one where the action requires a measure of general or specific intent, *i.e.,* where the use of Jordan's identity was *for the purpose of* commercially benefiting from his identity. *See, e.g.*, Black's Law Dictionary 1497 (7th ed. 1999). Whether Jewel acted willfully may be a question of fact, but as a matter of law, a right of publicity claim is an intentional tort.

5

in tort arising out of the same injury" to Plaintiff. 740 ILCS 100/2; *Vroegh v. J&M Forklift*, 651 N.E.2d 121, 125 (Ill. 1995) ("[A] party's obligation to make contribution rests on his liability in tort to the injured . . . party, *i.e.,* the plaintiff in the underlying action."); *Genzyme Corp. v. Discount Drugs Wisconsin, Inc*., 2010 WL 3721473, at *9 (N.D. Ill. Sept. 13, 2010). In other words, Jewel must show "*some* basis for liability to the original plaintiff." *Vroegh,* 651 N.E.2d at 125 (emphasis added). Thus, for Jewel to have a contribution claim against Time for Jordan's non-intentional tort claims – even assuming that would include right of publicity – Jewel must show that Time owed *Jordan* a duty that it breached. But as set forth below, Jewel has no right of contribution against Time because Jordan has no claim against Time for the following reasons: (1) Time owed no duty to Jordan because publishers owe no duty to third parties arising out of the content of ads placed; (2) Time did not benefit commercially from the content of Jewel's ad and did not determine the content that gave rise to Jordan's claims against Jewel. For these independent reasons, Jewel's contribution claims fail.

   **1.  As A Matter Of Law, Time Has No Duty To Jordan**

"[I]n order to establish liability [for contribution], a defendant must have breached a duty owed to the plaintiff." *Taake v. WHGK, Inc*., 592 N.E.2d 1159, 1176 (Ill App. 5th Dist. 1992) (upholding directed verdict in favor of third party defendant on contribution claim, finding that third party manufacturer of air filter unit at college had no duty to plaintiff, a maintenance employee of college injured by the unit). Jewel does not even plead that Time owed Jordan any duty and for good reason. *See* Ex. I ¶¶ 36-37. The law is well established that publishers like Time have no duty to monitor the content of advertising placed in their publications, nor do they assume responsibility for third-party claims arising out of such ads.

   In an unbroken line of authority, courts have refused to impose a duty on publishers to pre-screen advertisements for legal issues except in very limited cases not at issue here (such as

6

when an ad explicitly solicits criminal activity). *See Goldstein v. Garlick*, 318 N.Y.S.2d 370 (Sup. Ct. N.Y. Cty. 1971) (newspaper not liable for misappropriation or other torts related to ads that allegedly injured advertisers' competitors); *see generally Eimann v. Soldier of Fortune Magazine, Inc.* 880 F.2d 830, 838 (5th Cir. 1989) (magazine not liable for publishing personal services classified ad through which victim's husband hired assassin to kill her); *Boyd v. Keyboard, Network Magazine*, 2000 WL 274204, at *2 (N.D. Cal. Mar. 1, 2000) (magazine had no duty to investigate ad fraudulently using name of reputable company and soliciting business allegedly to benefit from other company's goodwill), *aff'd*, 246 F.3d 672 (9th Cir. 2000).[3]

"If state tort law places too heavy a burden on publishers with respect to the advertisements they print, the fear of liability might impermissibly impose a form of self-censorship on publishers," and "compromise the First Amendment interest in commercial speech" by depriving protected speech "of a legitimate and recognized avenue of access to the public." *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F. 2d 1110, 1117 (11th Cir. 1992), *see also Yuhas v. Mudge*, 322 A.2d 824, 825 (N.J. Super. A.D. 1974) (magazine not liable for injuries resulting from use of defective fireworks advertised in magazine). As one California appellate court recognized, to impose such a duty would

> require publications to maintain huge staffs scrutinizing and testing each product offered. The enormous cost of such groups, along with skyrocketing insurance rates, would deter many magazines from accepting advertising, hastening their demise from lack of revenue. Others would comply, but raise their prices beyond the reach of the average reader. Still others would be wiped out by tort judgments, never to revive. Soon the total number of publications in circulation would drop dramatically.

