**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | No. Civil Action No. 10-340 |
| | ) | |
| v. | ) | |
| | ) | Judge Gary Feinerman |
| JEWEL FOOD STORES, INC., and | ) | |
| SUPERVALU INC. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| Defendants/Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TIME INC. and VERTIS, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |

**TIME INC.'S RESPONSES TO
THIRD PARTY PLAINTIFFS' ADDITIONAL FACTS**

In accordance with Local Rule 56.1, Time hereby submits its Response to Jewel's statement of additional facts (the "JSOF"). To the extent that Time disputes any of these factual contentions, such facts do not preclude summary judgment to Time. For example, as discussed in Time's Memorandum of Law in Support of its Motion for Summary Judgment and in its Reply Memorandum, whether Time's rate card and terms & conditions applied to Jewel's tribute advertisement is not material to the Motion, and solely for the purpose of the Motion, the Court can assume that Time's rate card and terms & conditions did not apply.

    1. Time decided to publish a commemorative edition of *Sports Illustrated* dedicated to Michael Jordan's induction into the Basketball Hall of Fame in 2009. (Ex. 6, Dep. of Nancy Ryan, 72:24-75:1.)

    **TIME'S RESPONSE**: Undisputed.

    2. Time has been publishing commemorative editions of *Sports Illustrated* for more than five years. Commemorative editions of *Sports Illustrated* are not part of *Sports Illustrated*'s subscription packages. Time relies on retailers to promote the sales of these commemorative editions. (Ex. 6, Dep. of Nancy Ryan, 66:25-67:19; Ex. 7, Dep. of Ann Anderson, 43:3-7.)

**TIME'S RESPONSE**: Undisputed that Time has been publishing commemorative editions for more than five years, and that Ms. Ryan testified that that they were not part of *Sports Illustrated*'s subscription packages. Disputed that Time relies on retailers "to promote" sales. Ms. Ryan testified that Time relies on newsstand sales for the Commemoratives. Defs. Ex. 6, Ryan Dep. 67:7-19.

3. Time's subsidiary responsible for increasing the sales of its magazines sold through retailers is Time Warner Retail (TWR). TWR sells magazines, indirectly through wholesalers, to retailers. TWR generates its income by selling magazines, not advertising space within those magazines. (Ex. 6, Dep. of Nancy Ryan, 67:20-69:8; Ex. 7, Dep. of Ann Anderson, 11:17-12:19.)

**TIME'S RESPONSE**: Disputed. TWR does not sell magazines indirectly through wholesalers to retailers. Wholesalers purchase magazines from Time and sell them to retailers such as Jewel. Defs. Ex. 7, Anderson Dep. 11:20-13:5, 17:14-18:17. TWR does not generate income by selling magazines. It is responsible for assisting its publisher clients, including but not limited to Time Inc., in the placement and promotion of magazines on the newsstand, and generates its income by providing such services. *Id.*

4. TWR does offer what are called "TWR-allocated ads" to its retail customers. (Ex. 6, Dep. of Nancy Ryan, 63:11-64:3, 71:23-72:4.)

**TIME'S RESPONSE**: Undisputed that TWR personnel extend the offer of TWR-allocated ads, disputed to the extent that the Fact suggests that the offer originates with TWR.

5. TWR-allocated ads are included only in commemorative editions of Time's magazines. (Ex. 7, Dep. of Ann Anderson, 48:9-12.)

**TIME'S RESPONSE**: Undisputed that Ms. Anderson testified that she wasn't aware of TWR ads in other issues of the magazine.

6. TWR-allocated ads are offered to TWR's retail customers free of charge in exchange for several promises from the retailers taking advantage of these TWR-allocated ads. (Ex. 7, Dep. of Ann Anderson, 49:16-21.)

**TIME'S RESPONSE**: Undisputed.

7. One of the promises TWR requests it that the retailer provide premium floor space within the retailer's stores to promote the sale of Time's commemorative editions. Another one of the promises TWR requests is that the retailer provide access to its stores so that displays promoting Time's commemorative editions may be set up. Another one of the promises TWR requests is that the retailer provide Time with point of sale ("POS") data. Time does not require these commitments in exchange for traditional, paid-for advertising. (Ex. 6, Dep. of Nancy Ryan, 82:18-24; Ex. 7, Dep. of Ann Anderson, 49:22-25, 61:22-63:4.)

**TIME'S RESPONSE**: Undisputed that Defendants have correctly listed the commitments requested in exchange for the Shaws/Red Sox, ACME/Phillies, and Jewel/Jordan tributes, although Ms. Anderson testified that such commitments have been obtained in

2

connection with other promotions, Ex. 7, Anderson Dep. 76:2-77:25, and that Jewel would have provided these commitments even without the free ad. Ex. 7, Anderson Dep. 137:6-17; Defs. Ex. 8, Thie Dep. 25:14-15. Disputed to the extent that Defendants are implying that these commitments are anything other than an alternative to cash payment. So-called "traditional" advertisers do not stock Time magazines in their stores. *E.g.*, Ex. 7, Anderson Dep. 121:20-122:8.

