UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 340 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| JEWEL FOOD STORES, INC., and SUPERVALU INC., | ) | |
| | ) | |
| Defendants/Third-Party Plaintiffs/ | ) | |
| Third-Party Counter-Defendants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TIME INC., | ) | |
| | ) | |
| Third-Party Defendants/ | ) | |
| Third-Party Counter-Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VERTIS, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

After Jewel Food Stores, Inc., a Chicagoland grocery store chain, took out a page in a commemorative issue of *Sports Illustrated* congratulating Michael Jordan on his 2009 induction into the Hall of Fame, Jordan sued Jewel in state court for using his identity without permission. Doc. 1-2. Jewel removed the suit to federal court, Doc. 1, and filed third-party claims against *Sports Illustrated*'s publisher, Time Inc., and the page's graphic designer, Vertis, Inc., for contribution and indemnification, Doc. 17. Time responded with third-party counterclaims against Jewel for breach of contract and indemnification. Doc. 40. Jordan then filed an amended complaint that added Jewel's parent, Supervalu Inc., as a defendant; the amended complaint

1

stated claims under the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 *et seq.*, § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, and common law unfair competition. Doc. 55. (Supervalu's presence in this suit can and will be ignored for ease of exposition.) The court granted summary judgment to Jewel on First Amendment grounds. 851 F. Supp. 2d 1102 (N.D. Ill. 2012). The Seventh Circuit reversed, holding that Jewel's ad was commercial speech within the meaning of the First Amendment, entitling it to lesser constitutional protection, and remanded for consideration of the merits of Jordan's claims. 743 F.3d 509 (7th Cir. 2014). Vertis went into bankruptcy, so Jewel's third-party claims against it are stayed. Docs. 276, 285. With the parties' agreement, a jury trial has been set for December 8, 2015. Doc. 316.

Now before the court are Jordan's motion for summary judgment as to liability on his IRPA claim, Doc. 261, and Time's motion for summary judgment on Jewel's third-party claims, Doc. 288. After the motions were fully briefed, and with the agreement of all parties, the court granted Jordan's motion for leave to file a second amended complaint, which states only an IRPA claim; although Jordan did not formally dismiss his other claims, he agreed on the record that he will not renew those claims against Jewel in this or any other case. Doc. 339. Jordan's summary judgment motion is denied, and Time's motion is granted as to Jewel's claim for indemnity and contribution on Jordan's IRPA claim and denied as moot as to Jewel's claim for indemnity and contribution on Jordan's other, dropped claims.

**Background**

The following facts are set forth as favorably the non-movants as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary

2

judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

In 2009, when Jordan was inducted into the Naismith Memorial Basketball Hall of Fame, Time published a *Sports Illustrated Presents* commemorative issue devoted to celebrating his career. Doc. 301 at p. 2, ¶ 4. Time asked several businesses, including Jewel, to design a one-page advertisement for the issue "with some play on words or design that is specific to Michael Jordan." *Id.* at p. 1, ¶ 2; *id.* at pp. 4-5, ¶¶ 10-12. Attached to Time's email solicitation to Jewel were examples of ads designed for a similar commemorative issue celebrating the Philadelphia Phillies' 2008 World Series win; those ads incorporated the Phillies' logo and name. Doc. 308 at p. 21, ¶¶ 21-22. A Time vice president agreed that "acceptance of [the offer] would require the content [of the ad] to at least have something to do with Michael Jordan," and that "a tribute to LeBron James," for example, probably would not have been acceptable. *Id.* at p. 21, ¶ 24.

Jewel paid no money for the opportunity, but did agree to stock and sell the commemorative issue at special displays by the checkout counters of its stores. *Id.* at p. 18, ¶ 9; *id.* at p. 19, ¶ 14. Jewel's internal copywriter wrote the text, and Vertis, its marketing vendor, designed the graphics. Doc. 102 at ¶¶ 31, 32, 34. Here is the ad:



Doc. 301-8 at 4.  On the tongue of each shoe is "23," the number Jordan wore for most of his tenure with the Chicago Bulls.  Below the header "A Shoe In!" is the following text:

> After six NBA championships, scores of rewritten record books and numerous
> buzzer beaters, Michael Jordan's elevation in the Basketball Hall of Fame was
> never in doubt!  Jewel-Osco salutes #23 on his many accomplishments as we
> honor a fellow Chicagoan who was "just around the corner" for so many
> years.

