**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL JORDAN,<br><br>Plaintiff,<br><br>v.<br><br>JEWEL FOOD STORES, INC., and<br><br>SUPERVALU INC.<br><br>Third-Party Plaintiffs/Defendants,<br><br>v.<br><br>TIME INC. and VERTIS, INC.<br><br>Third-Party Defendants | Civil Action No. 10-340<br><br>Judge Gary Feinerman<br><br>Magistrate Judge Michael T. Mason |

**EXHIBITS A-B IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE**
**TO EXCLUDE THE TESTIMONY OF GREGORY S. CARPENTER**

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 10-cv-00340 |
| JEWEL FOOD STORES, INC., and | ) | |
| SUPERVALU INC., | ) | Judge Gary Feinerman |
| | ) | |
| Defendants/Third-Party Plaintiffs, | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| v. | ) | |
| | ) | |
| TIME INC. and VERTIS, INC., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**<u>Report of Gregory S. Carpenter</u>**

I am James Farley/Booz Allen Hamilton Professor of Marketing Strategy and Director of the Center for Market Leadership at the Kellogg School of Management at Northwestern University. I received my B.A. in Economics and Mathematics from Ohio Wesleyan University, and an M.B.A. and Ph.D. in Business from Columbia University.

1. My research on competitive marketing strategy has received four awards from the American Marketing Association. My work has been featured by the *Harvard Business Review, Financial Times* (London), and National Public Radio. I serve or have served on the editorial boards of the *Journal of Marketing Research, Marketing Science*, and *Marketing Letters*, and as Associate Editor of *Location Science*. I served as chair of the Marketing Department at Northwestern University's Kellogg School of Management for three years.

2. My activities include projects with Coca-Cola, Diageo, Dow Chemical, General Electric, Merck, Motorola, Sara Lee, and Unilever. A copy of my C.V., which provides additional details concerning my education and experience, is attached as Appendix A.

3. I have been asked by Michael Jordan through his attorneys to provide my opinion regarding the Jewel-Osco advertisement at issue in this case. For my work in this case I am being compensated at my customary rate of $800 per hour.

4. In connection with this request, I have reviewed the documents and materials listed in Appendix B.

## The Purpose of a Brand

5.      On the most basic level, a brand is a name or symbol or mark that is associated with a product or service and to which buyers attach psychological meanings.[1] By selecting target customers, developing a unique value proposition to these target buyers, and delivering that value consistently, an organization can endow a brand with meaning and hence value.

6.      A strong brand has many advantages. With a strong brand, a company's products are more easily recognized and more competitively distinct.

7.      A brand can create value for buyers in many ways. Some brands promise low price (such as Wal-Mart), others promise excellent service (e.g., Nordstrom), and some enable buyers to project a certain image (e.g., Harley-Davidson). Brands built using powerful images enable buyers to express themselves or their aspirations through their purchases.

8.      The value of brands in the minds of consumers translates into value for the owners of those brands. Studies have shown that changes in key intangible factors, such as brand assets, have a significant effect on the stock market valuation of the firm. This link between brand and market value has been documented across a wide variety of markets and environments.[2] These analyses show a significant positive link between changes in brand strength and stock return, suggesting that a brand is an asset with the ability to generate a stream of future cash flows.

---

[1] Alice M. Tybout and Gregory S. Carpenter, "Creating and Managing Brands," in A. Tybout and T. Calkins (eds.), *Kellogg on Marketing,* New York: John Wiley, 2010.

[2] See, for example, Aaker, David A. and Robert Jacobson "The Financial Information Content of Perceived Quality, "*Journal of Marketing Research*, May 1994, 191-201.

## Creating Brand Meaning

9.     Creating brands of great value takes considerable time and money. They are not built overnight. As part of the marketing strategy, organizations develop a *value proposition*, a statement of the unique value the corporation will offer consumers. Creating a valuable brand requires educating buyers about the value proposition. Doing so is the result of years of effort and careful implementation of an effective strategy:

> Strong brands do not just happen. Rather, they result from the creation of winning brand strategies and brilliant executions from committed, disciplined organizations.[3]

10.     Brands have value because those who create and manage them endow them with meaning through their actions. Some brand owners endow their brands with meaning through customer experience, such as Starbucks. Others do so through advertising. Advertising creates awareness, communicates product benefits, and conveys information about availability.

11.     Brands accomplish these goals in many ways. One means is to transfer meaning from a well-established entity, such as a concept or celebrity, to a brand. Through association with the concept or celebrity, the brand acquires its meaning in the form of thoughts and feelings that buyers link to the brand in memory. For example, in one of the most famous advertising campaigns, Philip Morris employed images of the American cowboy to associate Marlboro with masculinity, ruggedness and independence as shown in the ad below.

---

[3] Aaker, David, A., *Building Strong Brands*, New York: The Free Press,1991, p. 358.



12.     Other corporations endow their brands with meaning by sponsoring sporting events. For example, Rolex sponsors auto racing and yacht racing to link its brand with success and status. Mercedes-Benz sponsors tennis tournaments, Flora (a brand of margarine sold in Great Britain) sponsors the London Marathon, and countless corporations sponsor Nascar teams. Indeed, Nascar cars and drivers are covered with logos as corporations seek to use their popularity and success to influence buyers of a surprising range of brands.

13.     Many corporations endow their brands with meaning, creating commercially valuable assets, through advertising that excludes reference to any products. The purpose of such advertising is to create a positive association with the brand that influences buyers to purchase the company's goods or services. In the case of Nascar, for example, different teams advertise Stanley, Snickers and Office Depot by covering their cars with sponsors' logos, even though a drill, candy bar or a fax machine is nowhere in sight, as illustrated with the photo shown below.



14.     Apple Computer provides another iconic example. Apple Computer's "Think Different" campaign included a series of print ads depicting individuals well known for great achievement often through unorthodox means, including Alfred Hitchcock, Jim Henson, Albert Einstein, Orson Wells, among others. In addition to the image of the subject, the ads included only the Apple logo and its tag line, "Think Different." One such ad appears below.



15.     Nike is well known for defining its brand through famous athletes of great achievement such as Michael Jordan. Nike often advertises by simply depicting the athlete and

the brand, with very little or even no text and often without reference to any specific product. In some cases, such as the ad depicting Roger Federer, Nike includes text congratulating Mr. Federer on winning 15 Grand Slam tennis titles. In the case of the ad below showing Michael Jordan and his six championship rings, text is clearly unnecessary. In both cases, Nike is defining its brand, and all the products and services sold under the Nike brand, through these extraordinary athletes.





16.    Many corporations employ a similar strategy including American Express, Giorgio Armani, Office Depot, Du Pont, General Motors, Pepsi, Rolex, and Gap, and countless others. Examples are included in Appendix C.

17.    Through such advertising efforts, corporations create valuable assets and promote the sale of their goods and services. The brands are valuable because they are effective devices for proposing, creating and maintaining commercial relationships between consumers and the corporation. Advertising is an expression of that value proposition, whether it includes a specific reference to any product or not. Indeed, by not citing a particular product, a corporation suggests that the brand itself has unique value and promotes the sale of all products and services associated with the brand.

### The Jewel-Osco Brand and Brand Slogan and
### Their Use in the Advertisement

18.    Supervalu and Jewel Food Stores have endeavored to create meaningful brands, Jewel-Osco among them. I understand that in 2008 they embarked on a branding effort,

described as a "Big Brand Idea," using the slogan "Good things are just around the corner." Following the announcement of this branding effort, they began a series of activities such as advertising, direct mail, and using the new slogan on their websites. Supervalu developed a 48 page manual outlining its guidelines for communications and branding efforts.

19.     The manual describes the meaning, thoughts and associations they are seeking to build in their brand. According to Supervalu, the use of "Good things are just around the corner" is intended to communicate to consumers that "'Good things' are in store and remind them it is in their neighborhood store." It also is intended to convey the promise that "fresh, local produce, great value, good people, one-stop shopping and community involvement can all be found at their neighborhood Supervalu banner store." The Supervalu guidelines make clear that the brand slogan serves this purpose in "*each and every communication*" in which it is included.

20.     It is my understanding that in 2009 when Michael Jordan was inducted in to the Basketball Hall of Fame, *Time* published a special commemorative issue of *Sports Illustrated Presents*. Included in that issue is an ad from Jewel Food Stores, Inc. The ad features the Jewel-Osco logo, above a pair of red-white-and-black basketball shoes with the number 23 on the tongue, and underneath the following copy:

> A Shoe In! After six NBA championships, scores of rewritten record books and numerous buzzer beaters, Michael Jordan's elevation in the Basketball Hall of Fame was never in doubt! Jewel-Osco salutes #23 on his many accomplishments as we honor a fellow Chicagoan who was "just around the corner" for so many years.

Beneath the Jewel-Osco logo is the slogan "Good things are just around the corner." The ad shows no specific Jewel-Osco products.

21.     The Jewel-Osco brand is a symbol that Supervalu and Jewel Food Stores seek to endow with meaning. To do so, Supervalu and Jewel Food Stores employ advertising. Through

the use of the Jewel-Osco brand and brand slogan, Supervalu and Jewel Food Stores convey a promise of value and seek to create a commercial relationship with potential customers and to maintain and improve the relationship with existing customers.

22.     The communication at issue in this case is an advertisement. It informs consumers about Jewel-Osco, it conveys the meaning of the Jewel-Osco brand as its owners intend, and it proposes a commercial transaction with current and potential customers.  The communication proposes a transaction for all goods and services that bear or are associated with the Jewel-Osco brand and brand slogan, just as other ads including Michael Jordan do for Nike and other ads cited in this Report do for their sponsors.  The ad promotes and advertises all of Jewel-Osco's goods and services.

Gregory S. Carpenter
Evanston, Illinois
April 17, 2015

Appendix A

# GREGORY S. CARPENTER

*Address*

> Kellogg School of Management, Northwestern University, Donald P. Jacobs Center, 459 Leverone Hall, 2001 Sheridan Road, Evanston, Illinois 60208. Phone +1 847 491 2717, fax +1 847 491 2498; g-carpenter@kellogg.northwestern.edu.

*Education*

> Ph. D. (1983) Business, Columbia University
> M. Phil. (1983) Business, Columbia University
> M. B. A. (1980) Business, Columbia University
> B. A. (1978) Economics and Mathematics, Ohio Wesleyan University

*Honors and Awards*

> Sheth Foundation/*Journal of Marketing* Award (2014)
> Chevalier, Ordre des Coteaux de Champagne (2010)
> Robert D. Buzzell Marketing Science Institute Award (2008)
> Marketing Science Institute/H. Paul Root Award (2006)
> American Marketing Association Donald R. Lehmann Award (2000)
> American Marketing Association William F. O'Dell Award (1999, 1994, 1990 finalist)
> American Marketing Association Paul E. Green Award (1999)
> Donald P. Jacobs Research Professor, Northwestern University (1998-1999)
> Sidney J. Levy Teaching Award, Northwestern University (1996)
> American Marketing Association Doctoral Consortium Faculty (2006, 1996, 1991, 1989, 1985)
> McManus Research Professor, Northwestern University (1994-1995)
> Kraft Research Professor, Northwestern University (1993-1994)
> Outstanding Professor of the Year, The Managers' Program, Northwestern University (1992)
> Richard M. Clewett Research Professor, Northwestern University (1991-1992)
> American Marketing Association Doctoral Dissertation Award (1984)
> Beta Gamma Sigma (1983)
> Hermes Scholar, Columbia University (1982)
> Booz · Allen & Hamilton Fellow, Columbia University (1981)
> Dean's Merit Fellow, Columbia University (1980)
> University Fellow, Ohio Wesleyan University (1978)
> Charles Edison Memorial Fellow, Georgetown University (1977)

*Employment*

> James B. Farley/Booz Allen Hamilton Professor of Marketing Strategy (since 1999), Professor of Marketing (since 1999), Associate Professor of Marketing (1990-1999), Kellogg School of Management, Northwestern University.

Visiting Associate Professor of Marketing (Spring 1990), School of Organization and Management, Yale University.

Associate Professor of Business (1987-1990), Assistant Professor of Business (1985-1987), Graduate School of Business, Columbia University.

Assistant Professor of Management (1983-1986), Acting Assistant Professor of Management (1982 to 1983), Graduate School of Management, University of California, Los Angeles.

## RESEARCH

*Journal Articles*

Gebhardt, Gary F., Gregory S. Carpenter and John F. Sherry, Jr. (2006), "Creating Market Orientation: A Longitudinal, Multi-firm, Grounded Analysis of Cultural Transformation," *Journal of Marketing*, 66 (4), 37-55.

- *Winner of the Sheth Foundation/*Journal of Marketing *Award, 2014, given to the article published in the* Journal of Marketing *between 2004 and 2008 that has made long term contributions to the theory and practice of marketing.*

- *Winner of the Marketing Science Institute/H. Paul Root Award, 2006, given by the* Journal of Marketing *editorial review board for significant contribution to the advancement of the practice of marketing.*

Rust, Roland T., Tim Ambler, Gregory S. Carpenter, V. Kumar, and Rajendra Srivastava (2004), "Measuring Marketing Productivity: Current Knowledge and Future Directions," *Journal of Marketing*, 68 (4), 76-89.

Chernev, Alex, and Gregory S. Carpenter (2001), "The Role of Market Efficiency Intuitions in Consumer Choice: A Case of Compensatory Inferences," *Journal of Marketing Research*, 38 (August), 349-361.

Brown, Christina, and Gregory S. Carpenter (2000), "Why is the Trivial Important? A Reasons-Based Account for the Effects of Trivial Attributes on Choice," *Journal of Consumer Research*, 26 (4), 372-385.

Shankar, Venkatesh, Gregory S. Carpenter and Lakshman Krishnamurthi (1999), "The Advantages of Entry in the Growth Stage of the Product Life Cycle: An Empirical Analysis," *Journal of Marketing Research*, 36, 2 (May), 269-276.

Shankar, Venkatesh, Gregory S. Carpenter, and Lakshman Krishnamurthi (1998), "Late Mover Advantage: How Innovative Late Entrants Outsell Pioneers," *Journal of Marketing Research*, 35, 1 (February), 54-70.

- *Winner of the American Marketing Association's Donald R. Lehmann Award, 2000, honoring the best dissertation-based article recently published in the* Journal of Marketing *or* Journal of Marketing Research.

2

- *Winner of the American Marketing Association's Paul E. Green Award, 1999, recognizing the article in the* Journal of Marketing Research *that demonstrates the greatest potential to contribute significantly to the practice of marketing research.*

- *Abstracted in L. McAlister, R. Bolton and R. Rizley (eds.),* Essential Readings in Marketing, *Cambridge: Marketing Science Institute, 2006.*

Carpenter, Gregory S., and Kent Nakamoto (1996), "The Impact of Consumer Preference Formation on Marketing Objectives and Competitive Second Mover Strategies," *Journal of Consumer Psychology,* 5(4), 325-358.

DeSarbo, Wayne, Donald R. Lehmann, Gregory S. Carpenter, and Indrajit Sinha (1996), "A Stochastic Multidimensional Unfolding Approach for Representing Phased Decision Outcomes," *Psychometrika,* 61, 3 (September), 485-508.

Carpenter, Gregory S., and Kent Nakamoto (1994), "Reflections on 'Consumer Preference Formation and Pioneering Advantage'," *Journal of Marketing Research,* 31, 4 (November), 570-73.

Carpenter, Gregory S., Rashi Glazer and Kent Nakamoto (1994), "Meaningful Brands from Meaningless Differentiation: The Dependence on Irrelevant Attributes," *Journal of Marketing Research,* 26, 3 (August), 339-50.

- *Winner of the American Marketing Association's William F. O'Dell Award, 1999, given to the* Journal of Marketing Research *article published in 1994 that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice.*

- *Featured in* Harvard Business Review, *"Consumer Choices: The Relevance of Irrelevant Attributes," November-December 1993.*

- *Featured on National Public Radio, "Marketplace," December 9, 1993.*

- *Abstracted in L. McAlister, R. Bolton and R. Rizley (eds.),* Essential Readings in Marketing, *Cambridge: Marketing Science Institute, 2006.*

Carpenter, Gregory S., and Dominique M. Hanssens (1994), "Market Expansion, Cannibalization, and International Airline Pricing Strategy," *International Journal of Forecasting,* 10, 313-26.

Bell, Steven S., and Gregory S. Carpenter (1992), "Optimal Multiple-Objective Marketing Strategies," *Marketing Letters,* 3, 4 (October), 383-93.

Carpenter, Gregory S., and Kent Nakamoto (1990), "Competitive Strategies for Late Entry into a Market with a Dominant Brand," *Management Science,* 36, 10 (October), 1268-78.

Carpenter, Gregory S. (1989), "Perceptual Position and Competitive Brand Strategy in a Two-Dimensional, Two-Brand Market," *Management Science,* 35, 9 (September), 1029-44.

- *Abstracted in* OR/MS Today, *16 (1989), 4 (August), 39.*

Carpenter, Gregory S., and Kent Nakamoto (1989), "Consumer Preference Formation and Pioneering Advantage," *Journal of Marketing Research,* 26, 3 (August), 285-298.

3

- *Winner of the American Marketing Association's William F. O'Dell Award, 1994, given to the* Journal of Marketing Research *article published in 1989 that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice.*

- *Abstracted in L. McAlister, R. Bolton and R. Rizley (eds.),* Essential Readings in Marketing, *Cambridge: Marketing Science Institute, 2006.*

- *Reprinted (in French) in* Reserche et Applications en Marketing, *5, 2, 17-43.*

- *Abstracted in* Journal of Product Innovation Management, *June 1990, 158-9.*

Carpenter, Gregory S., Lee G. Cooper, Dominique M. Hanssens and David Midgley (1988), "Modeling Asymmetric Competition," *Marketing Science*, 7, 4 (Fall), 393-412.