---

[3] This basic principle was resolved decades ago. *See*, *e.g.*, *Pittman v. Dow Jones & Co.* 662 F. Supp. 921 (E.D. La. 1987) (Wall Street Journal not liable for fraudulent statement appearing in financial institution's ad), *aff'd*, 834 F.2d 1171 (5th Cir. 1987); *Walters v. Seventeen Magazine,* 241 Cal. Rptr. 101, 102 (Ct. App. 1987) (magazine not liable in tort for publishing ad for tampon that caused toxic shock syndrome); *Pressler v. Dow Jones & Co.*, 450 N.Y.S.2d 884 (N.Y. App. Div. 2d Dep't 1982); *Stoianoff v. Gahona,* 670 N.Y.S.2d 204, 205 (N.Y. App. Div. 2d Dep't 1998) ("no duty on the part of a publisher to investigate its advertiser absent a special relationship between the parties," and "no such legal duty rests upon a newspaper unless it undertakes to guarantee, warrant, or endorse the product").

7

*Walters*, 241 Cal. Rptr. at 103; *see also Vail! v. Oneida Dispatch Corp.*, 493 N.Y.S.2d 414, 416 (Sup. Ct. N.Y. Cty. 1985) (recognizing that such a duty would increase costs of advertising substantially). In short, since Time owed no duty to Jordan to monitor the content of ads placed by parties like Supervalu and Jewel in the Issue, Jewel has no right of contribution from Time.

      **2.    Undisputed Facts Establish Any Commercial Benefit From The Alleged Use Of Jordan's Identity Was Jewel's, Not Time's**

In order to state a claim against Time, Jordan would have to show that the use of his identity was commercial speech *by Time*, *i.e.*, that Time had an economic motivation behind the use of Jordan's identity, and acted, with respect to the content of the tribute, "for the purpose of promoting sales of, or other commercial transactions in, [Time's] products or services." *Kasky v. Nike*, 27 Cal.4th 939, 962 (Cal. 2002). Thus, to sustain their contribution claim, Defendants must also show that the use of Jordan's identity commercially benefitted Time. However, the Seventh Circuit explained that Jordan's claims though "aris[ing] from different sources of law" all "center on Jordan's allegation that Jewel misappropriated his identity for its commercial benefit." *Jordan*, 743 F.3d at 513. Since it is not Time's products, services, or goodwill being promoted in the tribute, Jordan could not state a claim against Time because it received no commercial benefit as a result of any association the tribute made between Jewel and Jordan.

This conclusion was demonstrated in *Newcombe v. Adolf Coors Co.*, 157 F.3d 686 (9th Cir. 1998), based on a set of facts that are remarkably similar to the current case. In *Newcombe*, former major league baseball player Don Newcombe sued Coors, its advertising agency, and Time relating to a beer ad in *SI* that allegedly used his likeness and identity. Like Illinois, California's misappropriation statute prohibits the unauthorized use of an individual's likeness for commercial purpose or commercial advantage. Affirming summary judgment to Time, the Ninth Circuit found that "the use of Newcombe's likeness could not be said to have directly

8

benefited Time, Inc., the publisher of *SI*, because the benefit they received – payment for the advertising space – was unrelated to the content of the advertisement." *Id*. at 693. *See also Stewart v. Rolling Stone*, 105 Cal. Rptr. 3d 98, 115 (Cal. 1st Dist. 2010) (since accepting advertising in a magazine does not create a "direct financial interest in the companies that purchase this advertising or in the products these advertisers sell," the publisher does not achieve the necessary commercial benefits to state a right of publicity claim).[4]

Here, the merchandising commitments Time received from Jewel in exchange for the ad placement were wholly unrelated to the substantive content of Jewel's tribute to Jordan. Time received no commercial benefit from any association perceived between Jordan and Jewel. To the contrary, over and over the Seventh Circuit recognized that the commercial benefit from the use of Jordan's identity ran to Jewel, not Time, observing, for example, that "Jewel gave Time valuable consideration – floor space in Jewel-Osco grocery stores – in exchange for the full-page ad in the magazine, suggesting that *it* [Jewel] expected valuable brand-enhancement benefit from it." *Jordan*, 743 F.3d at 520 (emphasis added). *See also id*. at 518, ("Jewel's ad . . . enhanc[ed] the Jewel-Osco brand in the minds of consumers"; "ad is plainly aimed at fostering goodwill for the Jewel brand among the targeted consumer group – 'fellow Chicagoans' and fans of Michael Jordan – for the purpose of increasing patronage at Jewel-Osco Stores"). Were the mere receipt of advertising dollars, or merchandising commitments, enough to provide the commercial component necessary for Jordan to state a claim against Time, publishers would automatically be

---

[4] *Stewart* also belies Jewel's argument that Time somehow assumed a duty to Jordan because it solicited merchandising commitments, rather than "passively" accepting the ad. In *Stewart,* the evidence showed that *Rolling Stone* had solicited Camel's ad and had told R.J. Reynolds "the topic that would be covered in the Feature and [RJR] designed the surrounding advertisement to complement this topic." *Stewart, supra,* at 689. Nonetheless, plaintiffs' right of publicity claims were rejected, because *Rolling Stone* had no business interest in the cigarettes that were the subject of RJR's advertising. Indeed, only the "rose-colored glasses" disdained by the Seventh Circuit in this action would lead one to conclude that magazine publishers "passively" sit back and wait for advertising commitments to come in over the transom. *Jordan*, 743 F.3d at 518.