8. TWR chose to pursue two Chicago-area grocery stores, Jewel Food Stores, Inc. ("Jewel") and Dominick's Finer Foods, LLC ("Dominick's), for TWR-allocated ads, given Jordan's strong connection to Chicago. (Ex. 7, Dep. of Ann Anderson, 135:8-12.)

**TIME'S RESPONSE**: Undisputed.

9. TWR's marketing group sent an email to Ann Anderson requesting that Anderson offer a TWR-allocated ad to Jewel in exchange for floor space, access to Jewel stores to set up displays of the Jordan commemorative edition, and POS data. (Ex. 6, Dep. of Nancy Ryan, 80:11-81:12; Ex. 7, Dep. of Ann Anderson, 135:8-12.)

**TIME'S RESPONSE**: Undisputed.

10. Anderson is National Account Director for TWR and is responsible for TWR's SUPERVALU and Target accounts. Anderson has no responsibility or experience selling advertising. Anderson has never been employed by Time for the purpose of selling advertising. (Ex. 7, Dep. of Ann Anderson, 8:23-9:6; 37:25-38:2.)

**TIME'S RESPONSE**: Undisputed that Ms. Anderson is National Account Director for TWR responsible for SUPERVALU and Target accounts. Undisputed that Anderson has no responsibility or experience selling advertising other than TWR allocated space. Ex. 7, Anderson Dep. 37:16-38:16.

11. Anderson copied the email she received from TWR, modified it, and sent it to Amy Thie at SUPERVALU. (Ex. 1; Ex. 7, Dep. of Ann Anderson, 136:24-137:5.)

**TIME'S RESPONSE**: Time does not dispute that Ms. Anderson "modified" the email, however such "modification" was done by deleting the request for any commitments from Jewel (including POS data, floor space, and display space) because SUPERVALU routinely authorized floor displays, and because Time received POS data as a direct feed from SUPERVALU. Defs. Ex. 7,Anderson Dep. 137:6-17; Defs. Ex. 8, Thie Dep. 25:14-15.

12. Thie was employed by SUPERVALU as a buyer for magazines and books. Thie had no responsibility or experience purchasing advertising. (Ex. 8, Dep. of Amy Thie, 12:10-11:2, 34:7-8.)

**TIME'S RESPONSE**: Undisputed.

13. The email Anderson sent Thie did not mention *Sports Illustrated*'s rate card.

**TIME'S RESPONSE**: Undisputed.

3

14. Time sought commitments from Jewel for floor display space of the Jordan commemorative edition and POS data. (Ex. 6, Dep. of Nancy Ryan, 80:11-81:3.)

**TIME'S RESPONSE**: Undisputed.

15. Jewel agreed to these commitments and Thie signed a floor display approval form, which included a photograph of Jordan, that was sent to her by Anderson. (Ex. 7, Dep. of Ann Anderson, 156:1-13; Ex. 16.) Time's declarant Nancy Ryan, who has no personal knowledge of Jewel's or SUPERVALU's advertising practices, testified that she had never seen a traditional advertiser sign a floor display form. (Ex. 6, Dep. of Nancy Ryan, 15:10-17 & 82:18-24.) Ryan also testified that Time's offer to Jewel in this case was different from traditional advertising in that (1) it did not come through SI Ad Sales group; (2) it was sent from the person at Time responsible for selling magazines, not advertising; (3) it was sent to the person at SUPERVALU that is responsible for buying magazines, not ad space within them; (4) Time specified the size; (5) Time specified the price; and (6) Time suggested that acceptance would require the content to at least have something to do with Michael Jordan. (Ex. 6, Dep. of Nancy Ryan, 86:16-87:6 & 89:2-90:19.)

**TIME'S RESPONSE**: Undisputed that Jewel agreed to the commitments and that Thie signed a floor display approval form – days after the tribute was submitted – which included a photograph of Jordan and was sent to her by Anderson. Defs. Ex. 16. Undisputed that Ms. Ryan, who has no personal knowledge of Jewel or Supervalu's advertising practices, testified that she had never seen a traditional advertiser sign a floor display form. Undisputed that Ryan testified that the offer was different from traditional advertising in that it (1) did not come through SI Ad Sales group; (2) was sent from Ann Anderson; (3) was sent to Amy Thie; (4) Time specified the size; and (5) Time specified the price.

Disputed that Ms. Ryan testified that Time suggested that acceptance would require the content to at least have something to do with Michael Jordan. Ms. Ryan, Time's Vice President of Finance, testified that she played no role in the solicitation or production of the advertisement, and did not see the email at issue until this lawsuit was filed, and thus has no personal knowledge of many of the issues for which Defendants' cite her testimony. Defs. Ex. 6, Ryan Dep. at 9:4-12:4. And critically, Defendants misrepresent Ms. Ryan's testimony: Ms. Ryan testified "I don't know that it specified content" because it says "often." Defs. Ex. 6, Ryan Dep. 90:3-11. To the extent that Ms. Ryan thought that Time might reject Jewel's tribute based on content, she did not testify that Time might reject a tribute that did not include content specific to Michael Jordan; she testified that Time might have rejected a tribute for the Michael Jordan Commemorative that *congratulated LeBron James*. That testimony is not evidence that she agreed that the ad required "a play on words or design specific to Michael Jordan." Defs. Ex. 6, Ryan Dep. 90:19-91:2. Most critically, when directly asked whether the email contained a requirement as to content, Ms. Ryan testified that it did not. Defs. Ex. 6, 172:21-173:3.