The phrase in quotes is a play on Jewel's slogan, which is printed below its logo: "Good things are just around the corner."  Jewel does not sell basketball shoes, and the ad mentions no specific Jewel product or service.

**Discussion**

I.      **Jordan's Summary Judgment Motion**

Jordan has moved for summary judgment on liability as to his IRPA claim. The IRPA provides in relevant part: "A person may not use an individual's identity for commercial purposes … without having obtained previous written consent[.]" 765 ILCS 1075/30(a). "To allege a statutory claim of appropriation of likeness under the [IRPA], one must set forth essentially the same three elements that were required for a common-law claim of appropriation of likeness." *Blair v. Nev. Landing P'ship*, 859 N.E.2d 1188, 1192 (Ill. App. 2006). "To allege a common-law appropriation-of-likeness or right-of-publicity claim, a plaintiff had to set forth three elements: (1) an appropriation of one's name or likeness; (2) without one's consent; and (3) for another's commercial benefit." *Trannel v. Prairie Ridge Media, Inc.*, 987 N.E.2d 923, 929 (Ill. App. 2013). Jewel does not dispute the first two elements, Doc. 301 at p. 2, ¶ 5; *id.* at p. 3, ¶ 10, so the only question is whether Jewel's ad served a "commercial purpose," 765 ILCS 1075/30(a).

"Commercial purpose" under the IRPA means "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5; *see Trannel*, 987 N.E.2d at 929. Jordan argues that these passages from the Seventh Circuit's opinion conclusively establish that Jewel's ad served a "commercial purpose" within the meaning of the IRPA:

> Jewel's ad served two functions: congratulating Jordan on his induction into the Hall of Fame and promoting Jewel's supermarkets. …
>
> [C]onsidered in context, and without the rose-colored glasses, Jewel's ad has an unmistakable commercial function: enhancing the Jewel-Osco brand in the

5

> minds of consumers. This commercial message is implicit but easily inferred, and is the dominant one. …
>
> [A]n ad congratulating a famous athlete can only be understood as a promotional device for the advertiser. …
>
> The ad is plainly aimed at fostering goodwill for the Jewel brand among the targeted consumer group—"fellow Chicagoans" and fans of Michael Jordan—for the purpose of increasing patronage at Jewel-Osco stores. …
>
> Jewel's ad is an example of a neighborly form of general brand promotion by a large urban supermarket chain. What does it invite readers to buy? Whatever they need from a grocery store—a loaf of bread, a gallon of milk, perhaps the next edition of *Sports Illustrated*—from *Jewel-Osco*, where "good things are just around the corner."

743 F.3d at 518-19. Yet Jordan's initial and reply briefs ignore this passage from the opinion:

> Jewel's counsel argued that the federal and state laws at issue here, by their own terms, apply only to commercial speech as defined by First Amendment jurisprudence. So Jewel's free-speech defense might be understood as using the First Amendment commercial-speech inquiry as a proxy for determining whether the speech potentially falls within the scope of these laws. It is true that each of the statutory and common-law claims alleged here has a "commercial" element in one form or another, but it's not clear that the Supreme Court's commercial-speech doctrine should be used to define this term in each cause of action. As to the Lanham Act claim in particular, we have cautioned against interpreting the scope of the statute in this way. We don't need to address this matter further because the parties haven't briefed the extent to which the scope of the Lanham Act (or the state laws) is coextensive with the Supreme Court's constitutional commercial-speech doctrine.

*Id*. at 514 n.4 (citation omitted). And this one as well:

> To wrap up, we hold that Jewel's ad in the commemorative issue qualifies as commercial speech. This defeats Jewel's constitutional defense, permitting Jordan's case to go forward. … Because the merits have not been briefed, *we express no opinion* on the substance of Jordan's claims under the Lanham Act or any of the state-law theories.