Carpenter, Gregory S. (1987), "Market Pioneering and Competitive Positioning Strategy," *Annales des Telecommunications*, 42, 11-12 (Nov.-Dec.), 699-709.

Carpenter, Gregory S. (1987), "Modeling Competitive Marketing Strategies: The Impact of Marketing-Mix Relationships and Industry Structure," *Marketing Science*, 6, 2 (Spring), 208-221.

Carpenter, Gregory S., and Donald R. Lehmann (1985), "A Model of Marketing Mix, Brand Switching, and Competition," *Journal of Marketing Research*, 22, 3 (August), 318-329.

- *Finalist for the American Marketing Association's William F. O'Dell Award, 1990, given to the* Journal of Marketing Research *article published in 1985 that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice.*

## Books

Carpenter, Gregory S., Gary F. Gebhardt and John F. Sherry (2014), *Resurgence: The Four Stages of Market-Focused Reinvention.* New York: Palgrave-Macmillian.

Shankar, Venkatesh, and Gregory S. Carpenter (eds.) (2012), *Handbook of Marketing Strategy.* Gloucestershire, UK: Edward Elgar Publishing Limited.

Carpenter, Gregory S., Rashi Glazer, and Kent Nakamoto (eds.) (1997), *Readings on Market Driving Strategies: Toward a New Theory of Competitive Advantage.* Reading, Massachusetts: Addison Wesley.

## Book Chapters, Conference Papers, and Other Publications

Carpenter, Gregory S. (2015), "The New CMO: Leading Change From the Inside Out and the Outside In," *Forbes,* forthcoming.

Carpenter, Gregory S. (2014), "When Betting on a Struggling Company is a Great Career Move," *BloombergBusinessweek,* May 7, www.businessweek.com/articles/2014-05-07/when-betting-on-a-losing-company-is-a-great-career-move

Carpenter, Gregory S., Gary F. Gebhardt, and John F. Sherry, Jr. (2014), "A Turnaround is a lot like baking a cake," *BloombergBusinessweek,* March 21, www.businessweek.com/articles/2014-02-21/a-turnaround-is-a-lot-like-baking-a-cake

Carpenter, Gregory S., and Thomas C. Hayes (2014), "Khosla's Rules: To Accelerate Growth, Champion the Consumer, Think Very Big, and Trust Front-line Leaders Emphatically," www.kellogg.northwestern.edu/news_articles/2014/03052014-khosla-rules.aspx

Carpenter, Gregory S., (2013), "Power Shift: The Rise of the Consumer-Focused Enterprise in the Digital Age," www.kellogg.northwestern.edu/

Shankar, Venkatesh, and Gregory S. Carpenter (2012), "Late Mover Strategy," in V. Shankar and G. Carpenter (eds.) *Handbook of Marketing Strategy.* Gloucestershire, UK: Edward Elgar Publishing Limited.

Carpenter, Gregory S. (2010), "Creating Customers and Shaping the Competitive Game," in A. Tybout (ed.) *Kellogg on Marketing.* New York: Wiley.

Tybout, Alice M., and Gregory S. Carpenter (2010), "Creating and Managing Brands," in A. Tybout (ed.) *Kellogg on Marketing.* New York: Wiley.

Gebhardt, Gary F., Gregory S. Carpenter and John F. Sherry, Jr. (2006), "Creating Market Orientation: A Longitudinal, Multi-firm, Grounded Analysis of Cultural Transformation," *MSI Reports,* Cambridge: Marketing Science Institute.

- *Winner of the Robert D. Buzzell Marketing Science Institute Award, 2008, given to honor the MSI working papers that have made the most significant contribution to marketing practice and thought.*

Carpenter, Gregory S., and Kent Nakamoto (2005), "Competitive Brand Strategy," in A. Tybout and T. Calkins (eds.), *Kellogg on Branding.* New York: Wiley.

Anderson, James C. and Gregory S. Carpenter (2005), "Brand Strategy for Business Markets," in A. Tybout and T. Calkins (eds.), *Kellogg on Branding.* New York: Wiley.

Carpenter, Gregory S., Rashi Glazer, and Kent Nakamoto (2000), "Market Driving Strategies: Toward a New Concept of Competitive Advantage," in D. Iacobucci (ed.), *Kellogg on Marketing.* New York: Wiley.

- *Cited in Victor Mosley and Cathy Mosley d/b/a/ Victor's Little Secret v. Victoria's Secret Catalogue, Inc., case number 01-1015 in the United States Supreme Court.*

Tybout, Alice M., and Gregory S. Carpenter (2000), "Creating and Managing Brands," in D. Iacobucci (ed.), *Kellogg on Marketing.* New York: Wiley.

Anderson, James C., Gregory S. Carpenter, and James C. Narus (2000), "Managing Market Offerings in Business Markets," in D. Iacobucci (ed.), *Kellogg on Marketing.* New York: Wiley.

Anderson, James C., and Gregory S. Carpenter (1998), "How to Escape the Commodity Trap in Business Markets," *Financial Times, Mastering Marketing* supplement, November 2, 5-6.

Carpenter, Gregory S., and Alice M. Tybout (1998), "Meeting the Challenge of the Post-Modern Consumer," *Financial Times, Mastering Marketing* supplement, October 5, 1-2.

Carpenter, Gregory S., (1998), "Changing the Rules of the Marketing Game," *Financial Times Mastering Management Review*, August, 30-33; and *Financial Times, Mastering Marketing* supplement, September 14, 2-4.

Carpenter, Gregory S., and Kent Nakamoto (1994), "Competitive New Product Strategies," in J. Hampton (ed.), *AMA Management Handbook*. New York: AMACOM.

Carpenter, Gregory S., and Kent Nakamoto (1994), "Brand Dominance: Competitive Advantage through Consumer Learning," in S. Levy, G. Frerichs, and H. Gordon (eds.), *Marketing Manager's Handbook*. Chicago: The Dartnell Corporation. Reprinted in *Creating Winning Marketing Plans*. Chicago: The Dartnell Corporation.

Carpenter, Gregory S. (1992), Review of Technological Competition in Global Industries: Marketing and Planning Strategies for American Industry by David T. Mehte (New York: Quorum Books, 1991), *Columbia Journal of World Business*, 1992, 26, 77-8.

Carpenter, Gregory S., and Kent Nakamoto (1987), "Market Pioneering, Learning, and Preference," in M. Houston (ed.), Advances in Consumer Research, vol. 15, Provo, UT: Association for Consumer Research, 275-279.

Carpenter, Gregory S., and John U. Farley (1985), Business Strategy and the Life Cycle. Cambridge: Marketing Science Institute.

*Working Papers and Papers Under Review*

Goedertier, Frank, Kristof Geskens, and Gregory S. Carpenter, "Leveraging the Old to Create the New: The Role of Brand Associations in New Product Novelty."

Kraus, Paul, Gregory S. Carpenter, and Matteo D'Angelis, "Competitive Differentiation Strategies: Choosing Between Simply Better and Simply Different."

D'Angelis, Matteo, and Gregory S. Carpenter, "Differentiation through Multiple Innovative Features: When are More Features Valued?"

*Work in Progress*

*Strategy+ Marketing:Creating Competitive Advantage throughAnalysis and Intuition*.

"The Consumer Perspective on Market Orientation: Analysis of the U. S. Wine Market" (with Ashlee Humphries).

"When Data and Social Consensus Conflict" (with Miguel Brendl and Benjamin Neuwirth)

"Competitive Advantage: An Analysis of Strategic Inimitability."

*Research Presentations*

"Resurgence: The Four Stages of Market-Focused Reinvention," Northwestern Healthcare Leadership Summit, February 2015.

"World Class Marketing," Marketing Science Institute Trustees Meeting, Chicago, November 2014.

"Market-Focused Reinvention," Marketing Science Institute, Chicago, June 2014; World Marketing Summit, Tokyo, September 2014; Marketing Science Institute Webinar, October 2014.

"Resurgence: The Four Stages of Market-Focused Reinvention," M50 Conference on Digital Marketing, New York, 2014; Kellogg Alumni Weekend, Evanston, 2014; San Diego Alumni Club, San Diego, 2014.

"Wine Worlds: Consumer Insight and Marketing Strategies," Viticulture 2013 Conference, Rochester, New York, 2013.

"Wine Worlds: Consumer, Producer and Growth Strategies," Wine Market Council Research Conference, New York and Santa Rosa, California, 2013.

"Wine Consumer Insight and Marketing Strategy," Wine Market Council Research Conference, New York and Santa Rosa, California, 2012.

"Brand Differentiation and Competitive Advantage," Liberà Università Internazionale degli Studi Sociali, Rome, 2011.

"New Perspectives on Customers, New Avenues for Growth," Kellogg/Marketing Science Institute Conference on Realizing Profitable Growth," Evanston, 2010.

"Market-Driven Strategy: Creating Competitive Advantage," Marketing Science Institute Immersion Conference," Boston, 2009.

"Competitive Differentiation Strategies: Choosing Between Simply Better and Simply Different," Liberà Università Internazionale degli Studi Sociali, Rome, 2009.

"Competitive Advantage: A Behavioral Agenda," UCLA Anderson School, 2008; Liberà Università Internazionale degli Studi Sociali, Rome, 2008.

"Creating a Market Orientation: Lessons from Elitist Revolutions," Marketing Science Institute/ McKinsey/Kellogg CMO Summit, Evanston, 2007.

"Reflections," American Marketing Association Doctoral Consortium, University of Maryland, 2006.

"Creating a Market Orientation: Lessons from Elitist Revolutions," Marketing Science Institute Trustees Meeting, Chicago, November 2005.

"Competitive Differentiation Strategies: Making Differences Valuable," Marketing Science Conference, Wiesbaden, July 2001.

"They Played a Game: Managerial Biases in Competitor Analysis," Marketing Science Institute Conference on Competitive Responsiveness, Cambridge, May 2001.

"Why Are Irrelevant Attributes Relevant? A Strategic Inference Model," University of Chicago Marketing Workshop, 1998; London Business School, 1998; INSEAD Marketing Camp, 1999.

"Market Driving Strategies: Toward a New Concept of Competitive Advantage," Marketing Science Institute/*Journal of Marketing* Conference on Fundamental Issues and Directions in Marketing, Cambridge, 1998.

"Competitive Differentiation Strategies: A Market-Driving Perspective," INFORMS Marketing Science Conference, Fountainebleau, 1998.

"Brand Differentiation: A Market-Driving Perspective," Marketing Science Institute Conference on Leveraging and Growing Mature Brands and Services, Chicago, 1997.

"Pioneering Disadvantage," 1997 Midwest Marketing Camp, Iowa City.

"Perception Asymmetry and Competitive Advantage," 1997 INFORMS Conference, Dallas.

"Alliances with Opportunism: Sustainable Distribution Partnerships Through Credible Threats and Credible Commitments," 1995 INFORMS Marketing Science Conference, Gainesville, Florida.

"Consumer Learning and Competitive Advantage," 1991 AMA Doctoral Consortium, University of Southern California; Marketing Science Institute, 1994; Henley Management College, 1995; Duke University, 1995; 1996 AMA Doctoral Consortium, University of Colorado.

"Market Driving Strategies: On the Foundations of Competitive Advantage," 1994 Marketing Science Conference, Tucson.

"Pioneering Disadvantage: Consumer Response to Differentiated Entry and Defensive Imitation," 1993 Association of Consumer Research Conference, Nashville; 1993 ORSA/TIMS Conference, Phoenix; University of Florida, 1995.

"Dominant Brand Advantage: An Empirical Analysis of Strategic Inimitability," 1991 Association for Consumer Research Meeting, Chicago; 1993 Marketing Science Conference, St. Louis.

"Competitive Late Mover Strategies: Beyond Classical Models of Consumer and Managerial Decision Making," 1992 ORSA/TIMS Conference, San Francisco.

"Meaningful Brands from Meaningless Differentiation: The Dependence on Irrelevant Attributes," 1989 Marketing Science Conference, Durham; 1992 Marketing Science Conference, London, University of Michigan, Phelp's Lecture, 1993, UCLA Marketing Workshop, 1994.

"Pursuing Competitive Advantage: From Industry Structure to Consumer Decision Making," 1989 AMA Educators' Conference, Chicago.

"Convergent Thoughts from Divergent Coauthors: The Road Less Traveled," 1989 AMA Doctoral Consortium, Harvard University.

"Product-Line Competition Between a Pioneer and Later Entrant," 1988 ORSA/TIMS Marketing Science Conference, Seattle; 1988 ORSA/TIMS Conference, Denver, 1991 Marketing Science Conference.

"Understanding the Equity Effects of Pioneering Brands," Marketing Science Institute, Trustees Meeting Miniconference on Brand Equity, Boston, 1988.

"Competitive Strategies for Late Entry into a Market with a Dominant Brand," 1987 ORSA/TIMS Conference, St. Louis; New York University; TIMS Conference on the State of the Art in Strategy Research. University of Pennsylvania; University of California, Berkeley; Northwestern University.

"Market Pioneering and Competitive Positioning Strategy," INSEAD Conference on Marketing Telecommunications Services, Fountainbleau, 1987.

"Market Pioneering, Learning, and Preference," 1987 Association of Consumer Research Meetings, Boston.

"Consumer Preference Formation and Pioneering Advantage," 1986 ORSA/TIMS Marketing Science Conference, Dallas; Dartmouth College, Columbia/NYU/Yale Marketing Workshop, Stanford University, University of Chicago, Cornell University, University of Pennsylvania, and Harvard University.

"Market Expansion, Cannibalization, and International Airline Pricing," 1985 and 1986 ORSA/TIMS Conferences.

"Perceptual Position and Competitive Brand Strategy in a Two-Dimensional, Two-Brand Market," 1985 AMA Winter Educators' Conference, Phoenix; 1985 ORSA/TIMS Marketing Science Conference, Nashville; 1985 ORSA/TIMS Conference, Atlanta; Duke University, and University of Arizona.

"Strategy Models," 1985 AMA Doctoral Consortium, Duke University.

"Modeling Asymmetric Competition," 1984 ORSA/TIMS Conference, Dallas; and Columbia University, 1984.

"Modeling Competitive Marketing Strategies: The Impact of Marketing-Mix Relationships and Industry Structure," 1984 ORSA/TIMS Marketing Science Conference, Chicago; and the 1984 AMA Marketing Educators' Conference.

"A Model of Marketing Mix, Brand Switching, and Competition," 4th ORSA/TIMS Market Measurement Conference, Philadelphia.

## TEACHING

*Courses Taught*

Masters: Marketing Management, Marketing Planning, Marketing Strategy, Advanced Marketing Practicum, Consumer Insight and Brand Strategy, Consumer-Led Growth
Doctoral: Marketing strategy

*Awards*

Sidney J. Levy Teaching Award, Northwestern University (1996)
Outstanding Professor of the Year, The Managers' Program, Northwestern University (1992)

*Doctoral Committees*

Rebecca Jen-Hui Wang (marketing), Northwestern University (in progress)
Ashlee Humphries, Ph. D. (marketing), Northwestern University (2008)
Ryan Hamilton, Ph. D. (marketing), Northwestern University (2008)
Ming Piao, Ph.D. (management of organizations), Northwestern University (2007)
Jeffrey D. Shullman, Ph. D. (marketing), Northwestern University (2006)
Alice Wang, Ph. D. (marketing), Northwestern University (2005)
Gary F. Gebhardt, Co-chair, Ph. D. (marketing), Northwestern University (2004)
Michaela Draganska, Ph. D. (marketing), Northwestern University (2001)
Paul Kraus, Ph. D. (marketing), Chair, Northwestern University (2000)
James Thompson, Ph. D. (marketing), Northwestern University (1998)
Monish Kacker, Ph. D. (marketing), Northwestern University (1997)
Suzanne Walchli, Ph. D. (marketing), Northwestern University (1996)
Amy Ostrom, Ph. D. (marketing), Northwestern University (1996)
Eyal Moaz, Ph. D. (marketing), Northwestern University (1995)
Gerri Henderson, Ph. D. (marketing), Northwestern University (1995)
Pablo Azar, Ph. D. (marketing), Northwestern University (1994)
Venkatesh Shankar, Co-chair, Ph. D. (marketing),  Northwestern University (1994)
Dong Hoon Kim, Ph. D. (business), Columbia University (1989)
Fernando Nascimento, Ph. D. (business), Columbia University (1987)
Jan Ouren, Ph. D. (public health), University of California, Los Angeles (1983)

PROFESSIONAL SERVICE

*Boards*

Academic Trustee, Marketing Science Institute, Cambridge, Massachusetts (2004-2010)
Member, Advisory Board, Terlato Wine Group, Lake Bluff, Illinois (2004-2007)
Member, Advisory Board, Hamilton Consultants, Cambridge, Massachusetts (2001-2005)

*Editorial Service*

Guest Editor, *International Journal of Research in Marketing*, special issue on the Theory + Practice of Marketing (2014-2015)
Guest Associate Editor, *Management Science* (2010-2011)
Editor Selection Committee, *Journal of Marketing* (2004)
Associate Editor, *Location Science* (1995-2000)
Editorial Board Member, *Journal of Marketing* (2002-2005)
Editorial Board Member *Journal of Marketing Research* (1991-2003)

Editorial Board Member, *Marketing Science* (1990-1997)

Editorial Board Member *Marketing Letters* (1989-2001)

Ad hoc reviewer for *Journal of Marketing, Journal of Marketing Research, Marketing Science, Management Science, Journal of Consumer Research, Journal of Economics and Management Strategy, Journal of Management Studies, Columbia Journal of World Business, International Journal of Research in Marketing, Sloan Management Review,* American Marketing Association, Marketing Science Institute, National Science Foundation, *Journal of Business, Omega, Journal of Consumer Psychology.*

## Invited Seminars

Liberà Università Internazionale degli Studi Sociali (2011, 2008, 2007)

University of California, Los Angeles (2008, 1994)

Ohio Wesleyan University, Milligan Lecture (2008)

INSEAD (1999)

London Business School (1998)

University of Chicago (1988, 1998)

Henley Management College (1995)

University of Florida (1995)

University of Wisconsin—Madison (1994)

University of Michigan, Phelps Lecture, (1993)

Northwestern University (1989)

University of California, Berkeley (1989)

Harvard University (1989)

New York University (1989)

University of Pennsylvania (1988, 1989)

Cornell University (1988)

University of Arizona (1988)

Stanford University (1987)

Duke University (1987, 1995)

Columbia University (1984, 1993)

## Grants

Various small grants from the UCLA Center for Managerial Economics and Public Policy, Columbia Strategy Research Center, and Columbia Institute for Marketing Studies.