9

responsible for all kinds of claims flowing from the content of ads. That is not the law. Thus, in short, Jordan could not state a right of publicity (or unfair competition or Deceptive Trade Practices) claim against Time because it received no commercial benefit from the content of Jewel's ad.

### 3. Undisputed Facts Establish Time Neither Assumed A Duty To Jordan Nor Breached Any Such Duty

The undisputed facts also establish Time did not assume a duty *to Jordan*. Ex. I ¶¶ 36-38 (alleging that Time owed a duty *to Jewel*). Quite the opposite. The email offer to Jewel – Defendants' only communication with Time regarding the ad – clearly states that the "retailer designs the ad" and makes no offer to Jewel of review or consultation by Time. Facts ¶ 22, 26, Ex. K. Further, *SI*'s advertising terms and conditions expressly provide that the advertiser bears responsibility for the content of the ad and warrants that the ad will not violate any third party's rights, Facts ¶ 11, Declaration of Nancy Ryan ("Ryan Decl.")[5] Ex. B. Even without the necessity of determining whether Time's rate card applied to Jewel's tribute, there is no plausible reading of Time's email that would turn these established practices on their head, whereby Time somehow assumed a duty on Time to ensure that Jewel's ad did not violate Jordan's rights.

Defendants' claim that Time "induced Jewel" to infringe Jordan's rights is entirely disingenuous. Ex. I ¶ 38. This argument is based entirely on a single phrase in the single email from Time presenting the offer of ad space. Jewel alleges that the language in the email

---

[5] Pursuant to the standard advertising terms and conditions of *SI* and all Time publications, the *advertiser* warrants that the ad "will not violate any law or infringe upon any right of any party," and the *advertiser* indemnifies and holds the Publisher (*i.e.*, Time) harmless from any and all claims arising out of the publication of its ad, including, without limitation, those arising from third party claims or suits for "trademark infringement, misappropriation, violation of the Lanham Act or rights of privacy or publicity." Ryan Decl. ¶ 8; Ex. B; Facts ¶ 11. Indeed, following the publication of its Jordan ad, Jewel received an invoice for the placement of the ad confirming that no money was due and that the ad was "governed by the terms and conditions of the applicable rate card." Ryan Decl. Ex. H; Facts ¶ 19. Defendants should have been well aware of these standard terms and conditions, as they have previously purchased ads in Time publications and published tributes in *SI* commemorative issues. Ryan Decl. ¶¶ 7, 10-12, 14; Exs. C-E, G-H; Facts ¶¶ 7-12.

10

"required" that "Jewel's salutation to Jordan was to include 'some play on words or design that is specific to Michael Jordan.'" Ex. I ¶ 12. Upon this slim reed, Defendants have spun a theory that Jewel only created the allegedly infringing content because Time "required" it, and therefore that Time is responsible for Jewel's allegedly tortious conduct. Unfortunately for Defendants, the undisputed facts show clearly that the email contained no such requirement, and that Time played no role in the allegedly tortious actions predicating each of Jordan's state law claims. As a result, Jordan's injury, if cognizable, was not proximately caused by any act of Time, and a claim by him against Time could not lie. Therefore contribution is not available.

The testimony is clear, and Jewel cannot dispute, that Time did not design or dictate to Jewel the design of the tribute, choose the allegedly offensive elements – particularly the use of Jewel's logo and marketing slogan – draft the copy, or approve the substantive content of the piece. To the contrary, Jewel and Vertis employees conceived of the message's idea, chose the graphic elements and drafted the copy for two options, and chose and approved the option that was ultimately printed. Facts ¶¶ 36-63, 73-74. Time never told Jewel that it had secured Michael Jordan's agreement to use any element of his "identity;" nor did anyone involved in the creation of the ad ask Time if it had secured any such agreement or even speak with Time regarding the ad's content. *Id.* ¶¶ 28, 36, 59, 65-66, 68-70. As is apparent from Time's offer to Jewel, which specified that "retailer designs the ad," Jewel concedes that it was Jewel's responsibility to create the substantive content of the advertisement and specifically it was Jewel that decided to prominently feature its logo and marketing slogan "Just Around the Corner" in the ad, the very elements the Seventh Circuit focused on to conclude that "Jewel's ad is commercial speech." *Jordan*, 743 F.3d at 520; Facts ¶¶ 58, 64, 73.