16. The email from Anderson to Thie also included the specification that the "[r]etailer designs the ad and often creates it with a play on words or design that is specific to Michael Jordan." (Ex. 1.) Time's declarant Nancy Ryan testified that she had never encountered a traditional advertising transaction that included a suggestion as to content by anyone affiliated with Time. (Ex. 6, Dep. of Nancy Ryan, 62:6-15.)

4

**TIME'S RESPONSE**: Undisputed that Ms. Anderson's email included the words "retailer designs the ad and often creates it with a play on words or design that is specific to Michael Jordan." Ex. K.

Disputed that Ms. Ryan testified that she had never encountered a traditional advertising transaction that included a suggestion as to content by anyone affiliated with Time. Ms. Ryan testified that she "can't say what conversations have taken place in specific deals that I'm not familiar with." Ryan Dep. 61:14-16. She also testified that it appeared that the advertising sales people who sold State Farm the advertisement in the Jordan Commemorative Issue also spoke with State Farm about the content of the issue, as the advertisement was geared toward Michael Jordan. Defs. Ex. 6, Ryan Dep. 173:12-174:21. She also testified that it was "not unusual" for ad salespeople to have conversations about what is going to be the general content of a particular issue that they're soliciting an ad for, for example, in the Super Bowl issue advertisers might design their advertising to have some reference to football. Defs. Ex. 6, Ryan Dep. 174:22-175:16. Likewise, Ms. Anderson indicated how common it was for advertisers in special issues of magazines to gear their advertisements to the content of the magazine, suggesting that such information must come from ad sales. Defs. Ex. 7, Anderson Dep. 149:17-150:8.

17. Jewel witnesses who read the email from Anderson to Thie testified that they understood Time's email as a requirement or strong suggestion that Jordan should be the focus of the piece. These witnesses also testified that they believed they had permission to use Jordan's identity in the tribute. (Ex. 9, Dep. of Robin Zimmerman, 215:9-21; Ex. 10, Dep. of Marjorie Kramer, 230:20-231:4, 343:20:344:14.)

**TIME'S RESPONSE**: Disputed. Every Supervalu/Jewel witness testified that Time's email contained no requirement, and that it did not imply that Time had secured any permissions from Jordan. Both Marjorie Kramer and Robin Zimmerman conceded that Time's email did not *require* them to do anything, and that they could have followed the instructions in the email and still chosen not to use a play on words or design specific to Michael Jordan. *See, e.g.*, Ex. N, Zimmerman Dep. 216:12-21; 217; 18-20 ("Q: But it wasn't a requirement? A: No, it was not."); Ex. M, Kramer Dep. 235:4-236-16 ("Q: Do you understand that to mean that you have to create it with a play on words or design that it specific to Michael Jordan? A: No."; "Q: And that direction did not require you to do this or SUPERVALU? A: Right.").

Similarly, both Ms. Kramer and Ms. Zimmerman testified that the email contained no requirements that they use elements of Mr. Jordan's identity:

Ms. Zimmerman testified as follows:

> Q: Does the sentence...require you to use his –does it require you to use his name?
> A: No, it does not…
> Q: Does the sentence…require you to use anything – to use any particular image?
> A: No, it does not.
> Q: Did it require you to use his number?
> A: No, it did not.
> Q: Or did it require you to use any trademark associated with Michael Jordan?
> [objection]

5

    A: No, it did not."

Ex. N, Zimmerman Dep. 218:10-219:11

And Ms. Kramer as follows:

> Q: The direction you received from Time Inc. did not say that you have to use Michael Jordan's name; is that right?
> A: That is correct.
> Q: And it did not say that you have to use any trademark associated with Michael Jordan; is that right?
> A. That is correct.
> Q: And it did not say that you have to use Michael Jordan's likeness, is that right?
> A: That is correct.

Ex. M, Kramer Dep. 249:1-11.

    Ms. Kramer's did not testify that the email implied, much less stated (which is clear from the email itself) that Time had received permission from Jordan to use his identity. Ms. Kramer's testimony was that they "had an email from Time giving us direction on how to create the ad, and we followed that." She also testified that they "didn't believe we needed anybody's permission…It never came up." Ex. M, Kramer Dep. 318:5-11. No one at Jewel thought about it one way or the other, with respect to whether anyone had, or needed, permission to run the advertisement, likely because they did not believe that the advertisement used Mr. Jordan's identity, not because they assumed that Time had gotten his permission.

    Mr. Hedrick's likewise testified that the email did not contain any "requirement," Ex. P, Hedrick Dep. 135:10-136:20. He also testified that no one at Jewel would have understood from the email that Jewel could use an actual image of Jordan or depiction of his likeness without Jordan's permission. Ex. P, Hedrick Dep. 139:4-141:17, and that they "know enough that if we had not seen a specific release we wouldn't have taken a picture" of Jordan himself. *Id*. 239:8-22, thus establishing that the email did not contain such permission, and that the advertising staff understood that releases are generally necessary to use a person's identity.