*Id*. at 522 (emphasis added).

The Seventh Circuit's opinion addressed whether Jewel's ad qualified as commercial speech under the First Amendment, and it held that the "brand" advertising advanced by Jewel's

6

page was First Amendment commercial speech even though it did not refer to any specific Jewel product or service. The Seventh Circuit explicitly declined to address whether "the Supreme Court's commercial-speech doctrine should be used to define" the "'commercial' element" of Jordan's IRPA, Lanham Act, and other claims. In fact, the court expressed doubt that First Amendment commercial speech doctrine governed the scope of the "commercial" element of those claims, explicitly pointing out that it had cautioned against interpreting the Lanham Act in that manner. And the Seventh Circuit twice noted that the parties had not briefed the meaning of the "commercial" element of Jordan's claims—or, in the court's words, "the extent to which the scope of the Lanham Act (or the state laws) is coextensive with the Supreme Court's constitutional commercial-speech doctrine." *Id*. at 514 n.4.

Faced with the Seventh Circuit's disclaimers and doubts, one would have expected Jordan's summary judgment briefs—in the absence of case law addressing whether the term "commercial purpose" in the IRPA encompasses brand advertising as well as the advertising of specific products, merchandise, goods, or services, and thus whether and, if so, to what extent the term is coextensive with "commercial speech" under the First Amendment—to engage with the IRPA's text in light of Illinois rules of statutory construction. *See U.S. Fire Ins. Co. v. Barker Car Rental*, 132 F.3d 1153, 1156 (7th Cir. 1997) ("in ascertaining the meaning of [an Illinois statute], we must apply the same rules of statutory construction that the Supreme Court of Illinois would apply if it were faced with the same task"); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 131 F.3d 625, 628 (7th Cir. 1997) ("What federal courts in diversity cases attempt to do, where statutory interpretation remains open, is to make a studied effort to determine how a state's highest court would interpret the law in question."). When faced with the need to interpret a particular statute, Illinois courts often look to decisions interpreting a closely related

7

Illinois statute—yet Jordan neither cited this canon nor brought to the court's attention any closely related statutes or precedents interpreting those statutes. *See DeLuna v. Burciaga*, 857 N.E.2d 229, 236 (Ill. 2006) ("It is appropriate statutory construction to consider similar and related enactments, though not strictly *in pari materia*. We must presume that several statutes relating to the same subject are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious.") (citations omitted). Illinois courts also look to the interpretation given analogous statutes enacted by other States—but again, Jordan neither cited this canon nor brought to the court's attention any cases from other States interpreting right to publicity or other similar statutes. *See Ill.-Ind. Cable Television Ass'n v. Ill. Commerce Comm'n*, 302 N.E.2d 334, 336 (Ill. 1973) ("The question of whether the words 'telephone or telegraph' as used in the statute can encompass cable television is one of first impression in this State. Similar statutes, however, have been interpreted by the highest courts in other States."); *Am. Serv. Ins. Co. v. Pasalka*, 842 N.E.2d 1219, 1228 (Ill. App. 2006) ("While there is no case in Illinois directly addressing this issue, courts in other states have issued decisions consistent with our view."); *Urban v. Loham*, 592 N.E.2d 292, 295 (Ill. App. 1992) ("In construing an Illinois statute, decisions of other states construing similar laws are entitled to respect and consideration.") (internal quotation marks omitted). Nor did Jordan address the possible applicability of the canon that "[w]hen [a federal court is] faced with two opposing and equally plausible interpretations of state law, [the court] generally choose[s] the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability." *Home Valu, Inc. v. Pep Boys–Manny, Moe & Jack of Del., Inc.*, 213 F.3d 960, 963 (7th Cir. 2000).