Marketing Science Institute, $5,000, with Kent Nakamoto; $2,500, with Gary Gebhardt.

## Administrative Service

Member, Northwestern University Vice President of Marketing Search Committee (2013)

Member, Kellogg Faculty Brand Advisory Board (2013)

Faculty Director, Kellogg Markets and Customers Initiative (since 2012)

Member, Kellogg Core Strategy Group (2011-2012)

Co-Chair, Northwestern University Branding and Communication Workgroup (2010-2012)

Member, Kellogg Dean's Transition Team (2010)

Co-Chair, Northwestern University Strategic Planning Committee, Areas of Distinction (2010)

Member, Northwestern University Program Review Committee (2009-2012)

Member, Kellogg Dean Search Committee, Northwestern (2009-2010)

Chairman, Department of Marketing, Kellogg (2006-2009)

Founder and Director of the Center for Market Leadership, Kellogg (since 2004)

Member, Kellogg Student Affairs and Activities Committee (2005-2006)

Member, Kellogg Curriculum Committee (2004-2006)

Member, Kellogg Conflict of Interest and Commitment Committee (2004-2006)

External Assessor, Appointments Committee, London Business School (2004, 2008)

Member, Kellogg Dean Search Committee, Northwestern (2000-2001)

Member, Kellogg Personnel Committee (2000-2002, 1990-1991 observer)

Member, Max McGaw Chair Search Committee, Kellogg (2000-2001)

Member, Kellogg Marketing Recruiting Committee (2000-2001, co-coordinator 1997, 1998, co-ordinator 1994)

Member, Kellogg Marketing Conference Coordinator (1996, 1998)

Member, Columbia University Senate, (1989)

Member, Virany Prize Committee, Columbia (1988-1989)

Member, Marketing Workshop Coordinator, Columbia (1987-1989)

Member, Marketing Search Committee, Columbia (1986-1989)

Marketing Recruiting Coordinator, Columbia (1986)

Member, Leonhard Professor Search Committee, UCLA (1984-1985)

Member, Legislative Assembly, UCLA (1984-1985)

Member, Doctoral Board, UCLA (1983-1985)

Member, MBA Task Force, UCLA (1983-1985)

*Conference Organization*

Co-Chair, Kellogg Marketing Leadership Conference (2011, 2012, 2013, 2014)

Chair, Theory + Practice in Marketing Conference, Evanston (May 2014).

Co-chair, Marketing Science Institute/Kellogg Conference "Realizing Profitable Growth" (May 2010)

Co-chair, Marketing Science Institute/McKinsey/Kellogg Chief Marketing Officers' Summit (2007)

Advisory Board Member, *Journal of Marketing*/Marketing Science Institute Conference on Measuring Marketing Productivity

Advisory Board Member, *Journal of Marketing Research*/Marketing Science Institute Conference on Academic-Practitioner Collaboration

Advisory Board Member, *Journal of Consumer Psychology*/Marketing Science Institute Conference on Product Assortment

American Marketing Association Educators' Conference, Marketing Strategy Track Chair (1994)

American Marketing Association Educators' Conference, session chair (1989)

Marketing Science Conference, session chair (1987, 1994)

ORSA/TIMS College of Marketing, session chair (1985-1989, 1992)

*Outside activities*

Advisor, speaker, management seminars and workshops. Clients for 2014 to 2015: Blue Cross Blue Shield, Brooks Kushman, Cerner, General Electric Company, Health Management Academy, Indian School of Business, KeyBank, LUISS Business School, Motorola, National Association of Convenience Stores, Pfizer, SABIC, S C Johnson, Teleperformance.

April 2, 2015

Appendix B

DOCUMENTS REVIEWED

Amended Complaint

Agreed Protective Order

Defendants' Memorandum Of Law In Support Of Summary Judgment

Michael Jordan's Combined Brief In Support Of His Motion For Partial Summary Judgment And In Opposition To Defendants' Motion For Summary Judgment

Defendants' Combined Brief In Support Of Their Motion For Summary Judgment And Opposing Jordan's Summary Judgment

Michael Jordan's Reply In Support Of His Motion For Partial Summary Judgment

Michael Jordan's Supplemental Memorandum In Support Of His Motion For Partial Summary Judgment And In Opposition To The Defendants' Motion For Summary Judgment

Transcript of Proceedings of November 2, 2011

Memorandum Opinion And Order dated February 15, 2012

*Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014)

Appendix C

















# EXHIBIT B

```
 1          IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3   MICHAEL JORDAN,          )
                              )
 4            Plaintiff,      )
                              )Civil Action No. 10-340
 5   v.                       )
                              )
 6   JEWEL FOOD STORES, INC.  )Judge Gary Feinerman
     and SUPERVALU, INC.      )
 7                            )Magistrate Judge
        Third-Party Plaintiffs/)Michael T. Mason
 8      Defendants,           )
                              )
 9   v.                       )
                              )
10   TIME INC. and VERTIS,    )
     INC.                     )
11                            )
        Third-Party Defendants.)
12                            )

13

14

15               THE DEPOSITION OF

16               GREGORY CARPENTER

17                June 11, 2015

18

19

20

21

22        PRO-SYSTEMS COURT REPORTING

23         4305 BRYANT AVENUE SOUTH

24      MINNEAPOLIS, MINNESOTA  55409

25
```

Page 2

```
 1          The deposition of GREGORY CARPENTER, taken
 2   on June 11, 2015, at Schiff Hardin, 233 South
 3   Wacker Drive, Suite 7100, Chicago, Illinois,
 4   commencing at approximately 9:01 a.m., before
 5   Heather M. Perkins, Registered Merit Reporter,
 6   Certified Realtime Reporter, a notary public in
 7   and for the State of Illinois.
 8
 9            A P P E A R A N C E S
10   SCHIFF HARDIN, LLP
     By:  MS. SONDRA A. HEMERYCK
11        MR. FREDERICK J. SPERLING
     233 South Wacker Drive
12   Suite 6600
     Chicago, Illinois  60606
13   (312) 258-5500
14        On behalf of the Plaintiff;
15
     MERCHANT & GOULD, P.C.
16   By:  MR. ANTHONY R. ZEULI
     3200 IDS Center
17   80 South Eighth Street
     Minneapolis, Minnesota  55402
18   (612) 332-5300
19        On behalf of the Defendants and
          Third-Party Plaintiffs.
20
21   REPORTED BY:
22        HEATHER M. PERKINS, RMR, CRR
23
24
25
```

Page 3

```
 1              I N D E X
 2   EXAMINATION BY:                              PAGE
 3   Mr. Zeuli                                     05
 4   Ms. Hemeryck                                 100
 5
     EXHIBITS MARKED FOR IDENTIFICATION
 6
 7   Exhibit No.
 8      31     Notice of Deposition              05
 9      32     Amended Third-Party
10             Complaint                         05
11      33     Agreed Protective Order           05
12      34     Defendants' Memorandum of
13             Law in Support of Summary
14             Judgment                          05
15      35     Michael Jordan's Combined
16             Brief in Support of His
17             Motion for Partial Summary
18             Judgment and in Opposition
19             to Defendants' Motion for
20             Summary Judgment                  05
21      36     Defendants' Combined Brief
22             in Support of Their Summary
23             Judgment and Opposing
24             Jordan's Summary Judgment         05
25
```

Page 4

```
 1   EXHIBITS:  (Continuing)
 2      37     Michael Jordan's Reply
 3             in Support of His Motion
 4             for Partial Summary Judgment      05
 5      38     Michael Jordan's
 6             Supplementary Memorandum
 7             in Support of His Motion
 8             for Partial Summary Judgment
 9             and in Opposition to the
10             Defendant's Motion for
11             Summary Judgment                  05
12      39     Transcript of Proceedings         05
13      40     Memorandum Opinion and Order      05
14      41     Seventh Circuit Opinion           05
15      42     Marlboro Man Google Images        77
16      43     Copy of Jordan Ring Photograph    84
17      44     Copy of Gilligan Ad               93
18   EXHIBITS PREVIOUSLY MARKED FOR IDENTIFICATION
19   Exhibit No.
20       5                                       66
21       6                                       91
22      16                                       93
23      17                                       89
24      22                                       86
25      37                                       72
```

Page 5

```
 1            P R O C E E D I N G S
 2          (Exhibits 32 thorough 41 marked
 3           for identification.)
 4          GREGORY CARPENTER,
 5             duly sworn,
 6   was examined and testified as follows:
 7             EXAMINATION
 8   BY MR. ZEULI:
 9      Q.  Good morning, Professor Carpenter.
10      A.  Good morning.
11      Q.  You submitted a report in this case,
12   Jordan versus Jewel Foods and Super Value, on
13   April 17, 2015, correct?
14      A.  I believe that's the right date, yes.
15      Q.  Okay.  Did you write that report?
16      A.  I did.
17      Q.  You did.
18          Did you type it up or did you have
19   someone type it for you?
20      A.  I typed it.
21      Q.  Okay.  About how long did you spend on
22   preparing the report of April 17, 2015?
23      A.  Well, I have to go check to be certain.
24   It was time devoted over a number of weeks.  I
25   don't recall the number of hours.
```

Page 6

1    Q.  Okay.  In the total number of hours that
2  you spent, including the analysis that you did,
3  would you say that it was more than 40 hours or
4  less than 40 hours?
5    **A.  I believe it was less than 40 hours.**
6    Q.  Okay.  Do you believe it was less than 20
7  hours or more than 20 hours?
8    **A.  Oh, I would say probably around 20 hours**
9  **would be a reasonable estimate, yes.**
10    Q.  Okay.  And I assume you prepared a bill,
11  correct?
12    **A.  I did.**
13    Q.  And you submitted it or you will be
14  submitting it?
15    **A.  I did submit it, yes.**
16    Q.  And was that based on the hours you spent
17  doing your analysis in this case?
18    **A.  Yes.**
19    Q.  Okay.  And do you recall either the
20  number of hours that you invoiced Jordan's counsel
21  or the time that you invoiced them for?
22    **A.  I don't recall the details, no.**
23    Q.  Do you recall the amount you invoiced
24  them for?
25    **A.  I don't recall a specific amount, no.  I**

Page 7

1  **would have to check.**
2    Q.  Okay.  All right.  To the best of your
3  recollection, as you sit here today, you spent
4  about 20 hours in your analysis and report,
5  correct?
6    **A.  That would be my best estimate, yes.**
7    Q.  Is your report accurate?
8    **A.  I believe it is, yes.**
9    Q.  Is there anything incorrect in your
10  report?
11    **A.  Not that I am aware of.**
12    Q.  Does your report contain a complete
13  statement of all your opinions in this case?
14    **A.  It does.**
15    Q.  Does your report include a complete list
16  of all the materials that you considered to form
17  your opinions?
18    **A.  I believe it does, yes.**
19    Q.  And that was the list that you provided
20  in Appendix B of your report, correct?
21    **A.  Correct.  It excludes, of course, things**
22  **I reviewed previously, read previously, books,**
23  **things that were part of my education; but things**
24  **that were specifically given to me for the report**
25  **are included in the listing, yes.**

Page 8

1    Q.  Okay.  And the things that you were just
2  referring to would be, for example, if you read a
3  textbook as part of your education or went to a
4  seminar as part of your education, correct?
5    **A.  Correct.**
6    Q.  All right.  But the things pertaining to
7  this case, those were listed in your Appendix B?
8    **A.  Correct.**
9    Q.  All right.  And would you just take a
10  look at -- I have marked Exhibits JFS-32 through
11  41.  Those are the documents that you listed in
12  your Appendix B.  Would you just confirm for me
13  that those are the documents that you considered
14  to form your opinions?
15    MS. HEMERYCK:  And I just want to make an
16  objection here that you haven't actually provided
17  Professor Carpenter with a copy of his report or
18  Appendix B, so he is going purely on memory at
19  this point as to what was listed in Appendix B.
20    **THE WITNESS:  So it is hard for me to**
21  **actually confirm this since I prepared that**
22  **Appendix B some time ago, and I didn't memorize**
23  **the list of things that are on it.  So these look**
24  **familiar.**
25

Page 9

1  BY MR. ZEULI:
2    Q.  Would it be helpful to see your
3  Appendix B?
4    **A.  It would, yes.**
5    Q.  I'm handing to you a copy of your report
6  dated April 17, 2015, and here is your Appendix B.
7  Would you just review that?
8    **A.  Thank you.**
9    Q.  And then compare it to the documents that
10  I have marked to confirm that we have all the
11  materials you considered in forming your opinions.
12    MS. HEMERYCK:  And, counsel, do you have
13  a copy of that?
14    MR. ZEULI:  I do.
15    MS. HEMERYCK:  Do you want to mark it as
16  an exhibit?
17    MR. ZEULI:  I don't yet.  I don't yet.
18    MS. HEMERYCK:  Okay.
19    (Brief pause.)
20    **THE WITNESS:  Okay.  This appears to be**
21  **the list of documents in the appendix to my**
22  **report.**
23  BY MR. ZEULI:
24    Q.  So the documents that I have marked as
25  JFS-32 through 41 are the documents that you

Page 10

1  considered in forming your opinions in this case,
2  correct?
3  **A.  Correct.**
4  Q.  And they are all the documents that you
5  considered, correct?
6  **A.  I believe so, yes.  I believe so, yes.**
7  Q.  Do you believe that your report contains
8  all of the information necessary for the court or
9  the jury to evaluate your opinions?
10 **A.  I believe it does, yes.**
11 Q.  You are not offering an opinion on
12 damages, correct?
13 **A.  Correct.**
14 Q.  Prior to this case and the one regarding
15 Dominick's, have you ever worked for Mr. Jordan
16 in --
17 **A.  No.**
18 MS. HEMERYCK:  Objection.  I don't
19 believe Professor Carpenter has been retained in
20 connection with the Dominick's case.  Is that
21 correct?
22 **THE WITNESS:  Correct.**
23 MR. ZEULI:  I'm sorry.  Let me restate
24 that.
25

Page 11

1  BY MR. ZEULI:
2  Q.  Prior to working on this case, have you
3  ever worked for Mr. Jordan?
4  **A.  No, I have not.**
5  Q.  Prior to your work in this case, have you
6  ever worked for Schiff Hardin?
7  **A.  I have not.**
8  Q.  Prior to this case, have you ever done
9  any work for Jewel Food Stores or Jewel-Osco?
10 **A.  I have not.**
11 Q.  Prior to your involvement in this case,
12 have you ever done any work for Super Value?
13 **A.  I have not, no.**
14 Q.  Has your testimony ever been excluded by
15 a court?
16 **A.  No.**
17 Q.  Has your testimony ever been limited by a
18 court?
19 **A.  Not that I am aware of.**
20 Q.  How many times have you testified in
21 court?
22 **A.  I believe it is around three or four**
23 **times.**
24 Q.  And how many times have you testified in
25 a deposition?