What ultimately dooms Defendants' entire theory that Time "required" the content at

11

issue is that even if Time's email *had* required that the ad contain a "play on words or design specific to Michael Jordan," any such mandate did not necessitate the use of Jordan's name, number, or basketball shoes, or any other element alleged to be Jordan's identity, as Jewel concedes. Facts ¶ 29. Jewel acknowledges that one could create a play on words or design specific to Jordan without infringing his identity. *Id.* ¶ 75. Indeed, Jewel actually created, and ultimately rejected, a design for the ad which did not include many of the elements deemed infringing by Jordan. Ex. Q, Facts ¶ 76. Likewise, Jewel conceded that State Farm's ad on the back cover of the Issue (Ex. R), which shows only a basketball hoop and the words "Here's to going above and beyond and beyond and beyond and beyond," is at least "indirectly" a play on words or design specific to Jordan. Facts ¶ 77.[6] Thus, even were the Court to accept Jewel's misreading of Time's email *and* accept that any duty Time owed Jewel is also owed to Jordan, the evidence establishes that the email did not impose an obligation to use Jordan's identity or Jewel's logo and slogan: that was Jewel's own choice. Having no part in choosing or approving the elements in the ad giving rise to the claims, Time cannot be subject to liability to Jordan.

**D.      There Is No Implied Indemnity Running From Time To Jewel/Supervalu**

Jewel's implied indemnity claim finds no support in the facts or the law.[7] Jewel has not pled, and cannot show, a pre-tort relationship between Time and Jewel as is required for an implied indemnity. To the contrary, the undisputed facts reveal that Jewel shouldered the primary responsibility for the acts causing Jordan's alleged injury, not Time.

The Contribution Among Joint Tortfeasors Act abolished the doctrine of "equitable

---

[6] Defendants previously created a tribute that included "play on words or design" that did not incorporate any individual's identity. In 2007, Defendants created an ad for an *SI* commemorative issue congratulating the Chicago Bears in the event they won the Super Bowl (they did not). The ad includes no "identity" or trademarks of the Bears or any of its players, yet Defendants concede that it is a play on words and design specific to the Bears. Ex. E, Facts. ¶ 78-80.

[7] Defendants admit that they cannot state a claim for an express indemnity. Jewel Resp. to Statement of Material Facts, ¶¶ 24-25 (Doc. 143).

12

implied indemnity," by which a "less culpable" tortfeasor could be indemnified by a "more culpable" tortfeasor. *See*, *e.g.*, *Mollfulleda v. Phillips*, 882 F. Supp. 689, 693 (N.D. Ill. 1994). As a result, all that remains of the doctrine of implied indemnity in Illinois are actions based on "quasi-contractual cases of vicarious liability." *Id.* To sustain an action for implied indemnity, therefore, a third-party plaintiff must show "(1) a pretort relationship between the third-party plaintiff and the third-party defendant, and (2) a qualitative distinction between the conduct of the third-party plaintiff and the third-party defendant." *Coleman v. Franklin Blvd. Hosp.*, 592 N.E.2d 327, 329 (Ill. Ct. App. 1st Dist. 1992). On the second factor, Jewel must show that it is "blameless" with respect to the actions alleged to have injured Jordan, and that Time is the entity "truly culpable." *Canadian Pac. Ry. v. Williams-Hayward Protective Coatings, Inc.*, 2004 WL 2108413, at *4 (N.D. Ill. Sept. 21, 2004). Not only is there no triable issue as to either element, but it is difficult to imagine a less apt way to describe the Time-Jewel relationship as to this ad.

### 1. Time And Jewel's Relationship Does Not Give Rise To A Duty to Indemnify

It is without question that only certain types of relationships give rise to a duty to indemnify, and "require[] a specified pre-existing legal relationship beyond mere involvement in a common undertaking." *Friedman, Alschuler & Sincere v. Arlington Structural Steel Co.*, 489 N.E.2d 308, 310 (Ill. App. 1st Dist. 1985). Such a relationship exists where, for example, "a principal is vicariously liable for the conduct of an agent or for the nondelegable acts of an independent contractor." *Am. Nat'l Bank and Trust Co. v. Columbus-Cuneo-Cabrini Med. Ctr.*, 609 N.E.2d 285, 288 (Ill. 1992). The classic relationships giving rise to an implied indemnity are: "lessor-lessee, employer-employee, master-servant, principal-agent, owner-leasee, [or] contractor-subcontractor." *Jethroe v. Koehring Co.,* 603 F. Supp. 1200, 1204 (S.D. Ill. 1985).