    Mr. Tomasi did not think he would be able to use a photo of Mr. Jordan without paying a specific licensing fee, and he was not informed that either Jewel or Time had either paid such a fee or otherwise gotten permission or a license to use a photo or intellectual property of Mr. Jordan. Ex. L, Tomasi Dep. 70:3-71:20.

    Perhaps most critically, neither of the contracting parties – Ann Anderson or Amy Thie – understood the email to require any particular content from Jewel. Defs. Ex. 7, Anderson Dep. 63:11; 65:15-16; 67:6-9; 68:5; 70:12-15; 71:9-11; 124:13-19; 143:21-23; 149:17-19; 150:19-24; 152:18-25; 181:9-182:18; Defs. Ex. 8, Thie Dep. 20:20-21:16; 63:18-25; 64:23-65:8.

    18.    Jewel employee Thomas Hedrick testified that even one with experience in the advertising industry would understand the specifications listed in the email as, at the very least,

6

encouragement to "come up with some witty catch phrase or some kind of imagery that would suggest a visual tribute to a person like Jordan . . . ." (Ex. 11, Dep. of Thomas Hedrick, 140:8-141:2.)

**TIME'S RESPONSE**: Disputed. First, Mr. Hedrick is a SUPERVALU employee, not a Jewel employee. Ex. P, Hedrick Dep. 17:7-9. Second, Mr. Hedrick conceded that Time's email did not contain any requirement (see Response to Additional Fact 17), and *at best* was a "suggest[ion]" that he viewed as encouragement. *Id*. 135:13-16. He continued to testify that Jewel could have created a tribute that did not use Mr. Jordan's name; that the email did not require Jewel to use any of Jordan's trademarks; and that they could have created a tribute that did not contain a trademark, that the email did not indicate that Time would have rejected a tribute that did not include Mr. Jordan's name or trademark. *Id*. 135:17-136:19.

19. Anderson attached to the email an example of a TWR-allocated ad that had been found acceptable in the past. (Ex. 1; Ex. 2; Ex. 7, Dep. of Ann Anderson, 142:1-14.)

**TIME'S RESPONSE**: Undisputed that Ms. Anderson attached to the email an example of a TWR ad that had been previously submitted by a SUPERVALU company and published. Disputed to the extent that the Fact suggests that Time had reviewed the ACME tribute for "acceptability," which is not in evidence.

20. The attached previous TWR-allocated ad had been published in a *Sports Illustrated* commemorative edition celebrating the Philadelphia Phillies' World Series Victory in 2008. (Ex. 2; Ex. 7, Dep. of Ann Anderson, 142:1-14.)

**TIME'S RESPONSE**: Undisputed.

21. The Phillies tribute created by Acme's shows prominent use of the Phillies' name and logo. (Ex. 2.)

**TIME'S RESPONSE**: Undisputed that the ACME tribute incorporated the Phillies' logo, disputed as to the "prominence" of the logo. Ex. E.

22. The email offer that resulted in the Phillies tribute created by Shaw's was nearly identical to the email Anderson emailed Thie, including the specification that the retailer "often creates it with some play on words or design that is specific to the hopeful winner (Philadelphia Phillies in this case)." (Ex. 1, Ex. 3.)

**TIME'S RESPONSE**: Undisputed.

23. Time's declarant, Nancy Ryan, testified that the whole point of the commemorative edition was to pay tribute to Jordan and that if Jewel had tried to submit a tribute to LeBron James for the commemorative edition, it may have been rejected by Time. (Ex. 6, Dep. of Nancy Ryan, 90:12-91:6.)

**TIME'S RESPONSE**: Undisputed, however Ms. Ryan also testified that she had no involvement in the publication of the issue or the solicitation or production of the advertisement. Defs. Ex. 6, Ryan Dep. at 9:4-12:4.

7

24. Ryan also testified that it was a requirement that the tribute refer to Jordan:

Q: And then the third specification includes the *requirement* that Jewel or [SUPERVALU] create the piece they're going to run with some play on words that is specific to Michael Jordan, correct?

A: Yes, that's correct.

\* \* \*

Q: Sure, "often includes." But they are in that sentence suggesting that acceptance of this TWR allocated ad would require the content to at least have something to do with Michael Jordan, correct?

A: Yes.

Q: In other words, if Jewel or [SUPERVALU] had come back to Time and said, Great, we'd like to accept this, but we're going to put in a tribute to LeBron James, Time wouldn't have accepted that, correct?

A: I suppose not.

(Ex. 6, Dep. of Nancy Ryan, 81:4-12, 90:12-91:2 (emphasis added).)

**TIME'S RESPONSE**: Disputed. Defendants excised a key portion of the cited testimony, specifically:

Q: And Sports Illustrated also specified the content with respect to the space made available, correct?
A: I don't know that it specified the content.
Q: In the third bullet point, I believe you testified earlier that Sports Illustrated – strike that – Time was specifying that Jewel's tribute include a plan words [sic] or design that is specific to Michael Jordan, correct?
A. Yes, but it says "often."