Instead, Jordan's initial brief devotes just a paragraph to the meaning of "commercial purpose" under the IRPA—the first sentence quotes the IRPA's definition of "commercial purpose"; the second sentence introduces block quotes from the Seventh Circuit's opinion; and the third and final sentence says, "Thus, Defendants' ad used Michael Jordan's identity for a commercial purpose, placing it squarely within the [IRPA's] prohibited conduct." Doc. 262 at 5-6. Put simply, Jordan argues that because the Seventh Circuit's opinion said what it said, Jewel's ad has a "commercial purpose" under the IRPA. But that is precisely what the Seventh Circuit twice made clear it was *not* saying. A party moving for summary judgment must establish the legal and factual predicates for summary judgment, and Jordan's failure to develop an argument on the central and unanswered legal question of "the extent to which the scope of the … state laws … is coextensive with the Supreme Court's constitutional commercial-speech doctrine," 743 F.3d at 514 n.4—or even to acknowledge that the Seventh Circuit left open that question—operates as a forfeiture, at least for purposes of summary judgment. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted).[*]

---

[*] Jordan filed a similar suit against another grocery chain, Dominick's, for taking out an ad in the same *Sports Illustrated* commemorative issue. *Jordan v. Dominick's Finer Foods, LLC*, No. 10 C 407 (N.D. Ill. removed Jan. 20, 2010). Jordan's brief in support of summary judgment on

Jordan's summary judgment motion accordingly is denied. This disposition renders it unnecessary to address Jewel's other arguments against summary judgment on the IRPA claim.

## II. Time's Summary Judgment Motion

### A. Jewel's Third-Party Contribution Claim

Time argues that Jewel has no right of contribution as to Jordan's IRPA claim because the right of publicity is an intentional tort. Jewel rightly concedes that Illinois law prohibits intentional tortfeasors from seeking contribution from co-tortfeasors. *See Appley v. West*, 929 F.2d 1176, 1180 (7th Cir. 1991) (per curiam) (Illinois law); *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 542 (Ill. 1989). Jewel argues, however, that because it is possible to violate the IRPA unintentionally, the question of whether Jewel's actions were in fact intentional—and thus whether Jewel can seek contribution from Time if found liable under the IRPA—is for a jury to decide.

To support its position, Jewel relies on the IRPA's punitive damages provision, which says that "[p]unitive damages may be awarded against a person found to have willfully violated" the IRPA. 765 ILCS 1075/40(b). Illinois law holds that "unlike intentionally tortious behavior,

---

his IRPA claim against Dominick's bears a strong resemblance, in both substance and brevity, to the initial brief he filed in this case. *Compare* No. 10 C 407, ECF No. 120 *with* Doc. 262 in this case. That tack made perfect sense in the *Dominick's* case, where the Dominick's page was not mere brand advertising, but instead displayed a picture of a Dominick's house brand steak and included a two dollar coupon. No. 10 C 407, ECF No. 120, at 4; 851 F. Supp. 2d at 1115. Given this, there was no question that the ad served a "commercial purpose" under the IRPA, as it offered for sale and advertised a specific "product, merchandise, [or] good[]." 765 ILCS 1075/5. In fact, the question was so clear that Judge Shadur, who at the time was presiding over the case, summarily granted summary judgment to Jordan at the motion's presentment hearing. No. 10 C 407, ECF No. 129, at 2-4; *see also* ECF No. 183, at 1-2 (Dominick's brief admitting that it "does not contest that its use of Mr. Jordan's identity in the tribute violated the [IRPA]"). For the reasons given in the text, this case, which involves brand advertising rather than the advertising of a specific product or good, required a different and far more analytical approach.

conduct characterized as willful and wanton may be proven where the acts have been less than intentional." *Ziarko v. Soo Line R.R.*, 641 N.E.2d 402, 406 (Ill. 1994). Jewel asserts that because it is possible for "willful" conduct to be less culpable than "intentional" conduct under Illinois law, and because the IRPA itself recognizes that there can be liability for less than willful conduct—since punitive damages are available for an IRPA violation only if the defendant's conduct is willful—it must be possible for a tortfeasor to violate the IRPA not intentionally, but only negligently or recklessly. Doc. 307 at 13-14. It follows, according to Jewel, that Illinois law does not render contribution categorically unavailable for an underlying IRPA claim. *See Ziarko*, 641 N.E.2d at 408-09 ("[W]e hold that a defendant found guilty of willful and wanton conduct may seek contribution from a defendant found guilty of ordinary negligence if the willful and wanton defendant's acts were found to be simply reckless, and thus were determined to be less than intentional conduct. We believe this ruling will better serve justice and will be more harmonious with the policies underlying the Contribution Act.").