Page 12

1  **A.  I believe it is at least somewhere**
2  **between half a dozen and ten times would be my**
3  **best guess without checking my records.**
4  Q.  So three to four testifying times at
5  trial, correct?
6  **A.  Correct.**
7  MS. HEMERYCK:  And just an objection:
8  Your question was in court.  The question wasn't
9  at trial.  So we don't know if that's true.
10 MR. ZEULI:  Maybe I can clarify that,
11 then.
12 BY MR. ZEULI:
13 Q.  The three to four times that you
14 testified in court, were those at trials?
15 **A.  Maybe I should ask what the difference is**
16 **between in court and at trial.**
17 Q.  Actually, it is a good question.  So you
18 might have given testimony at a hearing or
19 something prior to the trial.  So let's go back,
20 and I will ask it the broadest way, as I did in
21 the beginning.
22 How many times have you testified in
23 court?
24 **A.  I would say three or four.**
25 Q.  And of those three or four court

Page 13

1  testimonies, were they all trials?
2  **A.  Well, one was, as I recall, maybe a**
3  **hearing for a preliminary injunction.  I don't**
4  **remember the details.**
5  Q.  Okay.  Then you said you have given
6  testimony in about six to ten depositions?
7  **A.  Yes, I would say that's ballpark.  I**
8  **would say yes.**
9  Q.  I have noticed sometimes I have the
10 tendency to start asking my question before you
11 are finished, so I will work hard not to do that,
12 and if you will also give me the opportunity to
13 finish my question before you start to answer it.
14 You are very prompt in doing that, and I
15 appreciate that, but I want to make sure that
16 Heather gets a real clear record, okay?
17 **A.  Fine.**
18 Q.  Thank you.
19 Let's talk for a minute about the three
20 to four times that you have testified in court.
21 You mentioned one of them, possibly, at a
22 preliminary injunction.  What was the opinion in
23 that case that you were testifying to?
24 **A.  It was a case involving Daimler Chrysler**
25 **and General Motors about brand confusion, and I**

Page 14

1  was testifying about state of confusion between
2  Jeep and Hummer brands.
3      Q.  Was it a trademark dispute?
4      A.  It was a brand confusion case and
5  dilution case.
6      Q.  And can you just tell me generally what
7  your opinion was in that case?
8      A.  Yes.  Generally, my opinion was that the
9  issue in the case was the grill design of the
10 vehicle now known as the H2, and the question in
11 the case was was that confusing and possibly
12 damaging to the Jeep brand, and my opinion was
13 that it was.
14     Q.  And I assume you were retained by
15 Chrysler/Jeep?
16     A.  Daimler Chrysler.
17     Q.  In forming your opinion in that case, the
18 GM/Daimler Chrysler case, how did you go about
19 your analysis?
20     A.  I reviewed the documents about the Jeep
21 branding and marketing strategy.  I reviewed legal
22 documents and depositions in the case; testimony
23 by the Jeep and General Motors' executives, as I
24 recall; and survey research about consumers'
25 reaction to different questions.

Page 15

1      Q.  Did you conduct the survey?
2      A.  I did not.
3      Q.  Do you recall who conducted the survey
4  that you reviewed?
5      A.  I don't recall the name of the person,
6  no.
7      Q.  Am I correct that the survey was to
8  determine consumers' perception of the two grills?
9  Is that correct?
10     A.  Basically, yes.
11     Q.  And you looked at that data to understand
12 whether consumers were confused by the look or
13 design of the two grills, correct?
14     A.  Correct.
15     Q.  In the GM/Daimler Chrysler case, did you
16 interview anyone from Daimler Chrysler?
17     A.  I don't recall specifically interviewing
18 anyone from Daimler Chrysler for that case.  I,
19 however, did a number of cases with Daimler
20 Chrysler and spoke to people over a period of
21 time, and it was more than ten years ago I did
22 this case.  So I don't recall specifically whether
23 there were discussions in this case or another
24 case.  So I can't say for sure.
25     Q.  I see.

Page 16

1      But you had access to people from Daimler
2  Chrysler that you had been able to speak to as you
3  needed; is that fair?
4      A.  That's fair.
5      Q.  All right.  And as part of the GM/Daimler
6  Chrysler case, did you speak to anyone from GM?
7      A.  I don't recall speaking to anyone from
8  GM, no.
9      Q.  What was the name of the second case in
10 which you gave testimony in court?
11     A.  This is going back more than ten years,
12 but I believe it was a case also involving Jeep
13 versus a gentleman by the name of Dennis Ewald.
14     Q.  What was that case about?
15     A.  That case was also about brand confusion
16 and dilution of the Jeep brand.
17     Q.  Was it also with regard to the grill
18 designs?
19     A.  It was not.
20     Q.  What was the point of contention as to
21 the confusion?
22     A.  The point of contention was Chrysler had
23 planned to launch a new brand of their Jeep
24 Wrangler named the Rangler Rubicon, and the
25 gentleman, Dennis Ewald, owned a trademark to the

Page 17

1  name Rubicon for the production of Trailers.  So
2  he was suing, as I recall, to stop Jeep from using
3  the name Rubicon on its claiming it would be
4  confusing.
5      Q.  And did you give an opinion in that case?
6      A.  I believe I did.
7      Q.  And do you recall what your opinion was?
8      A.  I don't recall the details of that
9  opinion, no.
10     Q.  Generally?
11     A.  I don't recall the details.  I would have
12 to go back and review the details of that.
13     Q.  You were retained by either Jeep or
14 Chrysler or the lawyers for Jeep/Chrysler?
15     A.  By Daimler Chrysler, yes.
16     Q.  In preparing for your testimony in the
17 Ewald case, what did you do?
18     A.  I, again, reviewed the documents about
19 the Jeep branding.  I reviewed the legal
20 documents, the complaint, various depositions, as
21 I recall, and other documents about the Jeep brand
22 and learned a bit about this Rubicon Trail and the
23 connection between the Rubicon Trail and the Jeep
24 brand.
25     Q.  And did you perform a survey in the Ewald

Page 18

1  case?
2     A. I did not.
3     Q. Was there a survey in the Ewald case that
4  you reviewed?
5     A. I don't recall, actually. I don't recall
6  in that case.
7     Q. As part of the Ewald case, did you review
8  documents that Mr. Ewald had produced in the case,
9  perhaps about his trademark or how he was using
10 Rubicon for Trailers?
11    A. It sounds reasonable. I expect I did,
12 but I can't recall the specific documents in the
13 case that I reviewed.
14    Q. Sure.
15       And it would be fair to also conclude
16 that in the GM case, you would have reviewed
17 documents that GM had produced with regard to
18 their grill design and how they used grills? Is
19 that fair?
20    A. I don't remember in that particular case
21 those documents. It is possible, certainly, but I
22 don't recall the specifics.
23    Q. How about in the third case that you gave
24 testimony in court? What was that case?
25    A. Well, the third time -- I don't remember

Page 19

1  the sequence, but a third time that I gave
2  testimony was for the -- it was -- the reason I
3  hesitated, also, about the number, it was a
4  trademark case where it was presented before the
5  trademark board.
6     Q. Yes.
7     A. So it was a videoed deposition that was
8  actually considered testimony.
9     Q. Sure.
10    A. So that was the case, the one case, in
11 which I did that.
12    Q. Okay. So in that trademark case before
13 the board, were you also retained by Daimler
14 Chrysler?
15    A. No.
16    Q. All right. Who were the parties in that
17 case?
18    A. It was Hormel and a company called Spam
19 Arrest.
20    Q. And what was your opinion in that case?
21    A. I don't remember the details of the
22 opinion. Again, it was a significant period of
23 time ago.
24    Q. The dispute in the Hormel case was a
25 trademark dispute; is that correct?

Page 20

1     A. Correct.
2     Q. And tell me about the work that you did
3  in preparing for your testimony for that case.
4     A. Well, in most cases, I don't have recall,
5  specific memories of the details of the
6  preparation, but I assume I reviewed, again, the
7  documents I was provided. I remember the issue, I
8  reviewed some materials about Spam, the lunch
9  meat, and about spam, the software phenomenon of
10 unwanted junk mail. So I remember reading lots of
11 documents about those things, but I don't remember
12 the specifics of the documents.
13    Q. Did you conduct a survey in the Hormel
14 case?
15    A. I did not.
16    Q. Did you review a survey as part of your
17 analysis in that case?
18    A. I don't remember.
19    Q. You had mentioned possibly a fourth time
20 that you testified in court. Do you recall the
21 name of that case?
22    A. I do.
23    Q. And what is it?
24    A. It was Champagne Louie Roederer versus
25 the maker of -- it is a Spanish company and an

Page 21

1  American branch of that. I don't remember the
2  name of the Spanish company. They are makers of a
3  product called Cristalino, Juame Serra Cristalino.
4     Q. And in that case what was the opinion
5  that you gave at trial?
6     A. My opinion was about the confusion and
7  dilution of the Cristal brand name, which is owned
8  by Champagne Louie Roederer, by the marketing of
9  Juame Serra sparkling wine from Spain called
10 Cristalino.
11    Q. And for the court reporter, maybe you can
12 try to --
13    A. Spell something?
14    Q. Yes, the Spanish name, or something
15 close.
16    A. I know how to spell the name. The name I
17 referred to is Juame, J-u-a-m-e, S-e-r-r-a; and
18 Cristalino is C-r-i-s-t-a-l-i-n-o, Cristalino; and
19 Cristal is C-r-i-s-t-a-l; and it is Champagne
20 Louie Roederer, so it is Champagne, Louie,
21 R-o-e-d-e-r-e-r.
22    Q. As part of your analysis in the, say,
23 Cristalino case, did you conduct a survey?
24    A. I did not.
25    Q. Did you review a survey that had been

Page 22

1  conducted by someone else?
2      A.  I did.
3      Q.  In the Cristalino case, did you interview
4  anyone from Louie Roederer?
5      A.  So to clarify your question, I presume
6  you mean before I testified in the trial?
7      Q.  That's correct.
8      A.  I don't recall interviewing people before
9  testifying.
10     Q.  So you don't recall interviewing anyone
11  from the defendant?
12     A.  I don't recall that, no.
13     Q.  In that case, in forming your opinions
14  prior to your testimony, did you review documents
15  produced by both the plaintiff and the defendant?
16     A.  I did.
17     Q.  Now, we have gone through four cases in
18  which you have given testimony in court.  Can you
19  think of any other times that you have testified
20  in court that we haven't discussed?
21     A.  No.
22     Q.  You mentioned six to ten depositions.  I
23  would assume, but correct me if I'm wrong, that
24  four of those depositions were in the four cases
25  we just discussed; is that fair?

Page 23

1      A.  No.
2      Q.  Okay.  Was your deposition taken in any
3  of the four cases we just discussed?
4      A.  Yes.
5      Q.  How many of those cases?
6      A.  Well, two or three depending how you
7  count.
8      Q.  Okay.  So I'm guessing the two Jeep
9  cases?
10     A.  Correct -- oh, that may not be right.
11  No, that is not right.  Now that I recall, it is
12  not correct, no.
13     Q.  Okay.  Why don't you tell me of the four
14  cases we have discussed which of those was your
15  deposition taken prior to your testimony.
16     A.  All right.  In the General Motors versus
17  Jeep case, I was deposed.  In the Spam/Hormel
18  Foods versus Spam Arrest, the deposition was also
19  considered testimony, so I'm not sure how you
20  would want to categorize that.  I don't recall
21  being deposed in the Ewald case, and I was not
22  deposed in the Cristal and Cristalino case.
23     Q.  In any of the cases -- well, strike that.
24          Is it fair to say that typically in
25  preparing to give an opinion in a case, you review

Page 24

1  the documents that are provided to you by counsel?
2  Correct?
3      A.  Correct.
4      Q.  And you review any survey evidence that
5  is provided to you, correct?
6      A.  If it is relevant, yes.
7      Q.  You would review any deposition
8  transcripts from witnesses that were provided to
9  you, correct?
10     A.  If they are relevant, yes.
11     Q.  You would review -- or strike that.
12          You would interview witnesses from
13  at least the side that you're representing if
14  available to you, correct?
15     A.  If I thought it would be helpful for
16  forming my opinion and necessary, I would seek to
17  do that, yes.
18     Q.  And if you were provided documents from
19  both the side that retained you as well as the
20  other side, you would review both of those
21  documents, correct?
22     A.  Again, if they were relevant and useful
23  for forming my opinion, I would review them, yes.
24     Q.  Now, in this case, in the documents that
25  we have already talked about that you reviewed and

Page 25

1  relied upon, were there any documents that you
2  were provided that you deemed not relevant and did
3  not review and therefore did not put on your list
4  in Appendix B?
5      A.  Not that I recall.
6      Q.  So as you sit here today, you believe
7  that you reviewed everything that was provided to
8  you in this case, correct?
9      A.  That's my recollection, yes.
10     Q.  Have you ever been prevented from
11  testifying in any way?
12     A.  I don't know what you mean.
13     Q.  Well, is there any time where you
14  expected to testify in a case, but for any reason
15  were told not to testify?
16     A.  Were told?  No.
17     Q.  Okay.  Have you ever written a report in
18  which you gave an opinion, but then did not
19  testify?
20     A.  Yes.
21     Q.  And is that because some of those cases
22  settled or didn't go to trial, for example?
23     A.  Yes, for the most part.
24     Q.  Can you think of any instance in which
25  you wrote a report and which you gave an opinion,

Page 26

1 but did not testify either at a deposition or
2 trial, and it wasn't because the case settled?
3     **A. Yes.**
4     Q. What were the circumstances there? Well,
5 let me take a step back.
6        How many times did that occur?
7     **A. Once as I recall.**
8     Q. Okay. And which case was that?
9     **A. That was the Cristal versus Cristalino**
10 **case.**
11     Q. And what happened in Cristal that caused
12 you not to testify, even though you had given a
13 report?
14     **A. Oh, I testified in that case.**
15     Q. Oh, that's right. We talked about that.
16 You did testify.
17     **A. I did.**
18     Q. Okay. Maybe I'm confused. I think I had
19 asked were there any instances in which you
20 prepared a report providing an opinion, but then
21 later did not testify.
22     **A. No, I testified in the cases where I**
23 **prepared my report.**
24     Q. Okay.
25     **A. Oh, let me be correct: When I testified,**

Page 27

1 **I prepared a report, not the other way. Having a**
2 **report is not associated with testimony.**
3     Q. Right.
4        And I think I had asked, perhaps
5 inartfully, had there been an instance where you
6 had provided a report with your opinion and then
7 not testified in a case where it was something
8 other than the case had settled.
9     **A. No.**
10     Q. Do you consider yourself an expert in
11 competitive marketing strategy?
12     **A. I do.**
13     Q. What is competitive marketing strategy?
14     **A. A marketing strategy is how firms deploy**
15 **their resources to create relationships and**
16 **generate revenue from customers. So it is an**
17 **understanding of how firms use their resources to**
18 **build relationships and generate sales and**
19 **profits.**
20     Q. What is branding?
21     **A. Branding is the activity of creating a**
22 **brand name, which is, of course, something**
23 **recognized by consumers.**
24     Q. What is an advertisement?
25     **A. Well, an advertisement is**

Page 28

1 **typically -- they're many different forms**
2 **advertisements take, but one common form is a paid**
3 **commercial promotional message that hopes to**
4 **generate brand recognition, awareness and sales,**
5 **among other things.**
6     Q. Do you consider yourself an expert in
7 branding?
8     **A. I consider myself an expert in marketing**
9 **strategy of which branding is a very significant**
10 **component.**
11     Q. So you would say you don't consider
12 yourself an expert in branding, but you do in
13 marketing strategy, correct?
14        MS. HEMERYCK: Objection, misstates the
15 testimony.
16        **THE WITNESS: No, I consider myself an**
17 **expert in marketing strategy of which branding is**
18 **a significant part. Some people focus more**
19 **narrowly, some people focus more broadly. I**
20 **consider myself an expert in marketing strategy**
21 **which includes branding.**
22 BY MR. ZEULI:
23     Q. So do you consider yourself an expert in
24 branding?
25     **A. Yes.**

Page 29

1     Q. Do you consider yourself an expert in
2 right of publicity law?
3     **A. No.**
4     Q. Do you consider yourself an expert in the
5 grocery industry?
6     **A. I do not.**
7     Q. Do you consider yourself an expert in the
8 pharmacy industry?
9     **A. I do not.**
10     Q. Have you ever done any marketing projects
11 for a grocer?
12        Let me restate the question while you are
13 thinking about it.
14        Have you ever done any marketing projects
15 for someone in the grocery industry?
16        MS. HEMERYCK: I'm going to object that
17 "marketing projects" is vague and ambiguous.
18        **THE WITNESS: Well, it depends a bit on**
19 **how you define "grocery industry." I have done a**
20 **number of marketing projects for companies**
21 **involved in consumer packaged goods business for**
22 **which the grocery business, of course, is a**
23 **significant portion of that.**
24        MR. ZEULI: Yes, I was not including
25 packaging business. I was including companies

http://www.yeslaw.net/help

Page 30

1    that either sell grocery goods at retail or
2    wholesale.
3    BY MR. ZEULI:
4        Q.  Have you done any marketing projects for
5    those kinds of companies?
6        A.  I have, yes.
7        Q.  Okay.  Which companies?
8        A.  Target.
9        Q.  Okay.  Any others?
10       A.  Not that I can recall at the moment.
11       Q.  Okay.  And have you done any marketing
12   projects for retail or wholesale pharmacy
13   companies?
14       A.  Not that I recall.
15       Q.  Let's go back to Target.  How many
16   marketing projects have you done for Target?
17       A.  Well, I recall one in particular.
18       Q.  All right.  What was that project?
19       A.  It was a seminar I gave for some of their
20   executives on, as I recall, branding and
21   competitive strategy.
22       Q.  How long was the seminar?
23       A.  A couple hours, I suppose.  I don't
24   recall the details.
25       Q.  Was it just a one-time seminar?