The relationship between Time and Jewel is not of the type that can give rise to a duty to indemnify. At most, Time and Supervalu/Jewel acted at arm's length in a buyer-seller or

13

vendor-vendee relationship related to advertising in *SI*. However, the law is clear that "[a] buyer-seller relationship is not a sufficient pre-tort relationship to support a traditional indemnity claim." *Canadian Pac. Ry.*, 2004 WL 2108413, at *4; *see also Jethroe*, 603 F. Supp. at 1204; *AMF, Inc. v. Victor J. Andrew High School*, 526 N.E.2d 584, 587 (Ill. App. 1st Dist. 1988). Likewise, "the relationship between vendor and vendee is insufficient to give rise to such an implied indemnity right." *Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co., Inc.*, 123 F.3d 675, 684 (7th Cir. 1997).[8] And moreover, given the industry standard of advertisers indemnifying publishers against claims arising out of the content of their ads, like Jordan's claims (Ryan Decl. ¶¶ 6-9; Facts ¶ 12), it can hardly be argued that the advertiser-publisher relationship is the kind "by which the [publisher] impliedly promised to indemnify" the advertiser. *Allison v. Shell Oil Co.*, 495 N.E.2d 496, 498 (Ill. Ct.App. 1986).

### 2. Jewel Is The Culpable Party

The very essence of an implied indemnity belies its applicability here. Indemnity "shifts the entire loss from one tortfeasor who has been compelled to pay it *to the shoulders of another who should bear it instead.*" *Lewis Bros. Bakery v. Bittle*, 2007 U.S. Dist. LEXIS 92460, at *25 (S.D. Ill. Dec. 17, 2007) (*quoting Va. Sur. Co., Inc., v. Northern Ins. Co. of N.Y.*, 224 Ill.2d 550, 555 (Ill. 2007)) (emphasis added). To sustain its claim, Jewel must prove that it was blameless and its own liability "merely technical," *Allison*, 495 N.E.2d at 498, and also that Time is "the one who actually caused the plaintiff's injury." *Schulson v. D'Ancona & Pflaum LLC*, 821 N.E.2d 643, 647 (Ill. App. 1st Dist. 2004). Based on the undisputed facts, no one could seriously suggest that Jewel is blameless and liable only as a result of an alleged "pre-tort relationship" with Time: Jewel controlled the creation and substantive content of the ad, including the decision

---

[8] Jewel cited *Cooper Power* for the proposition that an implied indemnity can be found in a wholesaler/retailer relationship. But, no facts support a finding that Time and Jewel sit in a wholesaler/retailer relationship.

14

to use Jordan's identity as well as every element of the ad identified by the Seventh Circuit that led to the "unmistakable commercial function" of "enhancing the Jewel-Osco brand in the minds of consumers": the use of the "Jewel-Oslo's graphic logo and slogan . . . just below the textual salute to Jordan;" the use of the "bold red logo . . . prominently featured in the center of the ad and in a font size larger than any other on the page;" and the decision to use Jewel's slogan as part of the "congratulatory message." *Jordan*, 743 F.3d at 518. In short, Jewel had final authority over the ad, chose its elements, and approved its content. The relative "culpability" of the roles of Defendants and Time are the exact opposite of that which can give rise to a cause of action in implied indemnity, and for that reason, the indemnity claim must be dismissed. *See*, *supra*, C.2.

## IV. CONCLUSION

For the reasons stated herein, Time respectfully submits that the Court grant its motion for summary judgment under Rule 56 and dismiss the third party claims.

Respectfully submitted,

By: /s/ Elizabeth A. McNamara

| | |
|---|---|
| Elizabeth A. McNamara (*admitted pro hac vice*) | Mark E. Enright |
| Jeremy Chase (*pro hac vice* pending) | Christopher S. Naveja |
| DAVIS WRIGHT TREMAINE LLP | ARNSTEIN & LEHR, LLP |
| 1633 Broadway 27th floor | 120 South Riverside Plaza |
| New York, New York 10019 | Suite 1200 |
| (212) 489-8230 | Chicago, IL 60606-3913 |
| lizmcnamara@dwt.com | meenright@arnstein.com |

*Attorneys for Third-Party Defendant Time Inc.*

15