Defs. Ex. 6, Ryan Dep. 89:25-90:11. Moreover, Ms. Ryan testified that she played no role in the solicitation or production of the advertisement, and did not see the email at issue until this lawsuit was filed. Defs. Ex. 6, Ryan Dep. at 9:4-12:4. Moreover, when specifically asked if Ms. Anderson's email contained a requirement, Ms. Ryan unequivocally answered "no." *Id*., 172:21-173:3.

25. Anderson never informed Thie, in the email or any communications, that TWR's offer of a TWR-allocated ad was subject to *Sports Illustrated*'s rate card. Anderson had never seen the rate card. (Ex. 1; Ex. 6, Dep. of Nancy Ryan, 85:9-15; Ex. 7, Dep. of Ann Anderson, 127:13-16, 141:17-22.)

**TIME'S RESPONSE**: Undisputed.

8

26.     Ryan testified that the only terms and conditions that could apply in this case are those of *Sports Illustrated*'s rate card. The rate card does not mention either TWR-allocated ads or commemorative editions. (Ex. 1; Ex. 6, Dep. of Nancy Ryan, 8:13-18.) Moreover, Time's rate card is revised every year. Despite doing commemorative editions for at least five years, Time never bothered to update its rate card to include commemorative editions. (Ex. 6, Dep. of Nancy Ryan, 187:10-188:21.) There is no evidence that Jewel received a copy of the 2009 rate card and its terms and conditions before accepting and publishing its tribute. (Ex. 6, Dep. of Nancy Ryan, 146:19-25, 187:6-188:21.)

**TIME'S RESPONSE**: Undisputed that Ryan testified that the only terms and conditions that could apply in this case are the Terms & Conditions that appear with its rate card, and that Time's rate card is revised every year, and that there is no evidence that Jewel received a copy of the 2009 Rate Card and Terms & Conditions before accepting and publishing its tribute.

Disputed to the extent the Fact is intended to imply that Time's Terms & Conditions apply only to issues specifically identified in the rate card. Ms. Ryan testified that the Terms & Conditions apply to all advertising, regardless of whether a particular issue or price is outlined in the rate card. Defs. Ex. 6, Ryan Dep. 155:4-157:15. By its terms, the Terms & Conditions apply to all advertising. Ex. B. Ms. Ryan testified that it is Time's position that the Terms & Conditions apply to Commemorative Issues. Id. 157:4-15. As for revisions to the rate card, Ms. Ryan testified the rates on the rate cards are revised every year, but she did not testify that the Terms & Conditions are revised. Defs. Ex. 6, Ryan Dep. 187:10-12; 193:11-17. Commemoratives are not listed on the rate card because at the time the rate card is published, Time has not yet decided what Commemorative and special issues will be published, and the subject of the Issue determines its rate. Without knowing the subject, the Rate cannot be determined. Defs. Ex. 6, Ryan Dep. 15:18-156:19; 188:3-5; 202:13-204:10. Although Jewel may not have seen a copy of the 2009 Rate Card prior to the tribute, it is readily accessible on Time Inc.'s website, SUPERVALU entities have received copies of Time's Terms & Conditions in the past that contained the relevant provisions concerning that the advertiser is responsible for its ad and indemnifies the publisher, and Jewel itself received a copy of Time's online Terms & Conditions, which include the relevant provisions, in connection with its advertisement on myrecipies.com. Ex. D. Ms. Ryan also testified that it was not unusual for those responsible for soliciting advertisements to not send the Terms & Conditions in connection with the solicitation thereof, Defs. Ex. 6, Ryan Dep. 151:4-6; 162:13-163:21, and that such a situation does not affect the Terms & Conditions' applicability, id., 193:11-17..

27.     Time never sent or mentioned the rate card's terms and conditions to anyone involved in the creation of the Jordan tribute before the tribute was submitted or published. (Ex. 6, Dep. of Nancy Ryan, 111:23-114:9, 120:19-121:4.)

**TIME'S RESPONSE**: Undisputed.

28.     Ryan testified that it would not be ideal that the terms never communicated to a customer would then be asserted by vendor. (Ex. 6, Dep. of Nancy Ryan, 153:13-23.)

**TIME'S RESPONSE**: Undisputed, however, Ms. Ryan's statement was in response to a hypothetical question about whether, if she purchased something from a store, and the store later

9

sent her a document saying that the sale was subject to certain terms and conditions, and she didn't know whether the terms & conditions would be associated with that product, would it be fair that she'd be bound by them. Responding to that hypothetical, Ms. Ryan said that it might not be "ideal" that she receive those terms and conditions after the sale. Defs. Ex. 6, Ryan Dep. 152:23-153:23. She said nothing about whether that vendor could assert the Terms & Conditions, *id.*, and more critically, the hypothetical is entirely inapplicable given Ms. Ryan's testimony that as sophisticated advertisers, Jewel and Supervalu *would have been aware* that Terms and Conditions applied to the tribute ad. 168:22-169:20. Ms. Ryan also testified that the Terms & Conditions were well known and standard in the industry, e.g., Defs. Ex. 6, Ryan Dep. 112:4-9; 147:7-20; 191:10-20; 196:15, and the fact that an advertiser had not been sent the T&C in advance of the placement of the ad would not render them inapplicable. Defs. Ex. 6, Ryan Dep. 162:13-163:21.