Jewel's argument, while having some surface appeal, is incorrect. Illinois courts understand the term "willful," particularly in the context of punitive damages, to mean "in bad faith" or "with malice"—concepts that are orthogonal to the classification of torts as intentional or unintentional. For example, *Trannel* held that although the "defendant violated the letter of the [IRPA]" by intentionally publishing a photo of the plaintiffs in a media kit, the "[d]efendant's actions were not malicious or willful" so as to permit punitive damages because the defendant had honestly but incorrectly believed that it had obtained consent. 987 N.E.2d at 933. By contrast, a defendant who intentionally used the plaintiff's image in a television commercial without consent because he "thought most people would be thrilled that they would be in a commercial" and who, when confronted by the plaintiff, brazenly denied that the plaintiff was in

11

the commercial, might have "acted with malice" so as to be liable for punitive damages. *Ainsworth v. Century Supply Co.*, 693 N.E.2d 510, 515 (Ill. App. 1998). In short, "willful" in the context of punitive damages means something like "actual malice, deliberate violence or oppression," "some element of outrage similar to that found in crime," or "an evil motive." *Homewood Fishing Club v. Archer Daniels Midland Co.*, 605 N.E.2d 1140, 1148 (Ill. App. 1992). It has no bearing on whether the underlying tort is properly classified as intentional.

By way of analogy, trespass is an intentional tort. *See Levin v. United States*, 133 S. Ct. 1224, 1228 n.1 (2013) (classifying "trespass" as an "intentional tort[]"); *Turcios v. DeBruler Co.*, 12 N.E.3d 167, 175 (Ill. App. 2014) (referring to "trespass to land" as "one of the traditional intentional torts"); *Chicago Title Land Trust Co. v. JS II, LLC*, 977 N.E.2d 198, 220 (Ill. App. 2012) ("Trespass is an intentional tort."). Yet the Supreme Court of Illinois has long held that trespass can nevertheless be categorized as either "innocent" or "willful," with only the latter sort subject to punitive damages. *See Dethloff v. Zeigler Coal Co.*, 412 N.E.2d 526, 535 (Ill. 1980) ("The defendant in effect would have us eliminate the distinction drawn between innocent and wilful trespassers so far as recoverable damages are concerned. We consider that the elimination of this distinction would be unsound."); *Watkins v. Gale*, 13 Ill. 152, 157 (1851) (distinguishing between "good faith" and "wilful" trespassers for purposes of imposing punitive damages). This shows that an intentional tort can be committed willfully and with malice, on the one hand, or innocently and in good faith, on the other.

The same holds for the IRPA. Those to have considered the question agree that the right of publicity (or appropriation of identity) tort is properly classified as intentional. *See*, *e.g.*, *Lineberry v. State Farm Fire & Cas. Co.*, 885 F. Supp. 1095, 1098 (M.D. Tenn. 1995) ("Appropriation is committed by one who takes for his or her own use or benefit another's name

or likeness without consent. It is, therefore, an intentional tort, as an intentional act is required before one can be held liable for appropriation.") (citation omitted); Andrew J. McClurg, "A Thousand Words Are Worth A Picture: A Privacy Tort Response to Consumer Data Profiling," 98 *Nw. U. L. Rev.* 63, 128 & n.420 (2003) (noting that although "[t]heoretically, it might be possible for a negligent invasion of privacy to occur," the "tort of appropriation" has consent as an element, and "[c]onsent is a privilege to commit what would otherwise be an intentional tort"); *see also Kalimara v. Ill. Dep't of Corr.*, 879 F.2d 276, 277 (7th Cir. 1989) (Illinois law) (including among "intentional torts" the "publication of matter violating the right of privacy"); *Beal v. Wyndham Vacation Resorts, Inc.*, 956 F. Supp. 2d 962, 973 (W.D. Wis. 2013) (same, under Wisconsin law); *Norris by Norris v. Bd. of Educ. of Greenwood Cmty. Sch. Corp.*, 797 F. Supp. 1452, 1464 (S.D. Ind. 1992) (Tinder, J.) (same, under Indiana law); *Chang v. Virgin Mobile USA, LLC*, 2009 WL 111570, at *5 n.1 (N.D. Tex. Jan. 16, 2009) ("Plaintiffs allege intentional tort claims of invasion of privacy, libel, and copyright infringement."). This is so regardless of whether a defendant commits the tort innocently or willfully. *See Trannel*, 987 N.E.2d at 933 (innocently); *Ainsworth*, 693 N.E.2d at 515 (willfully).