Page 31

1        A.  I believe it was, yes.
2        Q.  What year was it?
3        A.  I couldn't say.
4        Q.  Roughly?  The last ten, prior to ten
5    years ago?
6        A.  It probably was within the last ten
7    years, but I would have to check.  I really don't
8    recall the details.
9        Q.  What did you do to prepare to give that
10   seminar on branding to Target?
11       A.  As I recall, I reviewed documents they
12   provided about their marketing, I interviewed
13   executives at Target about their marketing and
14   their branding efforts, and then prepared a
15   presentation to respond to the issues that they
16   were confronting and proposed some ideas that
17   would be helpful for them to address them.
18       Q.  As part of that Target project, did you
19   review any data regarding Target's customers?
20       A.  I don't remember.
21       Q.  Am I correct that part of the goal of
22   that marketing project was to improve Target's
23   brand or message to its customers and potential
24   customers?
25       A.  Well, I would say the goal was to improve

Page 32

1    their effectiveness in dealing with customers and
2    effectiveness in making their decisions.
3        Q.  And how did you go about determining
4    whether the advice you gave to Target would
5    improve their effectiveness?
6        A.  By discussions with them about what
7    issues they were confronting, by review of the
8    documents about what they were currently doing,
9    and by my general expertise in marketing strategy
10   and helping them think about some existing
11   problems in different ways that, perhaps, they
12   hadn't considered before.
13       Q.  So in the Target project, were they able
14   to communicate -- strike that.
15           In the Target project, was it Target
16   personnel that provided to you the knowledge that
17   you obtained regarding their customers?
18       MS. HEMERYCK:  Objection, lack of
19   foundation.
20       THE WITNESS:  They provided -- I don't
21   remember the nature of the documents they gave me,
22   except to the extent that they included documents
23   about their current marketing efforts and the
24   current challenges they faced.  I presume some of
25   those involved some mention of customers.  I don't

Page 33

1    recall what mention there was about customers in
2    that data or in the information, but I relied on
3    the documents they gave me, and I relied on my
4    conversations with them to develop the
5    presentation and offer my thoughts.
6    BY MR. ZEULI:
7        Q.  Do you recall what the specific problem
8    was that Target was trying to address?
9        A.  I do not.
10       Q.  It had to do with the efficacy of their
11   branding, though; is that correct?
12       A.  I would say it had more generally to do
13   with the effectiveness of their marketing, as a
14   whole, of which branding could be a significant
15   part.
16       Q.  Is it fair to say that as part of the
17   Target project, Target personnel provided to you
18   information of at least what they believed was not
19   effective marketing on their behalf or marketing
20   that could be improved upon?
21       A.  I'm sorry, I'm not sure I understand your
22   question.
23       Q.  Yes.
24           I gather that Target hired you because
25   they wanted to better the effectiveness of their

Page 34

1  marketing, correct?
2      **A.  Correct.**
3      Q.  All right.  And that presumes that they
4  were at least unhappy with their current marketing
5  or felt that it could be improved upon, correct?
6      **A.  Correct.**
7      Q.  And as part of that, I assume that they
8  shared with you not only their current marketing
9  efforts, but also points of dissatisfaction, for
10 example, correct?
11     **A.  Correct.**
12     Q.  All right.  And did they also share with
13 you information about their customers or
14 customers' perception of their current marketing
15 efforts?
16         MS. HEMERYCK:  Objection, asked and
17 answered.
18         **THE WITNESS:  I think I have -- I don't**
19 **know what else I can add to what I said before**
20 **about the recollection about particular customer**
21 **data.**
22 BY MR. ZEULI:
23     Q.  That if you had reviewed customer data,
24 it would have come from Target personnel, correct?
25         MS. HEMERYCK:  Objection, that was not

Page 35

1  the testimony.
2         **THE WITNESS:  I believe I said that I**
3  **don't recall the specific details of the**
4  **information they gave me.  I presume there is some**
5  **mention of customers in that, but I don't recall**
6  **the details.**
7  BY MR. ZEULI:
8      Q.  Do you recall what your advice to Target
9  was?
10     **A.  I do not.**
11     Q.  Do you know whether Target implemented
12 your advice?
13     **A.  I do not.**
14     Q.  Did you have any follow-up with Target
15 after the seminar?
16     **A.  I don't remember particular**
17 **conversations.  We have a good relationship with**
18 **Target and Kellogg.  So I have had conversations**
19 **with people, but no specific follow-up on that.**
20     Q.  So I guess what I'm getting at is there
21 wasn't after the seminar some type of ongoing work
22 that you were performing as part of that project?
23     **A.  No.**
24     Q.  Prior to this case, have you ever given
25 an opinion, either written or in testimony, as to

Page 36

1  whether a communication was a commercial
2  transaction?
3         MS. HEMERYCK:  Objection, that misstates
4  his opinion in this case.
5         **THE WITNESS:  What do you mean by**
6  **"commercial transaction"?**
7         MR. ZEULI:  Well, actually, that was a
8  word that you used in your expert report.
9  BY MR. ZEULI:
10     Q.  If you want to turn in your report to
11 Page 10, Paragraph 22, the third line, do you see
12 the term "commercial transaction"?
13     **A.  Okay.  I do.**
14     Q.  And what did you mean when you used the
15 words "commercial transaction"?
16     **A.  Sale of goods and services.**
17     Q.  Have you ever given an opinion on whether
18 a communication was a commercial transaction?
19         MS. HEMERYCK:  And, again, to the extent
20 you are talking about this opinion, that's not
21 what the opinion says.
22         MR. ZEULI:  Counsel, speaking
23 objections -- you can put an objection on the
24 record, but don't lace it with words.
25         **THE WITNESS:  So can you restate the**

Page 37

1  **question or repeat the question?**
2         MR. ZEULI:  Sure.  I will give it to you
3  again.
4         **THE WITNESS:  Okay.**
5  BY MR. ZEULI:
6      Q.  Have you ever opined on whether a
7  communication was a commercial transaction?
8         MS. HEMERYCK:  Same objection.
9         **THE WITNESS:  I don't believe my**
10 **testimony here suggests that I am saying a**
11 **communication is a commercial transaction.**
12 BY MR. ZEULI:
13     Q.  So it is not your opinion in this case
14 that Jewel's page was a commercial transaction; is
15 that correct?
16     **A.  I'm not sure what you mean by that**
17 **question to be perfectly honest.**
18     Q.  Okay.
19     **A.  What my report says is the communication**
20 **proposes a transaction.  That's different from the**
21 **communication, my understanding, being a**
22 **transaction.  I presume there was transactions**
23 **involved in placing the advertisement, but I'm**
24 **suggesting here that the communication proposes a**
25 **transaction for goods and services.**

Page 38

1  Q.  And we will come back to your particular
2  opinion in this case.
3       Have you ever given an opinion, other
4  than in this case, as to whether a communication
5  was a transaction?
6  **A.  I guess I don't understand how a**
7  **communication can be a transaction, so I'm not**
8  **understanding the question.**
9       Q.  Okay.  Other than in this case, have you
10  ever given an opinion that a printed page such as
11  an advertisement was a commercial transaction?
12       MS. HEMERYCK:  And, again, I object to
13  the extent it is mischaracterizing the opinion in
14  this case.
15       THE WITNESS:  **Again, I don't understand**
16  **what you mean by a page is a commercial**
17  **transaction.**
18  BY MR. ZEULI:
19       Q.  Okay.  Well, let's go back to your
20  definition of commercial transaction, that is
21  anything for the sale of goods and services,
22  correct?
23       **A.  What I have said is the communication**
24  **proposes a transaction which is the exchange of**
25  **money for goods and services.  That's different,**

Page 39

1  **in my understanding, from saying the communication**
2  **is a transaction.**
3       Q.  Okay.  In any other case, have you given
4  an opinion that a communication proposes a
5  transaction for all goods and services?
6       **A.  I don't recall using that specific phrase**
7  **in an earlier report or an earlier case.**
8       Q.  How about a similar phrase in an earlier
9  report or an earlier case?
10       **A.  As I sit here, I don't recall that, using**
11  **that particular language or similar language.**
12       Q.  So as you sit here today, to the best of
13  your recollection, this is the first time that you
14  have given an opinion that a communication
15  proposes a transaction for all goods and services,
16  correct?
17       **A.  So far as I can recall, this is the first**
18  **time I have said it as an expert witness, yes.**
19  **Certainly, I have argued that elsewhere, but the**
20  **first time as an expert witness in a case, without**
21  **checking in more detail.**
22       Q.  Have you ever provided an opinion that a
23  communication is an advertisement?
24       MS. HEMERYCK:  And you mean as an expert
25  witness?

Page 40

1  BY MR. ZEULI:
2       Q.  Have you ever provided an opinion that a
3  communication is an advertisement?
4       MS. HEMERYCK:  Well, counsel, I do think
5  we need clarification.
6       MR. ZEULI:  We will let the witness
7  decide if he can answer the question.
8       **THE WITNESS:  So do you mean as part of**
9  **my teaching, as part of my research, or as part of**
10  **my role as an expert witness?**
11  BY MR. ZEULI:
12       Q.  Let's start with your role as an expert
13  witness.  As an expert witness, have you ever
14  provided an opinion that a communication is an
15  advertisement?
16       **A.  To be fair, I would have to review the**
17  **cases that I have been involved in.  Some of them**
18  **did involve communications and advertisement,**
19  **advertising.  So I can't recall without more**
20  **careful review of the cases I have been involved**
21  **in.**
22       Q.  As you sit here today, you don't recall
23  giving testimony in any of the cases that we have
24  talked about as to whether a communication is an
25  advertisement, correct?

Page 41

1       **A.  That's correct, I don't recall as we sit**
2  **here today.**
3       Q.  And as you sit here today, you don't
4  recall giving testimony in any of the six to ten
5  depositions that a communication is an
6  advertisement, correct?
7       **A.  My earlier answer referred to all the**
8  **cases I have been involved in as an expert**
9  **witness.  So, therefore, logically, it would have**
10  **to include those six; wouldn't it?**
11       Q.  Right.
12       You mentioned your work as a professor.
13  In that work, have you ever given an opinion that
14  a communication is an advertisement?
15       **A.  Yes, I have.**
16       Q.  Okay.  Can you recall for me a particular
17  example?
18       **A.  I use advertising extensively in my**
19  **classes to illustrate points, so sure.  I use**
20  **advertisements from Hummer, for example, in my**
21  **classes to illustrate points.**
22       Q.  Can you describe for me the
23  communication?  Was it printed or was it a video
24  file with regard to the Hummer example?
25       **A.  The Hummer example is a printed**

Page 42

1   advertisement.
2       Q.  Okay.  Can you describe the printed
3   advertisement for me?
4       A.  I can.  There is a series of these ads
5   that involved images of the Hummer automobile with
6   typically one line of text in the ad.
7       Q.  What is the line of text?
8       A.  It is a series of them.  One, for
9   example, says "When the astroid hits and
10  civilization crumbles, you will be ready."
11      Q.  So the series of Hummer communications
12  include the vehicle itself and then a line similar
13  to the one you just provided?
14      A.  No, they are all very different, but
15  something associated with the message they like to
16  convey about the Hummer.
17      Q.  But all of the pages, you said, include
18  an image of the vehicle, correct?
19      A.  They do.
20      MS. HEMERYCK:  Tony, can we take a break
21  in about five?
22      MR. ZEULI:  We can take a break now.
23  This is a good time.
24      MS. HEMERYCK:  Okay.  Great.
25      (Recess taken.)

Page 43

1       THE WITNESS:  So there is actually one
2   thing I would like to clarify to an earlier
3   answer.
4       MR. ZEULI:  Okay.
5       THE WITNESS:  There is one document I
6   reviewed, which I wasn't clear if it was attached
7   to one of these or not, but I believe now it may
8   be a separate document, which is a brand manual
9   from Super Value or Jewel.  So I did see that, and
10  I can't remember to what it was attached or
11  exactly how I saw it, but that's --
12  BY MR. ZEULI:
13      Q.  That was that 48-page, approximately,
14  brand manual, correct?
15      A.  Correct.
16      Q.  All right.  Great.  Thank you.
17      Let's turn to your report and what you
18  plan on testifying to.  What did Jordan's counsel
19  ask you to do in this case?
20      A.  Well, they asked me, initially, to review
21  certain documents, including the advertisement
22  that is at issue here, and provide my opinion
23  about the ad, whether it was an advertisement,
24  and, as I recall, the initial issue was about
25  whether advertisements include products or can be

Page 44

1   advertisements that don't.
2       Q.  Do you recall being asked to do anything
3   else in this case?
4       A.  Well, we had discussions over the -- it
5   has been a number of years now, actually, since we
6   first began this.  So we had discussions about the
7   issue, but it has essentially always been to
8   provide my opinion about that document and whether
9   or not it is an ad.
10      Q.  So what you were asked to do is provide
11  an opinion as to whether the page that Jewel
12  published was an advertisement, correct?
13      A.  Correct.
14      Q.  And then, also, correct me if I'm wrong,
15  provide an opinion as to whether, because that
16  page doesn't have any products, goods or services,
17  whether it still qualifies as an advertisement?
18      A.  Correct.
19      Q.  Is there anything else you recall being
20  asked to do in this case?
21      A.  No.
22      Q.  Okay.  In your report, you used the
23  term -- well, strike that.
24      So what is your opinion?
25      A.  So my opinion, I guess, would be best

Page 45

1   summarized by Paragraph 22, and I will just read
2   it:  "The communication at issue in this case is
3   an advertisement.  It informs consumers about
4   Jewel-Osco, it conveys the meaning of the
5   Jewel-Osco brand as its owners intend, and it
6   proposes a commercial transaction with current and
7   potential customers.  The communication proposes a
8   transaction for all goods and services that bear
9   or are associated with the Jewel-Osco brand and
10  brand slogan, just as other ads including Michael
11  Jordan do for Nike and other ads cited in this
12  report do for their sponsors.  The ad promotes and
13  advertises all of Jewel-Osco's goods and
14  services."
15      Q.  Do you have any other opinions in this
16  case other than Paragraph 22 of your report?
17      A.  Well, the report contains all my opinions
18  that are relevant to the case.  That summarizes, I
19  think, some of the important conclusions of my
20  report.
21      Q.  Well, I really want to know exactly what
22  opinions you have.  So what opinions do you have
23  in this case other than what you just read in
24  Paragraph 22, if any?
25      MS. HEMERYCK:  And, again, I object that

Page 46

1  the question has been asked and answered.
2       THE WITNESS:  So my opinions are
3  contained -- my report reflects my opinions in
4  this case.  So looking at my report, for example,
5  after Page 2, it describes my background and
6  qualifications.
7  BY MR. ZEULI:
8       Q.  And just to stop you there for a second,
9  I assume you are not planning to give an opinion
10 with regard to your background or qualifications,
11 correct?
12      A.  Seeing it is just facts about my life
13 that are relevant for my qualifications as an
14 expert witness.
15          So the next pages, 3 through 10, contain
16 my opinions that I'm prepared to testify about in
17 this case.
18      Q.  And other than what you read to me in
19 Paragraph 22, what other opinions do you have?
20      MS. HEMERYCK:  Objection, asked and
21 answered, and it is in the report.
22      MR. ZEULI:  No speaking objections.
23      MS. HEMERYCK:  Well, counsel, this is a
24 ridiculous waste of time.  Do you want him to read
25 the entire report into the record?  We can do

Page 47

1  that.
2       MR. ZEULI:  I asked him to identify
3  whether there are any other opinions in the report
4  other than what are contained in Paragraph 22.
5       MS. HEMERYCK:  And he just did.
6       MR. ZEULI:  Good.
7  BY MR. ZEULI:
8       Q.  Take a look through, Professor, and
9  identify any other opinions for me.
10      A.  Yes, there are, Paragraphs 5 through 22
11 contain my opinions in this report.
12      Q.  So it is your testimony that Paragraph 5
13 is one of the opinions in this case?
14      A.  Well, perhaps you can clarify what you
15 mean by "opinion."
16      Q.  Well, actually, you are the one that was
17 asked to, I believe, by opposing counsel, to
18 provide your opinion with regard to the page that
19 Jewel published, correct?
20      A.  Correct.
21      Q.  All right.  And your report sets forth
22 that opinion, correct?
23      A.  It does.
24      Q.  And you said that Paragraph 22 was a
25 summary of that opinion, correct?

Page 48

1       A.  Correct.
2       Q.  Okay.  And what I'm asking is, other than
3  Paragraph 22, are there any specific opinions in
4  your report that you can point me to?
5       A.  Everything including Paragraph 5 through
6  Paragraph 22 is important in my opinion about this
7  case.
8       Q.  Your bases for your opinion in this case
9  is included in your report, correct?
10      A.  The report contains assumptions and
11 foundational information used to draw the
12 conclusions, that's correct.
13      Q.  It includes the bases on which you have
14 reached the opinion that is contained in your
15 report, correct?
16      A.  The opinions that are reflected in my
17 report, yes.
18      Q.  In forming your opinion in this case
19 about the page that Jewel published, did you have
20 the entire Sports Illustrated Presents magazine or
21 just the page itself?
22      A.  I did not have the entire magazine.  I
23 had the page, and I believe I saw the cover as
24 well.
25      Q.  In forming your opinions in this case,

Page 49

1  walk me through the steps that you undertook to
2  reach your opinions.
3       A.  Well, I will recall them as best as I
4  can.  It has been a significant period of time
5  since I began working on the case, but, as I
6  recall, I reviewed the complaint, the documents
7  that I was provided.  I examined the
8  advertisements and marketing of some other brands.
9  I considered those similarities and differences
10 and prepared my report with my opinion.
11      Q.  Any other steps in performing your
12 analysis in this case other than reviewing the
13 complaint, reviewing the documents that were
14 provided to you, considering advertisements of
15 other entities and other brands, and then
16 comparing the similarities and differences?
17      A.  I'm sure I reviewed some articles and
18 literature along the way, and I may have left
19 steps out in my process, but those were certainly
20 included in my process.
21      Q.  And the articles and treatises that you
22 would have reviewed you put as footnotes in your
23 report, correct?
24      A.  The ones that I included in the argument.
25 There may have been others that I looked at as

Page 50

1   well that I did not include, yes.
2       Q.  But the ones you found most important,
3   you provided a footnote; is that fair?
4       A.  That's fair.
5       Q.  Do you recall any other steps in
6   performing your analysis in this case, other than
7   reviewing the complaint, reviewing the documents
8   that were provided to you, considering
9   advertisements by brands and companies not
10  involved in this case, considering similarities
11  and differences, and then reviewing some articles
12  and treatises?
13          MS. HEMERYCK:  Just objection, misstates
14  the testimony.  He didn't use the word
15  "treatises".
16          THE WITNESS:  So I may have looked at
17  some books.  Perhaps I would describe it as that.
18  I'm sure I did other things.  That's what I can
19  recall at the moment.
20  BY MR. ZEULI:
21      Q.  Do you recall anything else that you did?
22      A.  Not at the moment, no.
23      Q.  And how long ago did you do this work?
24      A.  This work began, I think, in 2012, as I
25  recall.  Maybe 2010 or 2012.  I don't remember the

Page 51

1   exact date, but at least three years ago, possibly
2   five years ago.
3       Q.  And the steps that you described, your
4   analysis, in what year were those performed?
5       A.  The first part of that was performed in
6   the beginning of the engagement, which would have
7   been 2010 or 2012, somewhere in that time frame,
8   and then it would have been concluded just before
9   I submitted this report in April.
10      Q.  And I think you had testified earlier
11  that you, to the best of your recollection, spent
12  about 20 hours in doing your analysis and report,
13  correct?
14      A.  I believe that's correct, yes.
15      Q.  All right.  And with regard to the
16  earlier stage analysis back in 2010 or 2012, about
17  how much of that 20 hours was spent then?
18      A.  It is hard to estimate, but I would say
19  certainly more than half, perhaps 60 or 70
20  percent.
21      Q.  And you had prepared a declaration.  Do
22  you recall that?
23      A.  I do.
24      Q.  And when did you essentially pick your
25  work up again that led to this most recent report?