   29. The invoice Time sent to Jewel for the publication of the tribute was generated from a form that always includes boilerplate language at the bottom about Time's terms and conditions. (Ex. 4, Ex. 6, Dep. of Nancy Ryan, 186:3-19.)

   **TIME'S RESPONSE:** Undisputed that the invoice Time sent to Jewel is a standard form sent for all advertisements that includes the following language: "ALL ADVERTISEMENTS ARE GOVERNED BY THE TERMS & CONDITIONS OF THE APPLICABLE RATE CARD. PLEASE DIRECT INQUIRIES TO (212) 522-3021". Ex. H.

   30. The invoice, which is for $16,000 is dated after the tribute was submitted to Time by Jewel and after the commemorative edition was published. The invoice was sent not to Jewel or SUPERVALU but to Albertson's address in Boise, Idaho. Ryan could not identify a single person or entity involved in the Jordan tribute that was provided a copy of the invoice. (Ex. 4; Ex. 6, Dep. of Nancy Ryan, 102:4-7, 110:17-111:6, 116:4-11.)

   **TIME'S RESPONSE:** Undisputed that the invoice, which was discounted from $16,000 to zero, was sent to Jewel after the commemorative edition was published, which is in keeping with the express language of the Terms & Conditions, and Time's standard practice, so as to ensure that only advertisements that are actually published are invoiced. Ex. B ¶ 13; Defs. Ex. 6, Ryan Dep. 119:5-17. Undisputed that the invoice was sent to an address in Idaho. Time has no knowledge of where Albertson's is located, and thus denies the remainder of that statement. Time disputes the characterization of Ms. Ryan's testimony about to whom the invoice was sent. She was shown the invoice, and said that she didn't know if it was sent directly to a person connected to the tribute. Defs. Ex. 6, Ryan Dep. 111:7-22.

   31. Invoices for traditional advertising are sent by Time before the ads are published. (Ex. 6, Dep. of Nancy Ryan, 107:23-108:3.) The "open price" for a traditional ad with the characteristics of the tribute would be $336,000. The lowest rate on the SI rate card is $47,600. The SI rate card does not include a $16,000 rate. (Ex. 6, Dep. of Nancy Ryan, 102:10-103:3.)

   **TIME'S RESPONSE**: Disputed. Ms. Ryan testified that invoices are always sent after the advertisement is published and that testimony includes so-called "traditional advertising." Ex. B, Defs. Ex. 6, Ryan Dep. 116:23-117:1; 119:10-17. The date referenced in Defendants' Fact is the Issue date, which Ms. Ryan testified is a later date than the publication date. *Id.* The

10

prices noted in Defendants' Fact are irrelevant to a commemorative issue; they are only relevant to those types of issues listed on the Rate Card, which, as discussed in Response to Additional Fact 26, do not include Commemorative Issues because such ad prices cannot be determined in advance of knowing who or what is to be commemorated and in what city such issue will be sold. *See* Response to Additional Fact 26. Undisputed that the Rate Card does not include a $16,000 Rate but Ms. Ryan testified that actual rates charged are often discounted off of the rates reflected in the rate card. Defs. Ex. 6, Ryan Dep. 157:16-159:9.

32. Time's 2006 letter to Albertson's Supermarkets was generated from a form and sent to Albertson's in Boise, Idaho. The letter was not sent to Jewel or SUPERVALU. The specific recipient of the letter has not been identified. (Ex. 6, Dep. of Nancy Ryan, 121:9-122:1.)

**TIME'S RESPONSE**: Disputed that the letter was not sent to SUPERVALU. Albertson's is a subsidiary of SUPERVALU.

33. The 2006 letter purports to include Time's terms and conditions "under which Time Inc. accepts advertising in our magazines." It does not mention TWR-allocated space or commemorative editions. (Ex. 12.)

**TIME'S RESPONSE**: Disputed. Time's Terms & Conditions do not refer to any particular type of advertisement or type of issue; by its terms it applies to "all advertising." Ex. B.

34. Time's 2008 letter to Shaw's was not sent to Jewel, SUPERVALU, or Albertsons. Albertson's was excluded because the letter was sent only to companies that had advertised with Time in the previous two years, which Albertson's had not. (Ex. 6, Dep. of Nancy Ryan, 123:5-124:2; Ex. 12.)

**TIME'S RESPONSE**: Disputed that the letter was not sent to SUPERVALU. Ex. G. Shaw's is a subsidiary of SUPERVALU.

35. Dominick's received an email nearly identical to that which Anderson sent to Thie. (Ex. 1; Ex. 13.)

**TIME'S RESPONSE**: Undisputed.

36. Jewel and Dominick's were the only companies that received TWR-allocated space in the Jordan commemorative edition. (Ex. 6, Dep. of Nancy Ryan, 175:5-13, 184:19-185:5.) Both Jewel and Dominick's received the same TWR email from Time that included a specification that the "[r]etailer designs the ad and often includes a play on words or design that is specific to Michael Jordan." (Ex. 1; Ex. 13.) Both Jewel and Dominick's have been sued by Jordan.