In sum, Illinois's right of publicity tort—as codified by the IRPA, *see Blair*, 859 N.E.2d at 1192—is an intentional tort, and if Jewel is found to have violated the statute, it would be an intentional tortfeasor barred by settled Illinois law from imposing contribution liability on Time. This conclusion comports with the Illinois Supreme Court's holding that "the 'governing principle in this jurisdiction' [is] that 'the costs of *accidental* injury are to be apportioned in accordance with the relative fault of all concerned in the action.'" *Ziarko*, 641 N.E.2d at 408 (quoting *Allison v. Shell Oil Co.*, 495 N.E.2d 496, 499 (Ill. 1986)). One cannot *accidentally* create an ad using another's likeness and then publish it without consent—even though one can

do so innocently, for example, by incorrectly assuming that consent had been procured, as in *Trannel*. Time therefore is entitled to summary judgment on Jewel's third-party contribution claim for Jewel's potential liability under the IRPA.

### B. Jewel's Third-Party Indemnity Claim

Jewel's third-party indemnity claim against Time sounds in implied indemnity. Doc. 275 at ¶¶ 41-46. "Under Illinois law, implied indemnity is available to a principal who, through no fault of its own, is held liable for its agent's negligent tort against a third party." *BCS Ins. Co. v. Guy Carpenter & Co.*, 490 F.3d 597, 603 (7th Cir. 2007) (Illinois law). "To prevail on a claim for implied indemnity, a plaintiff must establish: (1) that there was a pre-tort relationship between the indemnitor and the indemnitee, and (2) that the indemnitee was held derivatively liable for the acts of the indemnitor." *Ibid.* (citing *Kerschner v. Weiss & Co.*, 667 N.E.2d 1351, 1355-56 (Ill. App. 1996)). Time contends that neither element has been met. Doc. 290 at 12-15.

With respect to the first element, Jewel responds that its pre-tort relationship with Time gives rise to an indemnification duty because they had a "wholesaler-retailer relationship." Doc. 307 at 15. The only case Jewel cites in support, *Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co.*, 123 F.3d 675 (7th Cir. 1997), indeed holds that implied indemnity can arise where the parties have a "wholesaler/retailer" relationship. *Id.* at 684. But *Cooper Power* applied Ohio law, not Illinois law, which in this context differs from Ohio law. In Illinois, the "[c]lassic pretort relationships which have given rise to a duty to indemnify include: lessor and lessee; employer and employee[;] owner and his lessee; [and] master and servant." *Van Slambrouck v. Econ. Baler Co.*, 475 N.E.2d 867, 870-71 (Ill. 1985) (citations omitted). Jewel's relationship with Time fits into none of those categories. And because Illinois courts have generally refused to expand the set of qualifying pre-tort relationships, *see Lohman v. Morris*,

14

497 N.E.2d 143, 146 (Ill. App. 1986) (holding that a business and business-invitee relationship does not qualify); *Friedman, Alschuler & Sincere v. Arlington Structural Steel Co.*, 489 N.E.2d 308, 310 (Ill. App. 1985) (same, for architect and subcontractor); *see generally Allison v. Shell Oil Co.*, 495 N.E.2d 496, 498-504 (Ill. 1986) (describing the evolution of implied indemnity and explaining why, except under narrow circumstances, it is no longer viable in Illinois), this court will not do so either.