Page 52

1       A.  I think it was earlier this year.
2       Q.  Okay.  And about how much time, then?  It
3   would be, obviously, the remaining 30 to 40
4   percent?
5       A.  I would say approximately 30 percent,
6   yes.
7       Q.  Which of the steps that you have
8   described to me as your analysis did you perform
9   in the earlier part of your engagement?
10      A.  I believe I performed most of the steps
11  in the earlier part in preparation of the
12  declaration, and that was certainly the foundation
13  for the report.
14      Q.  Do you recall any changes -- strike that.
15          Is your report of April 2015 identical to
16  your declaration?
17      A.  Not identical, no.
18      Q.  What changes were made in the report
19  compared to the declaration?
20      A.  I don't recall.  I would have to go
21  compare the documents to see.
22      Q.  What work did you do this year leading up
23  to your report in April?
24      A.  Well, most recently, I prepared for this
25  deposition by reviewing the documents and

Page 53

1   reviewing my report.
2       Q.  Other than preparing for the deposition.
3       A.  Going back, I recall using my declaration
4   as the basis for preparing the report, and there
5   may be additional -- I don't recall additional
6   analysis I did, but I may have done additional
7   thinking about it, certainly.  I don't recall
8   whether I specifically engaged in looking,
9   exploring new brands or not, but I may have done
10  that as well.
11      Q.  If there are no different brands
12  mentioned between your declaration and your report
13  in April, would it be fair to assume that you did
14  not undertake analysis of additional brands this
15  year leading up to your report?
16      A.  Again, I may have looked at some that
17  simply were not included.  I certainly may have
18  looked at other literature that's not included.
19  So I can't really say for certain.  I don't
20  remember the details, exactly the process of
21  preparing the report from the declaration.
22      Q.  Can you be more specific as to when you
23  began your work this year that led to your report
24  in April?
25      A.  I don't recall the specific dates.  It

Page 54

1    was fairly close to the submission of the report
2    as I recall.
3        Q.  By fairly close, do you mean less than a
4    month?
5        A.  I believe it was, yes.
6        Q.  Was it less than two weeks?
7        A.  I don't remember that detail.
8        Q.  So sometime between, less than a month, I
9    guess?
10       A.  That would be fair, yes.
11       Q.  As part of your analysis in this case to
12   form your opinions, did you interview Mr. Jordan?
13       A.  I did not.
14       Q.  As part of your analysis in forming your
15   opinions, did you interview Ms. Portnoy?
16       A.  I did not.
17       Q.  Did you interview Mr. Polk?
18       A.  No.
19       Q.  Did you interview Mr. Falk?
20       A.  No.
21       Q.  Did you interview anyone on Jordan's
22   behalf?
23       A.  I did not.
24       Q.  Did you interview anyone from Jewel?
25       A.  No.

Page 55

1        Q.  Did you interview anyone from Super
2    Value?
3        A.  I did not.
4        Q.  Did you interview anyone from Time?
5        A.  No.
6        Q.  Did you interview anyone from Sports
7    Illustrated?
8        A.  No.
9        Q.  Did you interview anyone that purchased
10   the Sports Illustrated Presents magazine?
11       A.  I didn't consider that relevant, so I did
12   not, no.
13       Q.  Did you interview anyone that saw Jewel's
14   page?
15       A.  Again, I did not consider that relevant,
16   so I did not.
17       Q.  Okay.  Why did you consider speaking to
18   someone who saw the Sports Illustrated
19   magazine -- well, strike that.
20           Why did you believe it was not relevant
21   to talk to someone -- let me try that a third
22   time.
23           Why did you believe it was not relevant
24   to interview someone that saw Jewel's page?
25       A.  I was asked to form an opinion about

Page 56

1    whether the page was an advertisement or not, and
2    whether or not it is an ad does not depend
3    necessarily on how a consumer would react to it.
4        Q.  So earlier you said that an advertisement
5    is something that sells products and goods,
6    correct?
7        A.  I don't think I said exactly that.
8        Q.  Okay.  Do you recall exactly what you
9    said?
10       A.  I don't recall exactly what I said.
11       Q.  Okay.  Well, the transcript will have
12   that.
13           So you concluded that to determine
14   whether Jewel's page was an advertisement did not
15   require your knowledge of how consumers perceived
16   the page; is that correct?
17       A.  Correct.
18       Q.  Okay.  And why is that?
19       A.  Because if an advertisement proposes a
20   commercial -- if a page is an
21   advertisement -- excuse me.
22           If a page proposes a commercial
23   transaction, some ads can be effective, some ads
24   can be ineffective.  The effectiveness of the ad
25   doesn't depend on whether it is or is not an ad.

Page 57

1        Q.  Did you interview -- well, you didn't
2    interview anyone to determine whether they
3    believed that Jewel's page proposed a commercial
4    transaction, correct?
5        A.  I was not asked to assess the impact of
6    the ad, just whether or not if the page was an ad.
7        Q.  I think a moment ago you said that if it,
8    the page, proposes a commercial transaction, then
9    it is an advertisement, correct?
10       A.  The role of an advertisement is to
11   propose and impart a commercial transaction, yes.
12       Q.  Ergo if a page proposes a commercial
13   transaction, you would conclude it is an
14   advertisement, correct?
15       A.  I'm not sure that's true, actually.
16       Q.  Can you think of a situation in which a
17   communication -- in other words, when I use
18   "communication," I mean it could be a printed
19   page, it could be a video, television spot,
20   something like that.  Can you think of a
21   communication that proposes a commercial
22   transaction that is not an advertisement?
23       A.  I haven't considered that.  That's a very
24   broad question.  Among all the universe of
25   commercial communications, I haven't considered

Carpenter, Gregory - 06/11/2015                                    Pages 58..61

Page 58

1   that.
2       Q.  Okay.  But in this case, you concluded
3   that because Jewel's page proposes a commercial
4   transaction, it is an advertisement, correct?
5       A.  Correct.
6       Q.  And you did that based on your review of
7   Jewel's page, correct?
8       A.  Jewel's page, the other documents, their
9   brand manuals, and their other activities that I
10  reviewed as part of this, yes.
11      Q.  You did not conduct a survey, correct?
12      A.  I did not.  I didn't think that was
13  relevant for the question I was asked to address.
14      Q.  Okay.  And why didn't you think
15  conducting a survey would be relevant?
16      A.  Because the question I was asked to
17  address was whether or not this is a brand, not
18  its impact on consumers.  That's a separate
19  question.
20      Q.  Right now when you were speaking, you
21  said you were asked to determine whether it is a
22  brand.
23      A.  I'm sorry, in an ad.  So, excuse me, I
24  misspoke.  I'm sorry.
25      Q.  So let's get that right.

Page 59

1           I believe what you just testified to is
2   that you were asked to determine whether Jewel's
3   page is an advertisement, and it was your opinion
4   that you did not need to know how consumers
5   perceived that page?
6       A.  I did not need to know the impact of that
7   on consumers to determine whether or not it was an
8   ad.
9       Q.  But doesn't that go to the efficacy of
10  the page rather than whether it proposes a
11  commercial transaction?
12          MS. HEMERYCK:  Objection, vague and
13  ambiguous.
14          THE WITNESS:  I don't understand what you
15  are asking.
16  BY MR. ZEULI:
17      Q.  So aren't you saying that you didn't
18  conduct a survey or speak to consumers who may
19  have seen Jewel's page because you were not asked
20  to determine the effectiveness of the page?
21      A.  Correct.
22      Q.  Okay.  And my question is:  Doesn't that
23  go to the effectiveness of the page in its
24  communication rather than whether it is a
25  commercial transaction?

Page 60

1           MS. HEMERYCK:  Objection, vague and
2   ambiguous.
3           THE WITNESS:  Again, maybe you could
4   clarify.  I'm not sure what you mean by "that."
5   BY MR. ZEULI:
6       Q.  Well, let's take a step back.  When you
7   were reviewing Jewel's page, what did you rely on
8   to determine whether, in your opinion, it was a
9   commercial transaction?
10          MS. HEMERYCK:  Objection, misstates the
11  opinion.
12          THE WITNESS:  I don't believe I ever said
13  it was a commercial transaction.
14  BY MR. ZEULI:
15      Q.  What was it that you relied on to
16  determine whether Jewel's page proposed a
17  commercial transaction such that, in your opinion,
18  it is an advertisement?
19      A.  So I believe my report outlines the
20  documents that I reviewed, and we discussed the
21  process through which I used those documents and
22  other related materials.  So I think that
23  summarizes how I reached the conclusions that I
24  have.
25      Q.  Did you determine what Jewel's page is

Page 61

1   advertising?
2       A.  I have an opinion about that.
3       Q.  And what is your opinion?
4       A.  It is promoting all the goods and
5   services associated with Jewel-Osco through an
6   affiliation, through the connection with Michael
7   Jordan and through using their own brand as well.
8       Q.  So from looking at the Jewel-Osco page,
9   you concluded that that page advertises everything
10  that Jewel-Osco sells; is that correct?
11      A.  That's correct.
12      Q.  And did you test that opinion in any way?
13      A.  You are asking did I empirically test the
14  opinion?  The answer is no, and I think the
15  conclusion is based on, as we have described, the
16  analysis of the documents, the analysis of the
17  Jewel-Osco brand manual, and based on that, it
18  seems completely straightforward that it is an
19  advertisement for all of Jewel-Osco products.
20      Q.  To you anyway?
21      A.  Based on my opinion.
22      Q.  Right.  Right.
23          You could have done a survey to determine
24  whether consumers perceived it as an
25  advertisement, correct?

Page 62

1    A.  I could have, but it wouldn't have been
2  relevant for my conclusion.  I could have done
3  lots of things that were not relevant to my
4  conclusion.
5    Q.  Is it correct that you did not analyze
6  any data regarding consumers' perception of
7  Jewel's page?
8    A.  I didn't consider it relevant, so I did
9  not, that's correct.
10    Q.  In Paragraph 22 of your report, the third
11  sentence, it says:  "The communication proposes a
12  transaction for all goods and services that bear
13  or are associated with the Jewel-Osco brand and
14  slogan."
15    A.  "And brand slogan."
16    Q.  "And brand slogan."  Thank you.
17       How did you determine -- well, what do
18  you mean there by the term "transaction"?
19       MS. HEMERYCK:  Objection, asked and
20  answered.
21       THE WITNESS:  I believe I have said that
22  advertisements are useful in generating revenue,
23  sales.  So I don't have much more to add to what I
24  described before about "transaction."
25

Page 63

1  BY MR. ZEULI:
2    Q.  Do you know how many sales were generated
3  for Jewel by the page in this case?
4    A.  I do not, and I don't consider that
5  relevant for my opinion.
6    Q.  Do you know how much income was
7  generated, if any, for Jewel by this page?
8    A.  I do not, and I don't consider that
9  relevant to my opinion.
10    Q.  And why don't you consider that relevant?
11    A.  Because the question I was asked is
12  whether or not that page is an advertisement and
13  promotes, and my conclusion is it is, and it
14  promotes and proposes a commercial transaction for
15  all the items associated with the Jewel-Osco name.
16  I was not asked to assess the impact of that ad.
17    Q.  When you reviewed the Jewel-Osco page,
18  what specific products, if any, do you believe it
19  was promoting?
20       MS. HEMERYCK:  Objection, asked and
21  answered.
22       THE WITNESS:  I believe I testified and
23  my report concludes that "It proposes a
24  transaction," quoting from my report, "for all
25  goods and services that bear or are associated

Page 64

1  with the Jewel-Osco brand and brand slogan."
2  BY MR. ZEULI:
3    Q.  Everything that's inside their stores?
4    A.  All goods and services.
5    Q.  Is there anything that you would exclude?
6    A.  All goods and services would be my
7  answer.
8    Q.  So nothing excluded?
9    A.  That would be correct.
10    Q.  Have you ever negotiated an agreement for
11  use of an individual's name or likeness in a
12  marketing campaign?
13    A.  I have not.
14    Q.  Have you ever worked with an athlete in
15  promoting a brand?
16    A.  I don't believe I have.
17    Q.  Does all speech by a company promote all
18  of its goods and services?
19    A.  I haven't considered that question fully,
20  but I suspect there is some that's not promoting
21  goods and services, yes.
22    Q.  Can you give me an example of speech by a
23  corporation that does not promote all of its goods
24  and services?
25    A.  Financial reports.

Page 65

1    Q.  Anything else?
2    A.  I haven't considered this question fully,
3  so that's all I'm willing to offer at the moment.
4    Q.  Do you think a corporation can use its
5  logo or its brand in a communication that does not
6  promote all of its goods and services?
7    A.  That's a very vague, hypothetical
8  question without any real context.  So it is very
9  hard to answer that question.
10    Q.  So if you had the page, as you did with
11  Jewel's page, you would be able to make a
12  determination?
13    A.  If you are talking about a particular
14  company, I think it depends on the specifics of
15  the communication, context in which that
16  communication occurs.
17    Q.  So what more would you need to determine
18  whether a page from a company promotes all of its
19  goods and services?
20    A.  So you are asking me to define all the
21  elements of the context in which information is
22  communicated from a corporation to a group of
23  people, and identify which of those elements in
24  that context are important in determining whether
25  that communication proposes a commercial

Page 66

1  transaction or not.  That's an extraordinarily
2  broad question.  I'm not prepared to offer a
3  general principle to that question, a general
4  principle that would address that question in its
5  broadest, most abstract sense.
6      Q.  So let's take a look at Jewel's page in
7  this case, which was previously marked as
8  Plaintiff's Exhibit 5.
9      A.  Thank you.
10     Q.  Just confirm for me that is the page that
11 you reviewed as part of your analysis in this
12 case.
13     A.  It appears to be the same one, yes.
14     Q.  And you agree that this page does not
15 include any Jewel products, goods or services,
16 correct?
17     A.  I do, and I would like to, of course, add
18 that that's not necessary for it to be an
19 advertisement.
20     Q.  I understand that that's part of your
21 opinion, but I just want to make sure, and I saw
22 it in your report.
23     A.  It is part of my opinion, and it is also
24 part of the general practice of marketing and
25 branding advertising.

Page 67

1      Q.  So what brands are on this page?
2      A.  Well, Jewel-Osco is on this page and
3  Michael Jordan is on this page.
4      Q.  So any time someone writes the name
5  Michael Jordan, his brand is used?
6      A.  That sounds like a legal question to me.
7      Q.  No, it wasn't.  It was a branding
8  question.
9      A.  Well, you have to clarify what you mean
10 "is used," then.
11     Q.  Well, a moment ago you testified that
12 Michael Jordan's brand appears in Jewel's page,
13 correct?
14     A.  Yes.
15     Q.  And you were referring to the fact that
16 the text includes Mr. Jordan's name, correct?
17     A.  I am.
18     Q.  And so my question is any time
19 Mr. Jordan's name is used in printed text, does it
20 use his brand?
21     A.  Well, before I answer it, I would like to
22 clarify that also the use of the 23 is evocative
23 of him, is association with Michael Jordan as
24 well.
25     Q.  Let me take a step back.

Page 68

1          When you answered my question earlier
2  stating that Jewel's page, Plaintiff's Exhibit 5,
3  uses Mr. Jordan's brand, was that based on the use
4  of Mr. Jordan's name or the use of some or all of
5  the basketball shoes, or both?
6      MS. HEMERYCK:  Objection, compound.
7      THE WITNESS:  So my conclusion is based
8  on the use of his name and the use of the shoes
9  with the number 23 on it.
10 BY MR. ZEULI:
11     Q.  If the shoes without the number 23 were
12 there -- let me say that again.
13         If the shoes having the number 23 were
14 not on Jewel's page, and only Mr. Jordan's name
15 was included as it is here, would that be using
16 his brand in your opinion?
17     MS. HEMERYCK:  And I do want to interject
18 an objection here, Tony, because this witness is
19 not testifying about --
20     MR. ZEULI:  No speaking objections,
21 counsel.
22     MS. HEMERYCK:  No, let me finish.
23     MR. ZEULI:  No, I'm not going to let you
24 finish.
25     MS. HEMERYCK:  Well, you are going to let

Page 69

1  me finish because the witness isn't going to
2  answer the question until I finish.
3      MR. ZEULI:  You can put your objection on
4  the record.  You can't speak it.  The objection
5  has been noted.
6      MS. HEMERYCK:  No, I'm going to finish,
7  and the witness is not going to answer until I
8  finish.  So you may not like it, but I'm going to
9  say it, because I want to put it on the record.
10     MR. ZEULI:  So you are instructing the
11 witness to not answer?
12     MS. HEMERYCK:  No, absolutely not.
13     MR. ZEULI:  Okay.
14     MS. HEMERYCK:  This witness is not here
15 to testify, has not offered any opinions about
16 whether or not Jewel's ad uses Michael Jordan's
17 identity.  That is not what his opinion is about.
18 That's not an issue.
19         So if you want to go down this road,
20 obviously, it is your deposition, you can waste
21 your time on that, but I do want to make
22 absolutely clear that this is outside the scope of
23 this witness's opinion.
24     MR. ZEULI:  You can answer the question,
25 Professor.