**TIME'S RESPONSE**: Undisputed, but Dominick's has not sued Time or given any other indication that it believes Time was at all responsible for its tribute advertisement, as the emails between Dominicks and Time establish that when Dominicks asked Time if it could provide a free image of Jordan to use in its tribute, Time declined and told Dominicks, "we could

11

not license anyone to use a photo in an ad without getting clearances. We do not have the rights from player/team or league to allow this." *See* Time Ex. T attached hereto.

37. Companies purchasing traditional advertising in the Jordan commemorative edition, General Motors and State Farm, did not receive an email specifying "a play on words or design that is specific to Michael Jordan." (Ex. 6, Dep. of Nancy Ryan, 175:5-13, 184:19-185:5.) No companies purchasing traditional, paid-for advertising in the Jordan commemorative edition were sued by Jordan. (Ex. 6, Dep. of Nancy Ryan, 183:24-185:13.) In ninety percent of traditional advertising deals, there is an insertion order that sets forth the parties' agreement. (Ex. 6, Dep. of Nancy Ryan, 43:6-15 & 56:19-57:1.) There was no such insertion order in this case. (Ex. 6, Dep. of Nancy Ryan, 81:13-24.)

**TIME'S RESPONSE**: It is undisputed that neither Cadillac nor State Farm was sued by Jordan. Otherwise, disputed. First, Defendants misleadingly suggest that Time's email to Jewel "specified" a play on words or design specific to Michael Jordan, which is inaccurate. Second, although it is undisputed that neither Cadillac nor State Farm ads were solicited through TWR, there is no evidence or testimony about what kind of communication they received from Time's ad sales. Specifically, Ms. Ryan testified that Time's ad sales regularly solicits advertising from its advertisers. Defs. Ex. 6, Ryan Dep. 162:5-163:7; 39:6-41:8; 88:13-89:1. Moreover, publishers often alert their advertisers as to the content or theme of an issue in which an advertisement will be placed. Defs. Ex. 6, Ryan Dep. 174:22-175:2; Defs. Ex. 7, Anderson Dep. 149:19-150:8. State Farm likely received some communication indicating or discussing the content of the Commemorative Issue, as its ad was a "play on words and design" related to Mr. Jordan. Ex. 6, Ryan Dep. 173:23-175:16. Third, insertion orders, to the extent they exist, set forth elements of the parties' agreement including price and location. They do not set for the warranties, indemnities, or other provisions included on the terms and conditions. *E.g.*, Ex. C (Albertsons/*People* insertion order). Ms. Ryan testified that they "want" an insertion order, but that there is no standard form. *Id*. 43:10-44:3. Ms. Ryan testified that she hadn't seen an insertion order for the tribute, but "that does not necessarily mean an insertion doesn't exist." Ryan Dep. 81:16-21. Time will "sometimes provide [the advertiser] with something or accept an email" or "other form of communication between the advertiser and *Sports Illustrated*." The point of an insertion order is to document the price negotiation between the parties, which was reflected in the email exchange. *Id*. 43:10-44:3, 199-202. The email exchange between Ms. Anderson and Ms. Thie was the equivalent of an insertion order.

38. Time received commercial benefits as a result of offering Jewel a TWR-allocated ad, namely goodwill with Jewel and floor space for the sale of the Jordan commemorative issue. (Ex. 6, Dep. of Nancy Ryan, 91:15-92:21; Ex. 7, Dep. of Ann Anderson, 48:22-49:1, 49:22-25, 51:4-13.)

**TIME'S RESPONSE**: Disputed that Time received any commercial benefits associated with the use of Michael Jordan's identity in Jewel's ad. None of the benefits received by Time were related to the content of the advertisement; the only commercial benefits Time received were associated with the sale of its commemorative issue. Anderson Dep. 48:7-51:9.

39. But for Anderson's email to Thie, there would be no lawsuit against Jordan because there would be no tribute. (Ex. 6, Dep. of Nancy Ryan, 74:21-75:1.)

12

**TIME'S RESPONSE**: This is not a statement of fact but rather a legal conclusion which Time disputes.

40. Jewel sells Time's magazines in its retail stores. Time has a relationship with Jewel through Time's TWR division. (Ex. 7, Dep. of Ann Anderson, 23:22-24:2.)

**TIME'S RESPONSE**: Undisputed in part and disputed in part. Undisputed that Jewel sells Time magazines in its retail stores. However, Time sells magazines to wholesalers, who in turn sell magazines directly to retailers such as Jewel. Defs. Ex. 7, Anderson Dep. 14:22-15:16, 17:21-25. Undisputed that Ms. Anderson at Time's TWR division has a relationship with SUPERVALU/Jewel, however she and TWR have "no financial relationship" with Jewel or SUPERVALU. *Id*. at 12:5-19. The TWR/Jewel relationship is limited to communicating what is going to be published in a given issue and instances in which an issue is being delivered on an unusual schedule, and negotiating space on a rack when a retailer is implementing new rack designs. *Id*. at 15:23-17:5.