In any event, with respect to the second element, implied indemnity is available in Illinois only where the indemnitee is "liable [to the plaintiff] solely on a derivative basis." Kenneth Kandaras & Patrick J. Kelley, "New Developments in the Illinois Law of Contribution Among Joint Tortfeasors," 23 *Loy. U. Chi. L.J.* 407, 443 (1992) (citing *Frazer v. A.F. Munsterman, Inc.*, 527 N.E.2d 1248, 1255 (Ill. 1988), and *Thatcher v. Commonwealth Edison Co.*, 527 N.E.2d 1261, 1263 (Ill. 1988)). Extensively citing the Kandaras and Kelley article, the Supreme Court of Illinois reaffirmed that, in light of the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/1 *et seq.*, the *only* remaining reason "to recognize the viability of implied indemnity [is] where a principal is vicariously liable for the conduct of an agent or for the nondelegable acts of an independent contractor." *Am. Nat'l Bank & Trust Co. v. Columbus-Cuneo-Cabrini Med. Ctr.*, 609 N.E.2d 285, 288 (Ill. 1992); *see also Travelers Cas. & Sur. Co. v. Bowman*, 893 N.E.2d 583, 590 (Ill. 2008) ("The right to common law implied indemnity is available to 'a tortfeasor whose liability is vicariously imposed by policy of law rather than culpability of conduct.'"); *BCS Ins. Co.*, 490 F.3d at 603 ("The liability must be wholly derivative, resulting solely out of the agent's actions."). Stated differently, "the party on whom the duty to indemnify is sought to be imposed must have been in some (though often an attenuated) sense 'at fault' and the other party blameless though liable—that is to say, only *strictly* liable, by virtue of respondeat superior,

implied warranty, strict products liability, or some other legal principle that imposes liability regardless of fault." *Jinwoong, Inc. v. Jinwoong, Inc.*, 310 F.3d 962, 965 (7th Cir. 2002).

Jewel does not argue that its potential liability to Jordan would be derivative, much less derivative of Time's liability. Nor can Jewel claim to be "blameless though liable" to Jordan by operation of law, if indeed a jury were to find that it *is* liable to him, thereby triggering its implied indemnity claim against Time; rather, if Jewel is found liable to Jordan, it would be due to its own conduct and not just derivatively through Time's conduct. Accordingly, Jewel cannot seek indemnification from Time under Illinois law. *See Van Slambrouck*, 475 N.E.2d at 871 (holding that the manufacturers of allegedly defective products who were sued by injured employees could not seek implied indemnity against the plaintiffs' employers, who had purchased, maintained, and required the plaintiffs to use the products).

## Conclusion

Jordan's motion for summary judgment is denied. Time's motion for summary judgment is granted as to Jewel's third-party claims on Jordan's IRPA claim, and otherwise is denied as moot. The only remaining, non-stayed claims in this case are Jordan's IRPA claim against Jewel and, should it choose to pursue them, Time's third-party counterclaims against Jewel, which also arise under state law.

The Seventh Circuit's opinion directed this court on remand to decide under 28 U.S.C. § 1367(c) whether it "should retain or relinquish supplemental jurisdiction over the state-law claims" if, as has come to pass, the Lanham Act claim goes away. 743 F.3d at 522. Section 1367(c)(3) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "As a general matter, when all federal claims

have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pend[e]nt state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). This general rule has three exceptions: "when the [refiling] of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Ibid*.

The second exception applies here; the factual circumstances underlying all of Jordan's claims are essentially the same, and this court and the Seventh Circuit have delved deeply into and engaged extensively with those facts since this case was removed from state court. Accordingly, in its discretion, this court will continue to exercise supplemental jurisdiction over the remaining state law claims. *See Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 513 (7th Cir. 2010) (affirming the district court's exercise of supplemental jurisdiction where "the factual basis for Doe-2's state-law claims was indistinguishable from the asserted basis for her federal claim, and the district judge had devoted substantial court time and resources to analyzing the complaint's factual allegations before addressing the state-law theories"); *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008) ("A balance of the factors listed above favors the district court's decision to exercise jurisdiction over the Hansens' state claims against HSSC. The district court and the parties in this case have already expended substantial judicial resources—litigation began in May 2005, and the parties have completed discovery.").

March 12, 2015

United States District Judge