Page 70

```
 1        THE WITNESS:  Well, it is really a
 2   question that I haven't considered.  I considered
 3   the ad as I saw it.  So I haven't considered that
 4   question.
 5   BY MR. ZEULI:
 6        Q.  So you don't have an opinion, if the
 7   shoes are not there, as to whether --
 8        A.  I don't, not without considering it, no.
 9        Q.  Can you consider it right now?
10        A.  I don't think in the context of a
11   deposition it would be fair to you to give you
12   that.  My report took a significant number of
13   hours to prepare thought, reflection, and
14   analysis, and I'm not prepared to do this in the
15   context of a deposition, no.
16        Q.  What is Jewel-Osco's brand?
17        A.  So perhaps you can clarify what you mean
18   by what is the brand.
19        Q.  I asked you earlier what brands appear on
20   this page, and you said the Jewel-Osco brand,
21   correct?
22        A.  Yes.  Correct.
23        Q.  And what are you referring to when you
24   say Jewel-Osco?
25        A.  I'm referring to the logo and this tag
```

Page 71

```
 1   line underneath, which is the tag line they use,
 2   "Good things are just around the corner."
 3        Q.  And my question is what is Jewel-Osco's
 4   brand?
 5        A.  Well, that's actually asking a much
 6   larger question than, perhaps, you would imagine.
 7   You are asking what does it stand for in the mind
 8   of consumers, what thoughts and feelings and
 9   associations they have, which I did not consider
10   for this --
11        Q.  So you don't know --
12        A.  -- for this report.
13        Q.  Apologies.
14            You have not determined what Jewel-Osco's
15   brand stands for, correct?
16        A.  I have not been asked to consider and do
17   an analysis of what Jewel-Osco's brand stands for,
18   so I did not.
19        Q.  Do you know what advertising Jewel has
20   done to endow its brand with meaning?
21        A.  I am aware of some of the advertising.  I
22   am aware of their intentions from the brand
23   manual.
24        Q.  What advertising are you aware of from
25   Jewel?
```

Page 72

```
 1        A.  Advertising that I have seen as a
 2   resident of Chicago.
 3        Q.  So those would be the circulars that come
 4   out in the weekly paper?
 5        A.  Among other things, I'm sure, yes.  I
 6   don't recall or I have not kept record of all the
 7   ads I have seen over the years of living here.
 8        MR. ZEULI:  Let me show to you what has
 9   been marked previously as Plaintiff's Exhibit 37.
10            And, Sondra, I apologize, I don't have an
11   extra copy of that.
12   BY MR. ZEULI:
13        Q.  But is that representative of the
14   advertising that you have seen by Jewel-Osco?
15        A.  It appears to be consistent with it, yes.
16        Q.  What does Jewel's page inform customers
17   about Jewel-Osco -- oh, excuse me.
18            How does Jewel's page inform customers
19   about Jewel-Osco?
20        A.  To which page you refer?
21        Q.  Yes, sorry.
22            How does Jewel's page, which is
23   Plaintiff's Exhibit 5, inform customers about
24   Jewel-Osco?
25        A.  Informs them in at least two ways:  One
```

Page 73

```
 1   is it reinforces the theme they have used
 2   throughout their other advertising, which is "Good
 3   things are just around the corner."  Secondly, it
 4   associates Michael Jordan with Jewel-Osco, and
 5   Michael Jordan, of course, being an
 6   extraordinarily famous individual, there is
 7   significant potential benefit from associating him
 8   with the Jewel-Osco brand, just as there has been
 9   tremendous value associating him with Nike and
10   other brands.
11        Q.  What is it that associates Mr. Jordan
12   with Jewel-Osco in the page of Exhibit 5?
13        A.  Including him in the ad.
14        Q.  So including his name and the number 23?
15        A.  Correct.
16        Q.  Is there anything else?
17        A.  I would add, additionally, the mention of
18   his many accomplishments, the elevation to the
19   Hall of Fame.  Those would evoke thoughts and
20   images about Michael Jordan as well.
21        Q.  Are you aware that the Jewel-Osco page
22   appeared in just one magazine, the Sports
23   Illustrated Presents?
24        A.  I am.
25        Q.  And are you aware that Jewel paid nothing
```

Page 74

1  for the page?
2     A.  I believe I am, yes.
3     Q.  Are you aware that -- well, we have
4  already talked about this:  The page shows no
5  Jewel products, goods or services, correct?
6     A.  I am aware of that, and it still doesn't
7  change my opinion that it is an advertisement for
8  all the things that Jewel-Osco sells, which is,
9  again, a very common type of advertisement used in
10 marketing.
11    Q.  And you agree with me that there is no
12 image of Michael Jordan shown in the page,
13 correct?
14    A.  There is no image of him, no.
15    Q.  You are not aware of any personal
16 appearances that Mr. Jordan did on behalf of
17 Jewel-Osco, correct?
18    A.  I am not aware of anything, no.
19    Q.  Do you know how many Sports Illustrated
20 Presents magazines that included Jewel's page were
21 sold?
22    A.  I do not.  Again, it is not relevant for
23 my opinion about whether this is an ad or not.
24    Q.  And that's because you perceive that as
25 whether it is an effective piece rather than

Page 75

1  simply commercial?
2     A.  I don't think the number of magazines
3  sold.  It may have impact on its effect, but it is
4  completely irrelevant to the question of whether
5  this is or isn't an ad for Jewel-Osco.
6        MR. ZEULI:  Why don't we go ahead and
7  take a break.
8        (Recess taken.)
9  BY MR. ZEULI:
10    Q.  Professor, referring back to Hedrich
11 Exhibit 37, the Jewel-Osco advertisement, is it
12 your testimony that Jewel's page at Plaintiff's
13 Exhibit 5, the one at issue in this case,
14 advertises and promotes everything in Exhibit 37?
15    A.  It is my testimony that it promotes
16 everything in Exhibit 37 and everything that
17 Jewel-Osco sells.
18    Q.  In your report on Page 5, and perhaps 4,
19 you talk about and you show the Marlboro man
20 advertisement, correct?
21    A.  I do.
22    Q.  Were you involved in the Marlboro man
23 advertising campaign?
24    A.  I was not.
25    Q.  Do you know when it began?

Page 76

1     A.  I don't recall.
2     Q.  Is it fair to say it was at least 40
3  years ago?
4     A.  Yes, that would be fair.
5     Q.  And do you know how much Philip Morris
6  spent on the Marlboro man campaign?
7     A.  I do not.
8     Q.  Would it be fair to say it was in the
9  hundreds of millions, if not more?
10    A.  I don't have any idea, so I couldn't say.
11    Q.  Do you think that Philip Morris spent
12 less than a hundred million dollars on the
13 Marlboro campaign?
14        MS. HEMERYCK:  Objection, asked and
15 answered.
16        THE WITNESS:  I don't have any idea,
17 especially given some of the dollars were
18 40-year-old dollars.
19 BY MR. ZEULI:
20    Q.  Okay.  Do you know how many print
21 advertisements Marlboro ran with the Marlboro man?
22    A.  I don't.  I don't.
23    Q.  Would it be fair to say a lot?
24    A.  I think it is a very large number, yes,
25 at least one of the most successful brands ever.

Page 77

1     Q.  And it would have -- the ad, that is, the
2  Marlboro man ad -- would have run in several
3  different magazines, correct?
4     A.  I'm sure it ran in many.
5     Q.  And it would have appeared on many
6  television channels in various markets, correct?
7     A.  All correct.
8     Q.  And is it your understanding that the
9  original advertisements that Philip Morris used
10 with the Marlboro man included cigarettes or the
11 pack of cigarettes?
12        MS. HEMERYCK:  I'm sorry, can you read
13 that back?  I didn't hear it.
14        (Record read.)
15        MS. HEMERYCK:  Objection; lack of
16 foundation, assumes facts not in evidence.
17        THE WITNESS:  I don't know that the
18 original ones did or did not.
19        (JFS Exhibit 42 marked for
20 identification.)
21 BY MR. ZEULI:
22    Q.  Professor, let me hand to you what I have
23 marked as Jewel's Exhibit 42.
24    A.  Okay.
25    Q.  And what this is is a Google search that

Carpenter, Gregory - 06/11/2015        Pages 78..81

Page 78

1 I did for Marlboro man historical ads. Do you see
2 that in the upper left?
3     **A. I do, yes.**
4     Q. Take a minute. It is only -- well, it
5 is, actually, 11-pages long, and just confirm for
6 me that most of the Marlboro man ads feature
7 either a cigarette or a pack of cigarettes.
8     MS. HEMERYCK: I'm sorry, counsel, what
9 was the number of this?
10     MR. ZEULI: 42.
11     MS. HEMERYCK: Thank you.
12     **THE WITNESS: Well, I think it is fair to**
13 **say there are a number of ads which show the**
14 **physical product, just as I point out there are a**
15 **number of Jewel-Osco ads which also show a large**
16 **range of products.**
17 BY MR. ZEULI:
18     Q. I guess my question was, in the
19 Exhibit 42 that I provided to you, the majority of
20 the Marlboro man ads do show either the cigarette
21 or pack of cigarettes, correct?
22     MS. HEMERYCK: And I will just make an
23 objection again. Do you actually want him to
24 count?
25     MR. ZEULI: He can if he wants to.

Page 79

1     **THE WITNESS: And your question was the**
2 **cigarette or the pack of cigarettes?**
3     MR. ZEULI: Yes.
4     MS. HEMERYCK: And, also, just for the
5 record, a lot of the images in Exhibit 42 are not
6 actually Marlboro ads, it appears. So I will put
7 that on the record, as well, just for clarity.
8     (Brief pause.)
9     **THE WITNESS: So it does appear -- I**
10 **didn't count all of them. There are some odd ones**
11 **in here like the Green Giant, but it looks like it**
12 **would be fair to say that a large number, if not**
13 **the majority, show the product, and that's, of**
14 **course, not to suggest that advertising without**
15 **the product is any more or less effective or any**
16 **less equivalent as an advertisement.**
17 BY MR. ZEULI:
18     Q. In the NASCAR example that you used in
19 your report, were you involved in the NASCAR
20 advertising campaign?
21     **A. I was not.**
22     Q. Do you know when it began?
23     **A. I do not.**
24     Q. Do you know how much money they spent on
25 the NASCAR advertising?

Page 80

1     MS. HEMERYCK: And just objection,
2 assumes facts not in evidence as to a single
3 campaign.
4     **THE WITNESS: These are, of course,**
5 **individual sponsorships arranged between teams and**
6 **corporations, so I don't know the details of their**
7 **arrangements at all, no.**
8 BY MR. ZEULI:
9     Q. And so, for example, one of those was
10 Stanley, I think you pointed out, correct?
11     **A. Correct.**
12     Q. You weren't involved in Stanley's NASCAR
13 advertising campaign?
14     **A. I was not.**
15     Q. You do not know when it began?
16     **A. I do not.**
17     Q. You don't know how much they spent on
18 that campaign?
19     **A. No.**
20     Q. You don't know how many advertisements
21 they ran prior to the one that you provided in
22 your report?
23     **A. Just to be clear, this is not an**
24 **advertisement. It is just an image of a NASCAR**
25 **race demonstrating the association between Stanley**

Page 81

1 Tools, I guess we could call it, and a particular
2 NASCAR team. So this is not print ad. It is an
3 image from an actual NASCAR race.
4     Q. And do you know how many times the
5 Stanley logo has appeared on a race car as part of
6 that NASCAR/Stanley campaign?
7     **A. No idea.**
8     Q. Let's talk about the Apple page that you
9 mention in your report. Again, you were not
10 involved in that campaign, correct?
11     **A. I was not.**
12     Q. You don't know when it began?
13     **A. I do not.**
14     Q. You don't know how much money Apple spent
15 on that campaign, correct?
16     **A. I do not.**
17     Q. You don't know how many pages like this
18 Apple published?
19     **A. I do not.**
20     Q. You don't know how many TV spots Apple
21 ran with that page?
22     MS. HEMERYCK: Objection, lack of
23 foundation.
24     **THE WITNESS: These are only print ads,**
25 **so I don't know.**

Carpenter, Gregory - 06/11/2015                        Pages 82..85

1        MR. ZEULI: Okay.

2        THE WITNESS: There was one famous TV ad

3 that included many of the people in the print ads,

4 but I don't remember how many more there were than

5 that.

6 BY MR. ZEULI:

7     Q. Turn, if you would, in your report to

8 Page 7 where the Roger Federer page is. Again,

9 you weren't involved in that campaign, correct?

10     A. I was not.

11     Q. Don't know when it began?

12     A. I do not.

13     Q. Don't know how much they spent on it?

14     A. No idea.

15     Q. Don't know how many times they ran print

16 ads like the piece that we see here on Page 7,

17 correct?

18     A. I don't.

19     Q. And in this page, it does include a

20 tennis shirt that Nike sells with the Nike logo,

21 correct?

22     A. It appears to be, yes.

23     Q. And also a headband or a sweatband?

24     A. It appears to be, yes.

25     Q. Now, this page, actually, this Federer

1 page, actually includes specific products that

2 Nike sells, correct?

3     A. It does, but I would argue it sells -- it

4 promotes all the goods and services that Nike

5 sells, not just the ones illustrated in the ad,

6 just like many Nike ads that show no products.

7     Q. And I think that brings us to the next

8 page, 8, right? That is one of the Jordan

9 advertisements or Nike advertisements that you say

10 shows no products of Nike, but, nonetheless,

11 advertises for Nike, correct?

12     A. Correct.

13     Q. And why is that? What is it on that page

14 that tells a consumer that that's a Nike ad?

15     A. The Air Jordan logo at the bottom right.

16     Q. Okay. Again, you weren't involved in

17 that Nike campaign, correct?

18     A. I was not.

19     Q. You don't know how many times Jordan's

20 image and the Nike logo in the bottom right were

21 shown together prior to this ad?

22     A. I do not.

23     Q. You don't know how much Nike spent on

24 that, correct?

25     A. I do not.

1        MR. ZEULI: Can you mark that as the next

2 exhibit? I think it is 43.

3        (JFS Exhibit 43 marked for

4        identification.)

5 BY MR. ZEULI:

6     Q. Professor, I have handed to you what I

7 have marked as Exhibit 43, which appears to be the

8 same image of the Jordan ad with the rings on

9 Page 8, correct, except that this image in 43 does

10 not include the Nike logo in the bottom right?

11     A. Correct.

12     Q. Is your opinion that Exhibit 43

13 advertises and promotes everything that Nike

14 sells?

15     A. It is an interesting question. That's a

16 very difficult question to answer. Michael Jordan

17 has been so strongly associated with Nike for so

18 long, I don't think there is a simple answer to

19 that question.

20     Q. What would you need to do to determine

21 that?

22     A. Well, I would have to think about that,

23 but without any obvious identification of Nike in

24 this, it, obviously, makes it more ambiguous, but

25 I don't think there is a simple answer. So I

1 think you would have to think about this very

2 carefully and explore other brand campaigns and

3 the Nike brand in greater detail. Those would be

4 my first inclinations of where to start, but

5 without considering that, that's a difficult and

6 complex question to answer.

7     Q. Would you want to show it to consumers to

8 see what their reaction was?

9     A. I think I would want to start with

10 looking at the Nike brand and other similar

11 situations to see related examples, to see what I

12 could learn from those.

13     Q. So, for example -- correct me if I'm

14 wrong, but if, for example, there was other

15 similar extensive advertising by Nike around this

16 image, that might tell you that, even without the

17 logo, it is an advertisement for all that Nike

18 sells?

19     A. Well, that's speculation. I don't know.

20 You're speculating about some hypothetical

21 associations and memories that consumers have. It

22 is hard for me to know just based on that

23 description.