41. Time made the same offer of a TWR-allocated ad to Walgreens for the Jordan commemorative issue. (Ex. 17.) Time personnel expressly instructed Walgreens that it would be permissible to use the Walgreens corporate logo and Jordan's name:

> Attached is another example of an ad . . . . Most are just generic messages or puns with the corporate logo congratulating a team or player on behalf of the retailer. I would assume you would just do a "Thank you, Michael" from all your fans at Walgreens type message and maybe promote some featured products.

(Ex. 17 at TIME 000466, emphasis added.)

**TIME'S RESPONSE**: Local Rule 56.1(b)(3)(C) provides that "Absent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-numbered statements of additional facts." As Jewel has not obtained prior leave of Court, Time need not respond to this, Jewel's 41st separately-numbered statement of additional facts.

To the extent a response is required, disputed in part and undisputed in part. Undisputed in that Time's email to Walgreens speaks for itself. Defs. Ex. 17. Disputed in that Time never "expressly instructed" Walgreens that it would be permissible to use the Walgreens corporate logo and Jordan's name. *Id.* The plain language of the email makes clear that Time merely attached an example of an ad for Walgreen's reference. *Id.* Time further disputes Jewel's characterization of the email chain, as it omits critical follow up communications between Time and Walgreens. Specifically, when Walgreens asked if Time could provide "a few concepts," Time's Paul Brettman responded that - consistent with the original offer that clearly states that "Walgreens designs the ad"- "Sports Illustrated provides the 'free ad' but is not set up to do the design/creative message." *Id.* at TIME000465. Furthermore, Walgreens elected not to create an ad and the commemorative issue did not include a tribute from Walgreens, rendering these emails between Mr. Brettman and Walgreens' representative wholly irrelevant to this action as they cannot possibly shed any light on Time's offer to Jewel or on Jewel's understanding of that offer.

13

42. Time's TWR rep even went so far as to suggest promoting Walgreen's products in the piece. (Ex. 17 at TIME 000466.)

**TIME'S RESPONSE**: Local Rule 56.1(b)(3)(C) provides that "Absent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-numbered statements of additional facts." As Jewel has not obtained prior leave of Court, Time need not respond to this, Jewel's 42nd separately-numbered statement of additional facts.

To the extent a response is required, disputed in part and undisputed in part. Undisputed in that Time's email to Walgreens speaks for itself. Defs. Ex. 17. Disputed in that Jewel's characterization of the email chain omits critical follow up communications between Time and Walgreens. Specifically, when Walgreens asked if Time could provide "a few concepts," Time's Paul Brettman responded that - consistent with the original offer that clearly states that "Walgreens designs the ad"- "Sports Illustrated provides the 'free ad' but is not set up to do the design/creative message." *Id.* at TIME000465. Furthermore, Walgreens elected not to create an ad and the commemorative issue did not include a tribute from Walgreens, rendering these emails between Mr. Brettman and Walgreens' representative wholly irrelevant to this action as they cannot possibly shed any light on Time's offer to Jewel or on Jewel's understanding of that offer.

43. The email from TWR also included an attachment of an example of what would be acceptable to Time. (*Id.* at TIME 000470.) TWR's attached example includes the VONS corporate logo, a federally-registered trademarked slogan "Ingredients for life," a VONS' product-steak-and a play on words: "Well Done, Bruins."

**TIME'S RESPONSE**: Local Rule 56.1(b)(3)(C) provides that "Absent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-numbered statements of additional facts." As Jewel has not obtained prior leave of Court, Time need not respond to this, Jewel's 43rd separately-numbered statement of additional facts.

To the extent a response is required, disputed in part and undisputed in part. Undisputed in that Time's email to Walgreens and accompanying attachments speak for themselves. Defs. Ex. 17. Disputed in that Time did not suggest that the attachment was "an example of what would be acceptable to Time." Rather, Time merely noted that it was "another example of an ad." *Id.* at TIME000466. Moreover, Walgreens ultimately elected not to create an ad and the commemorative issue did not include a tribute from Walgreens, rendering this entire email chain between Mr. Brettman and Walgreens' representative – including the example of an advertisement provided to Walgreens – wholly irrelevant to this action as they cannot possibly shed any light on Time's offer to Jewel or on Jewel's understanding of that offer.

14

| | |
|---|---|
| Dated: May 29, 2014 | Respectfully submitted, |
| | By:   /s/ Elizabeth A. McNamara   |
| Mark E. Enright<br>Christopher S. Naveja<br>Arnstein & Lehr, LLP<br>120 South Riverside Plaza, Ste. 1200<br>Chicago, IL 60606-3913<br>(312) 876-7862<br>meenright@arnstein.com | Elizabeth A. McNamara (*admitted pro hac vice*)<br>Jeremy A. Chase (*admitted pro hac vice*)<br>Davis Wright Tremaine LLP<br>1633 Broadway, 27th Floor<br>New York, NY 10019<br>(212) 489-8230<br>lizmcnamara@dwt.com |

*Attorneys for Third-Party Defendant Time Inc.*

15