24     Q. I guess I was trying to discuss with

25 you -- you were saying you would like to know more

Page 86

1   about previous ad campaigns that Nike had run.
2   What would you want to know?
3        A.  I didn't say previous ad campaigns.  I
4   said about the branding of Nike and the strength
5   of the association with Michael Jordan and Nike as
6   a place to start.
7        Q.  And what would that information tell you,
8   do you believe?
9        A.  It would tell me whether people would
10  think of the Nike brand without the logo even
11  being present on the page.
12       Q.  And you could determine that from looking
13  at what?
14       A.  I would have -- you are asking me -- you
15  are asking me to draw a hypothetical conclusion
16  from hypothetical research, which I'm not capable
17  of doing without more information, but I'm telling
18  you where I think I would start the process.  I
19  don't know where that process would lead until I
20  completed the first stage of the process.
21       Q.  I'm handing to you what was previously
22  marked as Jewel Exhibit 22.  Take a look at this
23  document for a moment.
24       A.  Okay.
25       Q.  You have not seen this document before,

Page 87

1   correct?
2        A.  I don't believe so.
3        Q.  I will represent to you it was a page
4   that was run in the basketball Hall of Fame
5   induction brochure that went around induction of
6   Mr. Jordan.  Is this an advertisement?
7        A.  I would have to consider that.  I have
8   not considered that question.  I don't know
9   anything about this other than what you have just
10  told me and what I can see.  So I don't have
11  enough information to draw a conclusion.
12       Q.  Okay.  What more information would you
13  need to know?
14       A.  Well, I need to know the context, the
15  context of the ad.  I would need to know who the
16  Onanians are.  I would need to know a little bit
17  about the details of this situation.
18       Q.  If the Onanians are friends of
19  Mr. Jordan, does that fact alone tip your opinion
20  one way or the other as to whether this Exhibit 22
21  is an advertisement?
22            MS. HEMERYCK:  Objection, lack of
23  foundation, if the witness has an opinion, and
24  incomplete hypothetical.
25            Sorry.

Page 88

1            THE WITNESS:  I don't have an opinion
2   about whether this is or isn't an ad yet.  So it
3   might or might not play a factor.  If the CEO of
4   Nike is a friend of Michael Jordan and ran an ad
5   like this, would that affect my opinion?  I
6   haven't considered that.  It still would be an ad
7   for -- certainly, the CEO of Nike and Michael
8   Jordan may be very good friends.  Does that make
9   this any less a commercial for Nike, an
10  advertisement for Nike?  I would say no.
11            In that case, I would argue it's -- so I
12  have not considered all the -- the role of
13  friendship in advertising is something you have
14  proposed to me that I have not considered before.
15  BY MR. ZEULI:
16       Q.  And you can't make that determination
17  just based on the page in front of you?
18       A.  No.
19       Q.  Because you would need to know the
20  context in which the page ran?
21       A.  Yes, and about the people who ran the
22  page, yes, just like I did in the case here with
23  Jewel-Osco, know something about their plans, the
24  enterprise, and something about this situation.
25       Q.  I'm handing to you what has been marked

Page 89

1   as Jewel Exhibit 17.  Would you take a look at
2   that for a moment?
3        A.  Yes.
4        Q.  I want you to assume that this text, just
5   as it appears, was a page that ran in the Sports
6   Illustrated Presents rather than the Jewel page,
7   okay?
8        A.  Okay.
9        Q.  So all the context, everything else you
10  have reviewed is the same, all right?
11            Is this an advertisement?
12            MS. HEMERYCK:  Objection, incomplete
13  hypothetical.
14            THE WITNESS:  Substantively, the context
15  is not the same, first of all, because I have no
16  idea who John Smith is, and I have no idea -- the
17  context is, in part, created by the history of
18  advertising of Jewel-Osco and the history
19  associated with Michael Jordan, and so this is
20  very incomplete.
21            I know the history about Michael Jordan
22  from what I have learned from this case and what I
23  have learned as a resident here of Chicago, and a
24  fan of the Bulls in some measure, but this is not
25  -- I don't know any more than this person's name

Page 90

1  is John Smith. I don't know. So the context
2  is -- in at least some conceptual sense, half the
3  context is missing.
4  BY MR. ZEULI:
5     Q. So what would you need to know about John
6  Smith to complete the context, so you could do the
7  analysis?
8     A. Well, again, you are asking me to
9  identify all the elements of the context of
10  branding and advertising that are relevant for
11  that. That's a very broad question among a
12  universe of things. I think that I'm not prepared
13  to identify all the elements that influence,
14  create the context for a communication to be seen
15  as an advertisement or not.
16     Q. Give me the top three. What top three
17  contextual things would you want to know about
18  Mr. Smith to help you determine whether this was
19  an advertisement?
20     A. So, as I said, I'm not prepared -- in
21  order to do the top three, I would have to know
22  some of the others, and I'm not prepared -- that's
23  a very broad, somewhat philosophical question
24  you've asked that I haven't considered. So I'm
25  not going to offer a less than well-formulated

Page 91

1  opinion under oath. I'm not going to do that.
2     Q. Let me hand you what has been marked as
3  Plaintiff's Exhibit 6, and, actually, this is just
4  a portion of the Sports Illustrated Presents
5  magazine. So it is the cover page and then it is
6  the very last page.
7        Why don't you review just the last page
8  for me, please. It is the page by State Farm.
9     A. Okay.
10     Q. Does State Farm's page promote and
11  advertise all of its products and services?
12     A. Well, I have never seen this before.
13     Q. As I mentioned, it was the last -- I
14  realize that.
15        As I mentioned, it is the last page in
16  the Sports Illustrated Presents magazine, the same
17  magazine that Jewel's page appeared in. Does it
18  promote all the products and services that State
19  Farm sells?
20     A. So my view on this, just to put this in
21  some context, to reach that conclusion about the
22  page under dispute here required more than 20
23  hours of analysis and consideration. You are
24  asking me in a question in a deposition to reach a
25  similar conclusion about an ad with which I have

Page 92

1  never seen before and have no context, so that is
2  very difficult. It certainly appears to be a
3  State Farm ad, but I have no way of forming a more
4  well-considered opinion. So I really can't offer
5  an opinion on that.
6     Q. What, again, contextually, what would you
7  need to know to be able to offer an opinion on
8  that?
9     A. Well, at the very minimum, I would need
10  to know something about the marketing and branding
11  efforts at State Farm. That would be a good place
12  to start. That would provide some of the context,
13  but I don't know what would be necessary after
14  beginning with that information.
15     Q. And just help me understand: What would
16  the marketing and branding efforts by State Farm
17  potentially tell you? In other words, what would
18  you be looking for in those?
19     A. Be looking for what they are seeking to
20  communicate to customers and what they have
21  communicated to customers in the past, just as in
22  the Jewel-Osco brand manual, what's their, we
23  call, "marketing the value proposition," the main
24  message they would like to communicate is.
25     Q. I'm handing to you what has been marked

Page 93

1  as Plaintiff's Exhibit 16. This is the cover page
2  to a different Sports Illustrated commemorative
3  edition that celebrated the Red Sox's win in 2007,
4  and if you turn to the second page of this
5  document, which is stamped 309, take a look at
6  this page for a moment, please.
7     A. Okay.
8     Q. Do you believe that this page is an
9  advertisement?
10     A. Again, I don't know much about Shaw's.
11  It is a grocery store. It appears to be similar
12  to an ad, but I would want to know more about
13  Shaw's, just like I described in the case of State
14  Farm.
15     Q. Do you know who Ed Gilligan was?
16     A. No.
17        MR. ZEULI: Mr. Gilligan was a longtime
18  American Express executive that died of a heart
19  attack recently.
20        Let me show you a page that appeared in
21  the New York Times.
22        Can we mark this as Exhibit 44?
23        (JFS Exhibit 44 marked for
24        identification.)
25

Page 94

1  BY MR. ZEULI:
2      Q.  After you have looked at this page, I
3  would like to know is it your opinion that this
4  page advertises everything that Delta sells.
5      A.  So it may very well.  I can't say -- I
6  can't form a clear, more definitive opinion about
7  it without knowing something about Delta's
8  marketing, whether this is part of a consistent
9  effort that would help propose this commercial
10 transaction.  So, again, I'm missing the context.
11 This is not something that I can do, as I'm
12 suggesting, instantly, but takes time, analysis,
13 thought, reflection to reach the conclusions that
14 I have reached.
15     Q.  Well, you can see that at the beginning
16 or at the top of the page in Exhibit 44, it's
17 remembering an exceptional leader and friend,
18 correct?
19     A.  I see that.
20     Q.  That it shows a picture of Mr. Gilligan?
21     A.  I see the picture of Mr. Gilligan, yes.
22     Q.  And that it is in the context of a
23 memorial, in essence, fair?
24     A.  It is remarking his loss, certainly, yes,
25 at least that's part of the context.

Page 95

1      Q.  And with that context, do you believe
2  that this page uses Mr. Gilligan's image and name
3  to promote all the Delta offers?
4      A.  It is a possibility.  I wouldn't know
5  without a more thorough analysis, but that's
6  certainly a possibility.
7      Q.  And the more thorough analysis that you
8  would have to undertake is the contextual analysis
9  that we are talking about?
10     A.  Yes, definitely.
11         MR. ZEULI:  Why don't we take a short
12 break and see what I have left.
13         MS. HEMERYCK:  Sure.
14         (Recess taken.)
15 BY MR. ZEULI:
16     Q.  Professor, I want to have you turn back
17 to Paragraph 22 of your report.
18     A.  Okay.
19     Q.  Take a look at the second sentence.  I
20 won't read it.  Just referring to the second
21 sentence, how does Jewel's page, which is
22 Plaintiff's Exhibit 5, does how it inform
23 consumers about Jewel-Osco?
24         MS. HEMERYCK:  Objection, asked and
25 answered.

Page 96

1          THE WITNESS:  I think I have already said
2  that it promotes the brand through the logo and
3  the tag line and other elements of the brand that
4  I had mentioned before.
5  BY MR. ZEULI:
6      Q.  That's what you mean in this sentence by
7  "informs the consumer about Jewel-Osco"?
8      A.  That's in part what I mean, yes.
9      Q.  What else?
10     A.  It says right here Jewel-Osco.  It tells
11 you that "Good things are just around the corner."
12 So it gives consumers awareness about the brand
13 and information about what to expect from the
14 brand at Jewel-Osco, and it associates Michael
15 Jordan with Jewel-Osco.  So that's a lot of
16 information in the advertisement.
17     Q.  Staying with informing the consumers
18 about Jewel-Osco, what, other than "Good things
19 are just around the corner," does this page,
20 Jewel's page, inform consumers about?
21     A.  It informs them about a connection
22 between Michael Jordan and Jewel-Osco.  It informs
23 them about that Michael Jordan is a fellow
24 Chicagoan who was just around the corner for so
25 many years.  So there is a lot of information here

Page 97

1  about the store and about its connection with
2  Michael Jordan and what to expect of the store.
3      Q.  But I was focusing for a moment on your
4  statement that Jewel's page informs consumers
5  about Jewel-Osco, right?  And just Jewel-Osco for
6  a moment.  We will get to Mr. Jordan in a minute.
7          Other than the "Good things are just
8  around the corner," in other words, informing the
9  consumer that good things are just around the
10 corner, is there anything else in this page that
11 it informs consumers about Jewel-Osco?
12     A.  Yes.
13         MS. HEMERYCK:  Objection, asked and
14 answered.
15 BY MR. ZEULI:
16     Q.  What else?
17     A.  I think I have already said that it
18 informs them about a connection between Michael
19 Jordan and Jewel-Osco.
20     Q.  Okay.  So it informs consumers about
21 Jewel-Osco having good things around the corner
22 and, in your opinion, a connection between
23 Jewel-Osco and Mr. Jordan?
24     A.  Correct.
25     Q.  Anything else?

Page 98

1    A.  It informs them -- the text provides some
2  literal information.  It offers
3  congratulatory -- it congratulates Michael Jordan,
4  but it also talks about his connection to Chicago,
5  and, obviously, suggests a connection between
6  Jewel-Osco and Michael Jordan.
7    Q.  Anything else on how this page informs
8  consumers about Jewel-Osco, specifically about
9  Jewel-Osco, than what you just listed?
10   A.  I think those are -- I think those are
11 the major points I have testified to already, yes.
12   Q.  All right.  The next part of the sentence
13 talks about the meaning that the page conveys as
14 its owner's intent, correct?
15   A.  It does.
16   Q.  Okay.  What meaning did Jewel-Osco intend
17 to convey in your opinion?
18   A.  It is the meaning described in their
19 brand manual.
20   Q.  Which is?
21   A.  Described in Paragraph 19 of my report.
22   Q.  Okay.  Does Jewel's page convey any other
23 meaning other than what you have identified in
24 Paragraph 19 of your report?
25   A.  The meaning conveys an association with

Page 99

1  Michael Jordan and the meaning linked to that.
2    Q.  And what is that meaning?
3    A.  So I didn't analyze the brand equity
4  associated with Michael Jordan, but he is an
5  extraordinarily famous athlete and clearly one of
6  the most sought after endorsers of all kinds of
7  products.  So the value that he brings to those
8  relationships such as Nike and others is being
9  brought here.  I wasn't asked to specifically
10 consider what that was, but it is clear there is
11 enormous value associated with an endorsement from
12 Michael Jordan.
13   Q.  What is your basis -- well, do you
14 believe that Jewel-Osco intended to convey a
15 meaning that Jewel-Osco and Jordan are connected?
16   A.  I wasn't asked to consider whether they
17 intended or not.  It is suggested here, certainly.
18   Q.  Okay.  With which current customers does
19 Jewel's page propose a commercial transaction?
20   A.  All of its current customers.
21   Q.  With which potential customers does
22 Jewel-Osco's page propose a commercial
23 transaction?
24   A.  All of its potential customers.
25   Q.  And, again, that commercial transaction

Page 100

1  is a proposal for all goods and services
2  associated with Jewel-Osco, correct?
3    A.  Correct.
4      MR. ZEULI:  That's all I have.
5      MS. HEMERYCK:  I actually have one
6  question -- well, I should never say that.  I
7  think I have one question.
8               EXAMINATION
9  BY MS. HEMERYCK:
10   Q.  So, Professor Carpenter, can you take a
11 look at Plaintiff's Exhibit 5 again?
12   A.  Yes.
13   Q.  Okay.  So Defendant's counsel asked you
14 how Plaintiff's Exhibit 5 informs consumers about
15 Jewel-Osco.  Do you recall that?
16   A.  I do.
17      MR. ZEULI:  Objection, misstates the
18 question and testimony.
19 BY MS. HEMERYCK:
20   Q.  And you specifically mentioned the "Good
21 things are just around the corner" slogan, right?
22   A.  I did.
23   Q.  I want you to take a look.  Does that
24 page include the Jewel-Osco logo as well as the
25 slogan?

Page 101

1    A.  It does.
2    Q.  And does the Jewel-Osco logo inform
3  viewers of the ad about Jewel-Osco in any way?
4    A.  Well, it evokes the associations that
5  people have built up with the Jewel-Osco brand
6  through its advertising and communication and
7  through people's experience in Jewel-Osco over the
8  years.
9    Q.  And what sorts of associations would
10 those be?
11   A.  Well, the associations they are seeking
12 to cultivate have to do with or are described in
13 their brand manual, which are described in
14 Paragraph -- I believe it is -- 19 of my report.
15 So they describe the idea that "Good things are
16 around the corner."  It is intended to communicate
17 to consumers that good things are in store, remind
18 them that it is in their neighborhood store.  It
19 is also intended to promise that fresh local
20 produce, great value, good people, one-stop shop,
21 and community involvement can all be found at the
22 neighborhood Super Value banner store.
23   Q.  And you are saying that is true for the
24 Jewel-Osco logo and well as the slogan?
25      MR. ZEULI:  Objection, leading.

**Page 102**

1    THE WITNESS:  It is true that the slogan

2    was meant to summarize that and the Jewel-Osco

3    brand is meant to evoke those thoughts and

4    feelings and associations.

5    BY MS. HEMERYCK:

6        Q.  Professor, with regard to your testimony

7    that you just gave with regard to the association

8    of the logo and slogan, that's based on your

9    review, and your review only, of the information

10   that you considered in this case, correct?

11       A.  That's correct.

12       Q.  It is not based on any analysis of

13   consumers that actually saw this particular page,

14   is it?

15       A.  That's correct.

16       MR. ZEULI:  All right.  Thank you.

17       We will read and sign.

18       (Whereupon, the deposition of GREGORY

19        CARPENTER concluded at 11:57 p.m.)

20                  * * * * *

21

22

23

24

25

**Page 103**

1                REPORTER'S CERTIFICATE

2

3

4        I, HEATHER PERKINS, Registered Merit
     Reporter, Certified Realtime Reporter, and Notary
     Public, hereby certify that the foregoing is a

5    true and accurate transcript of the deposition of
     said witness, who was first duly sworn by me on

6    the date and place hereinbefore set forth.

7        I FURTHER CERTIFY that I am neither
     attorney nor counsel for, nor related to or

8    employed by, any of the parties to the action in
     which this deposition was taken, and further that

9    I am not a relative or employee of any attorney or
     counsel employed in this action, nor am I

10   financially interested in this case.

11       I FURTHER CERTIFY that the cost of the
     original transcript has been charged to the party

12   noticing the deposition, unless otherwise agreed
     upon by counsel, and that copies have been made

13   available to all parties at the same cost, unless
     otherwise agreed upon by counsel.

14

15       I FURTHER CERTIFY that the reading and
     signing of the deposition was reserved by the
     witness and will be performed in accordance with

16   the attached letter.

17       Dated this _____day of _____, ____.

18

19

20

21

22       Heather M. Perkins, RMR, CRR
         Pro-Systems Court Reporting
         4305 Bryant Avenue South

23       Minneapolis, Minnesota  55409
         (612) 823-2100

24

25

**Page 104**

1            ACKNOWLEDGMENT OF DEPONENT

2        I, GREGORY CARPENTER, hereby certify that I

3    have read the foregoing transcript of my testimony

4    and that same is true and correct to the best of

5    my knowledge and belief, except as follows:

6    PAGE & LINE NO.    CORRECTION              REASON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        GREGORY CARPENTER

         SWORN TO AND SUBSCRIBED BEFORE ME

24   this _____day of _____, _____.

                   NOTARY PUBLIC

25